## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BEHAVIORAL HEALTH INDUSTRY
NEWS, INC. D/B/A OPEN MINDS,

        Plaintiff,

    v.

MENTAL HEALTH SYSTEMS, INC.,

        Defendant.

Civil Action

No.: 1:16-cv-01874-CCC

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE, TO TRANSFER THIS CASE TO THE SOUTHERN DISTRICT OF CALIFORNIA

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..........................................................................................1

II.   BACKGROUND .........................................................................................2

      A.    The Parties ..................................................................................2

      B.    Limited Contracts for Services in California ......................................5

III.  ARGUMENT................................................................................................12

      A.    The Court Lacks Jurisdiction over Defendant Under
            Pennsylvania's Long-Arm Statute and the Due Process Clause
            of the Fourteenth Amendment to the United States Constitution ......12

            1.    MHS Does Not Have "Continuous and Substantial"
                  Contacts With Pennsylvania ...................................................13

            2.    MHS Has No Meaningful Specific Contacts With
                  Pennsylvania ...........................................................................14

      B.    In the Alternative, Plaintiff's Claims Should be Transferred to
            the Southern District of California for the Convenience of
            Parties and Witnesses ........................................................................17

IV.   CONCLUSION............................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Leather Corp. v. Altama Delta Corp.*,
    785 F. Supp. 494 (M.D. Pa. 1992)......................................................14

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)............................................................................15, 16

*Burstein v. Applied Extrusion Techs., Inc.*,
    829 F. Supp. 106 (D. Del. 1992)........................................................20

*C.L. Grimes v. Vitalink Comm. Corp.*,
    17 F.3d 1553 (3d Cir. 1994) ..............................................................15

*Del Raso v. Stanly Kaplan Educ. Center, Ltd.*,
    1995 WL 66713 (E.D. Pa. Feb. 15, 1995) .........................................19

*Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.*,
    746 F.2d 208 (3d Cir. 1984) ..............................................................13, 14

*Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*,
    988 F.2d 476 (3d Cir. 1993) ..............................................................12

*Hershey Co. v. Pagosa Candy Co.*,
    2008 WL 1730538 (M.D. Pa. Apr. 10, 2008).....................................12

*Hillard v. Guidant Corp.*,
    76 F.Supp.2d 566 (M.D. Pa. 1999)....................................................19

*International Shoe Co. v. State of Washington*,
    326 U.S. 310 (1945)............................................................................12

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995) ................................................................18

*Luca Oil Drilling Co. v. Gulf Oil Corp.*,
    593 F. Supp. 1198 (W.D. Pa. 1984)...................................................19

*Manor Care, Inc. v. Continental Ins. Co.*,
    2003 WL 22436225 (E.D. Pa. 2003) .................................................21

*Mellon Bank (East) PSFS, N.A. v. Farino*,
   960 F.2d 1217 (3d Cir. 1992) .............................................................12, 14, 15

*National Property Investors VIII v. Shell Oil Co.*,
   917 F. Supp. 324 (D.N.J. 1995)...........................................................19

*Pennzoil Products Co. v. Colelli & Assocs., Inc.*,
   149 F.3d 197 (3d Cir. 1998) ...............................................................15

*Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*,
   675 F.2d 587 (3d Cir. 1982) ...............................................................13

*Royal Gist-Brocades N.V. v. Sierra Prods. Ltd.*,
   1997 WL 792905 (E.D. Pa. Dec. 22, 1997).........................................13

*Securities and Exchange Comm. v. First Nat. Fin. Corp.*,
   392 F. Supp. 239 (N.D. Ill. 1975).......................................................20

*Stewart Org., Inc. v. Ricoh Corp.*,
   487 U.S. 22 (1988)..............................................................................19

*Strick Corp. v. A.J.F. Warehouse Distributs., Inc.*,
   532 F. Supp. 951 (E.D. Pa. 1982).......................................................14

*USA v. Commito, Mattison, Monica E. Oss*,
   88-CR-00597-MHP-3 (N.D. Cal. September 20, 1988)......................4

*USA v. Commito, Mattison, Monica E. Oss*,
   CR-88-434A (N.D. Ga. September 21, 1988) ......................................4

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964)............................................................................17

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)......................................................................13, 15

**STATUTES**

28 U.S.C. § 1391(a)(2)..............................................................................17

28 U.S.C. § 1404(a) ....................................................................17, 18, 20, 21

42 P.C.S.A. § 5322(b) ...............................................................................12

**OTHER AUTHORITIES**

15 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3847 (2d ed. 1986) ............................................................................18

U.S. Const. amend. XIV ...........................................................12, 13, 14

Defendant Mental Health Systems, Inc. ("Defendant" or "MHS") submits

this Brief in support of its Motion to Dismiss Plaintiff's ("Open Minds" or

"Plaintiff") Complaint for lack of personal jurisdiction or, in the alternative, to

transfer this case to the U.S. District Court for the Southern District of California.

## I.     INTRODUCTION

Plaintiff Open Minds' action is blatant forum shopping and a feeble attempt

to avoid being sued for fraud in California by a California non-profit for work that

Open Minds supposedly performed for the non-profit in California.  Plaintiff only

filed its Pennsylvania state court action after MHS sent a demand letter specifically

outlining Open Minds' egregious billing and questionable relationship with MHS's

now former Chief Executive Officer ("CEO"), Kim Bond ("Ms. Bond"), and her

husband, David Conn ("Mr. Conn"), who was also an employee of MHS and

secretly, a paid consultant of Open Minds.  The controversy concerning Open

Minds and its relationship with Ms. Bond and Mr. Conn was recently the subject of

a substantial audit and investigation by the County of San Diego ("San Diego

County"), which concluded that only $145,100 of Open Minds' work was

supported by actual contracts, even though company has billed MHS

approximately $1.4 million in questionable expenses and for services it supposedly

rendered in California.  Now, according to news reports, there is an investigation

by the San Diego County District Attorney's office.

Following the County's investigation and its findings, MHS issued a demand letter seeking return of $1 million and specifically outlining the egregiousness of Open Minds' conduct. To avoid being sued in California in a city where the lawsuit would likely be subject to further scrutiny by investigating authorities, Open Minds preemptively filed in Pennsylvania state court. The case however, should be dismissed and or transferred to the Southern District of California because MHS, a California non-profit, which provides mental health and drug and alcohol rehabilitation services to California residents, has no contacts with Pennsylvania, the consulting work for which MHS retained Open Minds was to be performed in California, as the limited contracts indicate, and the key witnesses and evidence are located in California, including Ms. Bond and Mr. Conn. Accordingly, MHS requests that the Court dismiss the case for lack of personal jurisdiction or transfer it to the Southern District of California, which is the more appropriate venue.

## II.     BACKGROUND

### A.     The Parties

MHS is a non-profit California corporation founded in 1978 to improve the lives of individuals, families and communities facing substance abuse and behavioral health challenges. (Declaration of Chief Executive Officer ("CEO") James C. Callaghan Jr. ("Callaghan Decl."), attached hereto as Ex. A, ¶ 2; *see*

http://www.mhsinc.org/. Located in San Diego, California, MHS provides mental health and drug and alcohol rehabilitation services to California residents throughout Southern and Central California. (*Id*.) It operates approximately 70-75 programs throughout the state of California but mainly in San Diego County. (*Id*.) MHS's programs are mainly funded by San Diego County and also Riverside, Fresno, Santa Barbara, San Bernardino and Contra Costa Counties. (*Id*. ¶ 3.) MHS also receives federal funding through the United States Department of Housing and Urban Development ("HUD") and through the various county contracts. (*Id*.) MHS does not provide any services at all in Pennsylvania and does not receive any funding from the state of Pennsylvania. (*Id*. ¶ 4.)

From approximately 2007 until she was terminated in June 2016, Ms. Bond was the President and CEO of MHS. (*Id*. ¶ 5.) Ms. Bond is married to Mr. Conn, who was also employed at MHS until he was also terminated in June 2016. (*Id*.) Mr. Conn's job title prior to his termination was Senior Vice President of Government Relations. Michael Hawkey was the Chief Financial Officer ("CFO") at MHS until approximately February 2016, when his employment was suspended by Ms. Bond. His employment has since been terminated. All three reside in San Diego County. (Declaration of Rebecca S. Roberts ("Roberts Decl."), attached hereto as Ex. B, ¶ 2.)

Behavioral Health Industry News, Inc. d/b/a Open Minds is a health care consulting company incorporated in Delaware, which it appears at the time of filing its complaint in Pennsylvania state court on August 5, 2015, was not registered in the state of Pennsylvania. Open Minds only recently filed its statement of registration on September 12, 2016. (*Id*. ¶ 3, Exs. 1-2.)

In approximately 1988, the president and founder of Open Minds, Monica Oss ("Ms. Oss"), was indicted in what was perhaps the largest health care fraud case at the time involving prepaid health-care plans sold to labor unions. *See USA v. Commito, Mattison, Monica E. Oss*, 88-CR-00597-MHP-3 (N.D. Cal. September 20, 1988); *USA v. Commito, Mattison, Monica E. Oss*, CR-88-434A (N.D. Ga. September 21, 1988). Federal grand juries in San Diego, San Francisco, Chicago, Atlanta and Baltimore charged an organized crime figure and his business partners, including Ms. Oss, with paying kickbacks to obtain contracts to provide optical, dental and other services to unions and employee groups across the county. (Roberts Decl. ¶ 3, Ex. 2A.) Ms. Oss was indicted in Georgia and California and the criminal case against her was ultimately transferred to San Francisco. It is unknown how the criminal case against Ms. Oss was resolved but it appears she was a defendant in the criminal proceeding for several years.

**B.    Limited Contracts for Services in California**

MHS retained Open Minds to provide consulting services to assist its business and programs **in California**.  MHS and Open Minds entered into three contracts for limited amounts: (1) a December 2010 agreement to assist it in identifying a vendor to provide software for storage of MHS's electronic healthcare ("HER") records relating to its programs in California for $51,000; (2) a June 2012 agreement to identify for-profit companies that specialize in autism services for possible acquisition for $36,000; and (3) a March 1, 2013 agreement to provide MHS with an interim business development director (Steve Ramsland) for its subsidiary Novata, which was also located in San Diego, California for $57,600. (*Id.* ¶ 4, Exs. 3-5.)  These three contracts totaled only approximately $145,100 in value and yet, Open Minds billed MHS over $1.4 million for its "consulting" services, approximately $40,000 a month.  (*See* Complaint, attached hereto as Ex. C.)  While it is highly questionable whether the work Open Minds billed for was actually performed, requested by MHS, or of any real value, even the Open Minds invoices make clear that work it allegedly performed was to benefit MHS's programs and business in California and performed in California.

All of the contracts expressly contemplate that Open Minds was to perform "on-site" work, e.g., at MHS's offices in San Diego.  For example, the software implementation contract provides that Open Minds would conduct an "on-site"

assessment of MHS's software needs, present its recommendations "on-site", and then meet with MHS and possible vendors "on-site." (*Id*. ¶ 4, Ex. 3.) The interim business director agreement contemplates that the proposed director would work out of MHS's office in San Diego, to obtain fee for service contracts for Novata, also in California. (*Id*. ¶ 4, Ex. 5.) Similarly, the consulting acquisition contract contemplates that Open Minds would be "on-site" to discuss MHS's strategy for identifying and evaluating possible autism companies for acquisition. (*Id*. ¶ 4, Ex. 4.)

In regards to the acquisition contract, the company that was ultimately identified by Open Minds and acquired by MHS was the Center for Autism Research, Evaluation and Service (CARES), which is also a San Diego company. (*Id*. ¶ 5, Ex. 6.) This acquisition was hugely disastrous and MHS's recent financial difficulties, which placed its contracts with San Diego County in jeopardy, can be attributed to this transaction, in which Open Minds was involved and may have orchestrated. MHS believes it has sustained substantial damages due to the CARES acquisition. The key witnesses to the CARES acquisition, which likely include Ms. Bond, Mr. Conn, and the former principals of CARES, are all California residents. (*Id*. ¶¶ 2, 5; Ex. 6.)

In addition to the "consulting work" Open Minds allegedly performed for MHS, Open Minds also convinced MHS to "co-sponsor" a for-profit convention

called the "California Planning & Performance Management Institute" which was held in San Diego in August 2014. (*Id*. ¶ 6, Exs. 7-8.) Under the agreement, MHS was required **to pay** approximately **70% of the expenses** for the event and yet, Open Minds received **83% of the profit**. (*Id*.) Open Minds held this event in San Diego again in August 2015 (which Mr. Conn promoted) and even this year, August 24-25, 2016. (*Id*. ¶ 6, Exs. 9-10.)

Despite the fact that work called for by the three contracts was completed by the latest in November 2013, Open Minds continued to bill MHS approximately $40,000 a month for its "consulting services," even though little work product exists for this alleged work. Numerous witnesses, specifically MHS current and former employees, all located in California, will be able to testify about the little to no work performed by Open Minds, which had little to no value for the company. MHS employees, all in California, repeatedly complained about the expense and value of Open Minds to Ms. Bond, to no avail.

Open Minds' invoices, which are very vague about what services Open Minds actually performed, do reflect that much of the work it was allegedly billing for was "on-site" in San Diego. (*See* Complaint, Ex. C.) For example, most of the Open Minds' billing entries are by Senior Associate Joe Naughton Travers ("Mr. Travers"), who apparently traveled to San Diego for approximately 1 week each month, occasionally on first class plane tickets, and stayed at the Coronado Island

Marriott Resort and Spa (a luxury hotel nowhere near MHS's office) at rates between $300-$500 a night, all on MHS's dime.  Mr. Travers would expense multiple meals a day at high end restaurants, rent limos and charge car rentals and valet parking for the entire week to MHS, even though his billing entries reflect that he only worked "on-site" in San Diego for 2-3 day periods.  Between 2014 and 2016, Mr. Travers expensed from $2,327.04 to $6,851.93 a month to MHS.  **His expenses alone** from just January 1, 2014 through January 31, 2016 exceed $105,000.  (Roberts Decl. ¶ 7, Ex. 11.)

While Mr. Travers would blankly bill MHS 12 hours a day for these "on-site" visits to MHS's offices, which are located in central San Diego, his meal expenses for these same days reflect that he was having expensive lunches in Coronado – an island in San Diego located nowhere near MHS's offices. Regardless of whether Mr. Travers fraudulently billed MHS for his time or expenses, it is clear that the alleged work he was supposedly performing was at least meant to be in San Diego.  Notably, the billing entries in the invoices submitted by Open Minds do not reflect "meetings" between MHS and Open Minds **in Pennsylvania**.  Other than the "on-site" visitations, the entries reflect emails and calls on alleged work Open Minds was performing to assist MHS with its EHR software or to offload CARES/Novata, which Open Minds had convinced MHS to acquire.  Again, all this work was supposedly to benefit MHS's business

and programs located **in California**.  To the extent that MHS's former CEO Ms. Bond and/or Mr. Conn may have traveled to visit Open Minds in Gettysburg, MHS submits this was likely for their own personal benefit, not MHS's and did not concern "the consulting work" Open Minds was supposedly performing for MHS.

During the summer of 2015, MHS began having financial difficulties. During the fall of 2015, MHS tried to terminate Open Minds' services and Ms. Oss offered to credit any work performed during the summer of 2015 and through the end of the year (again for alleged work on the EHR records and offloading Novata, all done in California).  Open Minds now claims that these amounts are owed because Ms. Bond agreed to pay them.

Then, in February 2016, Mr. Hawkey, MHS's CFO, sent a whistleblower letter to MHS's main funder, San Diego County, alleging various improprieties, complaining about the exorbitant amounts billed by Open Minds, and the questionable relationship between Open Minds and Ms. Bond and Mr. Conn.  (*Id*. ¶ 8, Ex. 12.)  Mr. Hawkey's letter triggered an extensive audit and investigation into his allegations, which culminated in the County issuing a report and placing MHS on notice that they were in breach of their funding contracts.  (*Id*. ¶ 8, Ex. 13.)  The County's investigative report questioned the value of the services rendered by Open Minds and indicated the contracts justified only approximately $145,100 in expenses.  (*Id*. ¶ 8, Ex. 14.)  Mr. Hawkey's whistleblower allegations and the

County's investigation of MHS have been substantially covered by the media.  (*Id.* ¶ 9, Exs. 15-17.)  According to news reports, the San Diego District Attorney is also investigating the matter.  (*Id.* ¶ 9, Ex. 16.)

In response to Mr. Hawkey's whistleblower allegations and the County's investigation, MHS's board appointed a special committee to conduct an internal investigation.  During the investigation, it was discovered that Mr. Conn had an agreement with Open Minds which provides for monetary compensation.  Mr. Conn's agreement expressly provides that he may be compensated as a "Senior Associate" of Open Minds (the same title as Mr. Travers and Mr. Ramsland, who served as the interim business director for Novata).  It provides:

> $133 per billable consultation hour for billing under the standard hourly rate schedule; $100 per billable consultation hour for billing under the discounted hourly rate schedule; $1000 per six-hour training day; or one-third (33 1/3%) of the fixed fee/ billing fee paid by Company client for Consultant's service.

(Roberts Decl. ¶ 10, Ex. 18.)

Furthermore, the Agreement also provides that Mr. Conn is also eligible to receive commission payments (2% or 10%) for securing new consultation projects for **clients like MHS**:

> Commission On New Sales:  Consultant shall also be paid a commission on sales of new consultation projects to client organizations.  To be considered a "new consultation project," the project must be one that no *Open Minds* team member is currently in the process of

development.  For each prospective new consultation project, Consultant role may be:

- Referral/ relationship development – identify new project, provide input on scope, review project proposal and agreement with client, secure client approval of agreement (2% commission on fees as paid)

- Referral/ relationship development and proposal preparation – identify new project, create work plan and pricing model for project, write scope of work and understanding sections of proposal; review final proposal, review project proposal and agreement with client, secure client approval of agreement (10% commission on fees as paid).

Mr. Conn is also entitled to 30% of net revenues of any publications he develops and OM sells on its website.  (*Id.*)

If Mr. Conn in fact received compensation from Open Minds, this would amount to an illegal kickback.  Regardless, the inherent conflict of interest is obvious and may explain why Open Minds' exorbitant billings continued as long as they did.  Given that Mr. Conn is a California resident, it is highly likely that his bank records would be in California.   Mr. Conn and Ms. Bond were terminated shortly after the County's report came out.  After the County report came out and Mr. Conn and Ms. Bond were terminated, MHS issued a demand letter to Open Minds demanding repayment of approximately $1 million.  (Roberts Decl. ¶ 10, Ex. 19.)  It is only after receiving that letter Open Minds filed suit in Pennsylvania state court.

# III.    ARGUMENT

## A.    The Court Lacks Jurisdiction over Defendant Under Pennsylvania's Long-Arm Statute and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

In order to defeat this Motion, Plaintiff bears the burden of establishing personal jurisdiction exists under Pennsylvania's long-arm statute and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See*, *e.g.*, *Hershey Co. v. Pagosa Candy Co.*, 2008 WL 1730538, *2 (M.D. Pa. Apr. 10, 2008). Specifically, Plaintiff must establish "with reasonable particularity sufficient contacts between the defendant and the forum state." *Id*. (quoting *Mellon Bank (East) PSFS, N.A. v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)). Plaintiff cannot meet this burden.

Pennsylvania's long-arm statute, 42 P.C.S.A. § 5322(b), "reaches as far as the Due Process Clause of the Fourteenth Amendment to the United States Constitution permits." *Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 481 (3d Cir. 1993). Due process mandates that the exercise of personal jurisdiction over a non-resident defendant is appropriate only when the defendant has "certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). A plaintiff must demonstrate that the defendant's conduct and

connection with the forum state are such that the defendants may "reasonably expect to be haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

An analysis of whether personal jurisdiction exists under the Due Process Clause requires separate consideration of two categories, "specific" and "general" jurisdiction. As explained by the Third Circuit,

> Personal jurisdiction over a nonresident defendant may be asserted in two situations. The first, "general jurisdiction," exists when the claim does not arise out of or is unrelated to the defendant's contacts with the forum. [*citations omitted.*] The second, "specific jurisdiction," is invoked when the claim is related to or arises out of the defendant's contacts with the forum.

*Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.*, 746 F.2d 208, 211 (3d Cir. 1984). Plaintiff cannot establish either general or specific jurisdiction.

> 1.  *MHS Does Not Have "Continuous and Substantial" Contacts With Pennsylvania.*

For general personal jurisdiction to exist, a plaintiff must show that the defendant "maintained 'continuous and substantial' forum affiliations." *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 588 (3d Cir. 1982). In order to meet this burden, Open Minds here must show that MHS has conducted a "continuous and systematic part of [its] business" in Pennsylvania, or that its contacts with Pennsylvania are "extensive and pervasive." *Royal Gist-*

*Brocades N.V. v. Sierra Prods. Ltd.*, 1997 WL 792905, *2 (E.D. Pa. Dec. 22, 1997).

Plaintiff does not allege a single fact demonstrating that MHS conducts any business in Pennsylvania, much less that it has any contacts with Pennsylvania that rise to the level of being "continuous and systematic." To the contrary, MHS has no contacts with Pennsylvania, it does not do business there, it does not run any programs there, and it does not receive any funding from the state of Pennsylvania. (Callaghan Decl. ¶4.) Accordingly, the exercise of general jurisdiction over MHS would violate the Due Process Clause.[1]

### 2. *MHS Has No Meaningful Specific Contacts With Pennsylvania.*

Specific jurisdiction exists "when the plaintiff's 'claim is related to or arises out of the defendant's contacts with the forum.'" *Mellon Bank (East PSFS), N.A. v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992) (quoting *Dollar Sav. Bank*, 746 F.2d at 211). The Third Circuit applies a two-part test in making this determination:

> To make a finding of specific jurisdiction, a court generally applies two standards, the first mandatory and the second discretionary. . . First, a court must determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." [*citation*

---

[1] Federal courts in Pennsylvania have refused to exercise general jurisdiction in cases where the defendant had far more contacts with Pennsylvania than the defendant in this action. *See, e.g., Allied Leather Corp. v. Altama Delta Corp.*, 785 F. Supp. 494, 497-8 (M.D. Pa. 1992) (holding that general jurisdiction was not established, even though defendant exchanged numerous phone calls and correspondence with person in Pennsylvania and picked up shipments from Pennsylvania); *Strick Corp. v. A.J.F. Warehouse Distribus., Inc.*, 532 F. Supp. 951 (E.D. Pa. 1982) (holding that general jurisdiction was not established, even though defendant had seven-year business relationship with plaintiff located in Pennsylvania and derived some revenue from Pennsylvania).

> *omitted.*] Second, assuming minimum contacts have been
> established, a court may inquire whether "the assertion of
> personal jurisdiction would comport with 'fair play and
> substantial justice.'"

*Pennzoil Products Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 201 (3d Cir. 1998).

Here, Plaintiff cannot prove even the first part of this test.

To establish minimum contacts, a plaintiff must demonstrate "some act by
which the defendant purposely avail[ed] itself of the privilege of conducting
business within the forum State, thus invoking the protection and benefits of its
laws." *Id.* at 203 (quoting *Mellon Bank*, 960 F.2d at 1221). In ascertaining
specific jurisdiction, the court must assess **the defendant's activities, not the in-
state plaintiff's activities**. *World-Wide Volkswagen Corp.*, 444 U.S. at 298 ("The
mere unilateral activity of those who claim some relationship with a nonresident
defendant cannot satisfy the requirement of contact with the forum State.")
(internal citation omitted). More specifically, the plaintiff must show that the act
of the defendant that forms the basis of jurisdiction "is substantially related to the
claim being adjudicated." *C.L. Grimes v. Vitalink Comm. Corp.*, 17 F.3d 1553,
1559 (3d Cir. 1994). A contract between a resident plaintiff and an out-of-state
defendant alone does not automatically establish sufficient minimum contacts.
*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). Whether the
defendant purposefully established minimum contacts with the forum depends on

"prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id*. at 479.

As discussed above, all of the alleged work (or as the case may be, non-work) performed by Open Minds for MHS was to benefit MHS's business and programs in California. The limited contracts expressly contemplate that the "consulting work" was to be performed "on-site" in San Diego. Open Minds' invoices similarly reflect this and indeed, a good portion of the excessive billing can be attributed to Mr. Travers' trips to San Diego for his supposed "on-site" work. In contrast, none of the contracts contemplate meetings or presentations in Pennsylvania. Neither do the invoices. Open Minds cannot point to any trips or work that MHS made to Pennsylvania relating to the "consulting work" it was supposedly performing for MHS. And why would it be able to? Open Minds was hired to consult MHS about its business and its programs in California, not the other way around. The fact that Open Minds employees may have drafted emails or PowerPoints or participated in conference calls from their offices in Pennsylvania does establish that MHS purposefully availed itself of the forum. It was also offend the notion of fair play and substantial justice to haul a California not-profit, which has no contacts with the state and has been effectively defrauded by a Delaware company for alleged work that was to be performed in California.

**B.    In the Alternative, Plaintiff's Claims Should be Transferred to the Southern District of California for the Convenience of Parties and Witnesses.**

Should the Court decline to dismiss this case for lack of personal jurisdiction, it should be transferred to the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1404(a).  Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The purpose of this statute is to protect the parties, witnesses, and the public against unnecessary inconvenience and expense.  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  Transferring this action to the Southern District of California will further that purpose; keeping the case here will defeat it.

The Southern District of California can exercise personal jurisdiction over MHS because it is a resident of California and, specifically that District.  It can also exercise personal jurisdiction over Open Minds since it has conducted extensive activity in California and in particular, San Diego.  Moreover, venue is proper in the Southern District of California because the vast majority of the events giving rise to the claim occurred in California.  *See* 28 U.S.C. § 1391(a)(2).  Accordingly, jurisdiction is proper in the Southern District of California.

The case of *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995), is instructive. In *Jumara*, the Third Circuit held that in ruling on a § 1404(a) motion to transfer, the court should "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Id*. at 879, *quoting* 15 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 3847 (2d ed. 1986). The court recommended that the following factors be considered when determining a motion to transfer venue: (1) the plaintiff's forum preference as shown in the original choice of forum; (2) the defendant's preferred forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses, to the extent that they may actually be unavailable for trial in one forum; and (6) the location of books and records, to the extent that they could not be produced in one of the fora. *Id*. at 879-80. In addition, the Third Circuit recognized that several public interest factors must be considered: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id*.

Moreover, the interest in deciding local controversies at home and the familiarity of a Southern District of California judge with the applicable state law in a diversity case such as this warrant a transfer of venue. *See Luca Oil Drilling Co. v. Gulf Oil Corp.*, 593 F. Supp. 1198, 1202 (W.D. Pa. 1984) (finding transfer from Pennsylvania to Texas appropriate in contract case where Texas law would govern case, events underlying claim occurred in Texas, and Texas had significant interest in protecting contractual rights of its corporations).

A plaintiff's choice of forum is also diminished considerably in cases such as this one where the central events of the lawsuit occurred outside the chosen forum. *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988); *National Property Investors VIII v. Shell Oil Co.*, 917 F. Supp. 324, 327 (D.N.J. 1995); *Hillard v. Guidant Corp.*, 76 F.Supp.2d 566, 569 (M.D. Pa. 1999); *Del Raso v. Stanly Kaplan Educ. Center, Ltd.*, 1995 WL 66713 at *3 (E.D. Pa. Feb. 15, 1995) ("the deference accorded a plaintiff's choice of forum is reduced where few if any of the underlying operative facts occurred there").

These factors weigh heavily in favor of transferring this action to the Southern District of California. As discussed above, this case concerns excessive billings and possible fraud rendered on a California non-profit for work that was to be performed in California to benefit the non-profit's California based business and programs. Nearly all of the key witnesses, including Ms. Bond, Mr. Conn, Mr.

Hawkey, the principals of CARES, and numerous current and former MHS employees, reside in California. *See Burstein v. Applied Extrusion Techs., Inc.*, 829 F. Supp. 106, 113 (D. Del. 1992) (travel and accommodation expenses, and general inconveniences of witnesses, argued for transfer); *Securities and Exchange Comm. v. First Nat. Fin. Corp.*, 392 F. Supp. 239, 241 (N.D. Ill. 1975) (finding that it is the residence of principal witnesses that is material to a court's decision on a § 1404(a) motion to transfer). Key documents reflecting the alleged work Open Minds' work and fraud are located in California. Without a transfer, witnesses would be forced to travel from California to Pennsylvania and would therefore be required to incur undue hardships such as loss of work. Such travel is time-consuming and expensive. Discovery and trial would also move much more swiftly and less expensively if the case were transferred to California.

Moreover, Open Minds has purposely availed itself of California as a forum as its principals repeatedly traveled there, allegedly for MHS work. It should also be noted that Open Minds has **financially benefited** by hosting for profit conventions **in San Diego** specifically for the last three years (which, at least the first one, **was paid for by MHS**). California and San Diego in particular, also have a strong interest in having this lawsuit litigated there for San Diego County is a primary funder of MHS. MHS provides very important services to thousands of city and county residents who also have a strong interest in seeing this litigation

play out in a San Diego court.  Moreover, California law likely applies to this dispute and thus, California courts are better suited and have an interest interpreting their own law.  *See Manor Care, Inc. v. Continental Ins. Co.*, 2003 WL 22436225 (E.D. Pa. 2003).  Any deference to Plaintiff's choice in forum here should be minimized, especially in an egregious forum shopping case like this one and when this dispute concerns conduct in California.  Accordingly, should this Court decline to dismiss this action for lack of personal jurisdiction, MHS requests that this action be transferred to the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1404(a).

## IV.   CONCLUSION

For the foregoing reasons, Defendant Mental Health Systems, Inc. respectfully requests that this Court dismiss the above action for lack of personal jurisdiction or, in the alternative, transfer this case to the Southern District of California.

Respectfully submitted,

/s/ Lauren M. Wilchek
**DLA PIPER LLP (US)**
Lauren M. Wilchek
Identification No.:  207101
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
(215) 656-3300
(215) 656-3301 (*fax*)
lauren.wilchek@dlapiper.com

Pamela Naughton
Rebecca Roberts
401 B Street, Suite 1700
San Diego, CA 92101
(619) 699-2700
(619) 699-2701 (*fax*)
pamela.naughton@dlapiper.com
rebecca.roberts@dlapiper.com
*Pro hac vice applications anticipated*

Attorneys for Defendant Mental Health
Systems, Inc.

## CERTIFICATE OF SERVICE

I hereby certifies that a copy of the foregoing Brief in Support of Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer this Case to the Southern District of California was served by first-class mail, postage prepaid, on September 19, 2016, upon counsel of record:

>Dana W. Chilson
>Elizabeth S. Daniels
>**MCNEES WALLACE & NURICK LLC**
>100 Pine Street
>P.O. Box 1166
>Harrisburg, PA 17108-1166


>/s/ Lauren M. Wilchek