# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BEHAVIORAL HEALTH INDUSTRY NEWS, INC. D/B/A OPEN MINDS, | Civil Action No.: 1:16-cv-01874-CCC |
| Plaintiff, | |
| v. | |
| MENTAL HEALTH SYSTEMS, INC., | |
| Defendant. | |

**DECLARATION OF REBECCA S. ROBERTS IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION OR, IN THE ALTERNATIVE, TO TRANSFER
THIS CASE TO THE SOUTHERN DISTRICT OF CALIFORNIA**

I, Rebecca S. Roberts, declare as follows:

1.      I am an attorney at the law firm DLA Piper, LLP (US), counsel for Defendant Mental Health Systems, Inc. ("MHS").  I have personal knowledge of the facts I state below except where they are stated on information and belief.  If called upon by this Court, I could competently testify as follows:

2.      On information and belief, it is my understanding that Ms. Kimberly Bond and Mr. David Conn reside in San Diego, California and are California residents.  It is also my understanding that Mr. Michael Hawkey resides in Escondido, California.

3.     Attached as Exhibit 1 are excerpts of an investigative report indicating which states Behavioral Health News, Inc. d/b/a Open Minds ("Open Minds") is registered.  This report was generated on or about September 6, 2016.  It is my understanding that the report does not list Open Minds as a registered company in Pennsylvania at the time it was created.  Attached as Exhibit 2 is a copy of a report from the Pennsylvania Secretary of State indicating that Open Minds filed its statement of registration with the state on September 12, 2016.  Attached as Exhibit 2A is a copy of September 23, 1988 article that ran in the LA Times.

4.     Attached as Exhibit 3 is the December 2010 Agreement.  Attached as Exhibit 4 is the June 2012 Agreement.  Attached as Exhibit 5 is the March 1, 2013 Agreement.

5.     Attached as Exhibit 6 is a January 7, 2014 news article announcing the CARES acquisition.  Based upon information and belief, it is my understanding that the principals of CARES reside in California.

6.     Attached as Exhibit 7 is the August 27, 2013 California Planning & Performance Management Institute Collaboration Agreement between Open Minds and MHS.  Attached as Exhibit 8 is a letter from Ms. Oss to Ms. Bond outlining their profit share arrangement concerning the California Planning & Performance Management Institute.  Attached as Exhibit 9 is a copy of a series of Open Minds publications.   An article by Mr. Conn appears on pages 5-6 of this pamphlet,

which promotes the Open Minds 2015 California Management Best Practices Institute in San Diego.  Attached as Exhibit 10 is the 2016 brochure for this event recently held in San Diego.

7.      Attached as Exhibit 11 are samples of expense receipts Mr. Travers submitted to MHS for payment in November 2015.  Upon information and belief, my understanding is that Mr. Travers alone billed MHS $105,000 in expenses from January 1, 2014 through January 31, 2016.

8.      Attached as Exhibit 12 is a copy of a February 10, 2016 letter MHS's CFO at the time, Michael Hawkey, sent to San Diego County.  Attached as Exhibit 13 is a copy of San Diego County's Cure Notice of Non-Conforming Contract Requirements.  Attached as Exhibit 14 is Appendix A to the County's report which responds to Mr. Hawkey's allegations.  Pages 11-13 address the Open Minds contracts.

9.      Attached as Exhibit 15 is a March 3, 2016 article that ran in the San Diego Union Tribune.  Attached as Exhibit 16 is a June 2, 2016 article that ran in the San Diego Union Tribune.  Attached as Exhibit 17 is a June 10, 2016 article that ran in the San Diego Union Tribune.

10.     Attached as Exhibit 18 is a copy of Open Minds' and David Conn's Advisory Board/Consultant Agreement.  Attached as Exhibit 19 is a copy of the demand letter MHS sent to Open Minds.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 19th day of September 2016 in San Diego, California.

_____
Rebecca S. Roberts

# EXHIBIT 1

## Global Watch Lists (None Found)

## US Business Affiliations (2 Found)

**BEHAVIORAL HEALTH INDUST NEWS (Primary)**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
**OPEN MINDS (Trade Style)**
Link Number: **4346905265**

163 YORK ST, GETTYSBURG, PA 17325-1933 (Adams COUNTY) (1988 to 02/19/2016)
**Current Phone at address**
**(717) 334-1329 (ET)**

4465 OLD HARRISBURG RD, GETTYSBURG, PA 17325-7612 (Adams COUNTY) (1988 to 02/19/2016)
**Current Phone at address**
**(717) 334-1329 (ET)**

**INSTITUTE FOR BEHAVIORAL HEALTHCARE INFORMATICS (Primary)**
Link Number: **195851545**

163 YORK ST, GETTYSBURG, PA 17325-1933 (Adams COUNTY) (05/28/2009 to 03/14/2012)

## UCC Filings (None Found)

## US Corporate Affiliations (10 Found)

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **2004031800205**
Filing Office Link Number: **1807693485**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **07/14/2014**
Filing Date: **03/12/2004**
Incorporation Date: **10/14/1987**
Date First Seen: **04/17/2004**
Date Last Seen: **07/18/2014**
Received Date: **07/15/2014**
Misc Details: **FILING ACT:  INDIANA BUSINESS CORPORATION LAW**
Filing Office Name: **SECRETARY OF STATE/CORPORATIONS DIVISION**
Filing Office Address: **200 W WASHINGTON ST, INDIANAPOLIS, IN 46204-2715 (MARION COUNTY)**
File Date: **07/19/2014**
Sec Status: **Revoked Foreign**

**Corporate Officers and Directors**
**JAMES JONES** , Title: **Registered Agent**
101 W OHIO ST STE 610, INDIANAPOLIS, IN 46204-1972 (MARION COUNTY)
**MONICA E OSS** , Title: **President**
4465 OLD HARRISBURG RD, GETTYSBURG, PA 17325-7612 (ADAMS COUNTY)

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **C3341538**
Filing Office Link Number: **1807680030**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **05/28/2016**
Filing Date: **12/17/2010**
Date First Seen: **01/21/2011**
Date Last Seen: **06/04/2016**
Franchise Tax Board Status: **Delinquent**
Franchise Tax Board Status Date: **12/02/2013**
Received Date: **05/31/2016**
Filing Office Name: **BUSINESS PROGRAMS DIVISION**
Filing Office Address: **1500 11TH ST FL 3, SACRAMENTO, CA 95814-5701 (SACRAMENTO COUNTY)**
File Date: **06/07/2016**
Sec Status: **Forfeited**

**Corporate Officers and Directors**
**CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS CSC - L** , Title: **Registered Agent**
2710 GATEWAY OAKS DR STE 150N, SACRAMENTO, CA 95833-3502 (SACRAMENTO COUNTY)
**MONICA E OSS** , Title: **Chief Executive Officer**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)

**Corporate Amendments**
Filing Date: **12/02/2013**
Reason: **Forfeiture Of Incorporation**
Description: **FRANCHISE TAX BOARD FORFEITURE**

---

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **F10000002902**
FEINumber: **52-1540991**
Filing Office Link Number: **1808321890**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Foreign Corporation**
Verification Date: **02/01/2015**
Filing Date: **06/25/2010**
Date First Seen: **08/01/2010**
Date Last Seen: **03/11/2015**
Received Date: **02/02/2015**
Filing Office Name: **STATE DEPARTMENT/CORPORATION DIVISION**
Filing Office Address: **409 E GAINES ST, TALLAHASSEE, FL 32301-2412 (LEON COUNTY)**
File Date: **03/12/2015**
Sec Status: **Inactive**

**Corporate Officers and Directors**
**CORPORATION SERVICE COMPANY** , Title: **Registered Agent**
1201 HAYS ST, TALLAHASSEE, FL 32301-2699 (LEON COUNTY)
**MONICA E OSS** , Title: **Other, CPVS**
4465 OLD HARRISBURG RD, GETTYSBURG, PA 17325-7612 (ADAMS COUNTY)

---

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **F06000007512**
FEINumber: **52-1540991**
Filing Office Link Number: **1808321890**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Foreign Corporation**
Verification Date: **02/01/2015**
Filing Date: **12/05/2006**
Date First Seen: **12/24/2006**
Date Last Seen: **03/11/2015**
Received Date: **02/02/2015**
Filing Office Name: **STATE DEPARTMENT/CORPORATION**

**Corporate Officers and Directors**
**MONICA E OSS** , Title: **Other, CPS**
4465 OLD HARRISBURG RD, GETTYSBURG, PA 17325-7612 (ADAMS COUNTY)
**MONICA E OSS** , Title: **Other, VP**
4465 OLD HARRISBURG RD, GETTYSBURG, PA 17325-7612 (ADAMS COUNTY)
**BORDEN WILSON** , Title: **Registered Agent**
700 S HARBOUR ISLAND BLVD, TAMPA, FL 33602-5713 (HILLSBOROUGH COUNTY)

**DIVISION**
Filing Office Address: **409 E GAINES ST, TALLAHASSEE, FL 32301-2412 (LEON COUNTY)**
File Date: **03/12/2015**
Sec Status: **Inactive**

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **2009082400248**
Filing Office Link Number: **1807693485**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **08/06/2015**
Filing Date: **08/21/2009**
Incorporation Date: **10/14/1987**
Date First Seen: **09/19/2009**
Date Last Seen: **08/10/2015**
Received Date: **08/06/2015**
Misc Details: **FILING ACT:  INDIANA BUSINESS CORPORATION LAW**
Filing Office Name: **SECRETARY OF STATE/CORPORATIONS DIVISION**
Filing Office Address: **200 W WASHINGTON ST, INDIANAPOLIS, IN 46204-2715 (MARION COUNTY)**
File Date: **08/11/2015**
Sec Status: **Active**

**Corporate Officers and Directors**
**CORPORATION SERVICE COMPANY** , Title: **Registered Agent**
251 E OHIO ST STE 500, INDIANAPOLIS, IN 46204-2184 (MARION COUNTY)
**JAMES MACKIE** , Title: **Treasurer**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)
**MONICA OSS** , Title: **President**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)

**Corporate Amendments**
Filing Date: **07/17/2015**
Reason: **Miscellaneous**
Description: **2015 BUSINESS ENTITY REPORT FILED.  LOCATOR NUMBER- 150717WWW**

Filing Date: **08/23/2013**
Reason: **Miscellaneous**
Description: **2013 BUSINESS ENTITY REPORT FILED.  LOCATOR NUMBER- 130823WWW**

Filing Date: **08/14/2012**
Reason: **Miscellaneous**
Description: **2011 BUSINESS ENTITY REPORT FILED.  LOCATOR NUMBER- 120814WWW**

Filing Date: **08/21/2009**
Reason: **Miscellaneous**
Description: **APPLICATION FOR CERTIFICATE OF AUTHORITY**

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **F053093**
Filing Office Link Number: **1809275950**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **11/03/2008**
Filing Date: **12/20/2007**
Incorporation Date: **10/14/1987**
Date First Seen: **01/11/2008**
Date Last Seen: **12/11/2008**
Received Date: **11/07/2008**
Perpetual Indicator: **Y**
Filing Office Name: **SECRETARY OF STATE/CORPORATIONS BUREAU**
Filing Office Address: **100 N PARK AVE, HELENA, MT 59601-6219 (LEWIS AND CLARK COUNTY)**
File Date: **06/17/2010**
Sec Status: **Intent to Revoke Cert of Authority**

**Corporate Officers and Directors**
**DANNY M AUNE** , Title: **Registered Agent**
300 N WILLSON AVE STE 3005, BOZEMAN, MT 59715-3551 (GALLATIN COUNTY)
**MONICA E OSS** , Title: **Director**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)
**MONICA E OSS** , Title: **Other, OTHER**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)

**Corporate Stock Issues**
Auth Quantity: **1**
Par Value Flag: **N**
Convertible Flag: **N**
Stock Type: **Common**

Incorporation State: **DE**

**Corporate Officers and Directors**

**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Country: **USA**
Filing Number: **683693**
Filing Office Link Number: **1809288790**
Corporation Type: **Not Available**
Address Type: **Business**
Registration Type: **Corporation**
Verification Date: **03/04/2016**
Filing Date: **12/17/2012**
Date First Seen: **12/24/2012**
Date Last Seen: **03/09/2016**
Received Date: **03/07/2016**
Perpetual Indicator: **Y**
Misc Details: **PURPOSE: CONSULTING SERVICES.@**
Filing Office Name: **SECRETARY OF STATE/CORPORATIONS DIVISION**
Filing Office Address: **107 N MAIN ST RM 204, CONCORD, NH 03301-4951 (MERRIMACK COUNTY)**
File Date: **03/10/2016**
Sec Status: **In Good Standing**

JAMES , Title: **Treasurer**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)
**MONICA OSS** , Title: **President**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)
**LAWYERS INCORPORING SERVICE** , Title: **Registered Agent**
10 FERRY ST STE 313, CONCORD, NH 03301-5004 (MERRIMACK COUNTY)

<u>**Corporate Amendments**</u>
Filing Date: **03/02/2016**
Reason: **Miscellaneous**
Description: **ANNUAL REPORT**

Filing Date: **12/11/2015**
Reason: **Miscellaneous**
Description: **STATEMENT OF CHANGE OF REGISTERED OFFICE**

Filing Date: **03/26/2015**
Reason: **Miscellaneous**
Description: **ANNUAL REPORT**

Filing Date: **01/28/2014**
Reason: **Miscellaneous**
Description: **ANNUAL REPORT**

Filing Date: **12/17/2012**
Reason: **Miscellaneous**
Description: **APPLICATION FOR CERTIFICATE OF AUTHORITY**

---

Incorporation State: **DE**
**BEHAVIORAL HEALTH INDUSTRY NEWS, INC. (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **3190266**
Filing Office Link Number: **1809299645**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **04/29/2011**
Filing Date: **04/12/2005**
Incorporation Date: **10/14/1987**
Sec State Status Date: **04/27/2011**
Date First Seen: **04/25/2005**
Date Last Seen: **05/01/2011**
Received Date: **05/01/2011**
Perpetual Indicator: **Y**
Filing Office Name: **SECRETARY OF STATE/CORPORATION DIVISION**
Filing Office Address: **162 WASHINGTON AVE, ALBANY, NY 12210-2304 (ALBANY COUNTY)**
File Date: **05/03/2011**
Sec Status: **Dissolution By Proclamation**

<u>**Corporate Officers and Directors**</u>
**MONICA E OSS** , Title: **Chairman of the Board**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)

<u>**Corporate Amendments**</u>
Filing Date: **04/27/2011**
Reason: **Dissolution Of Corporation**
Description: **BY PROCLAMATION; REFER TO MICROFILM NUMBER DP-2011357**

Filing Date: **04/30/2007**
Reason: **Address Change**
Description: **AMENDED ADDRESS OF CHAIRMAN OF THE BOARD; REFER TO MICRO FILM NUMBER 070430002179**

---

Incorporation State: **PA**
**INSTITUTE FOR BEHAVIORAL HEALTHCARE INFORMATICS (Primary)**
Address: **163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)**
Filing Number: **3883051**

<u>**Corporate Officers and Directors**</u>
**MONICA OSS** , Title: **Other, TAX RESPONSIBLE PARTY**
163 YORK ST, GETTYSBURG, PA 17325-1933 (ADAMS COUNTY)

<u>**Corporate Amendments**</u>
Filing Date: **05/21/2009**

Link Number: **195851545**
Filing Office Link Number: **1809779455**
Corporation Type: **Non-Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **03/02/2012**
Filing Date: **05/21/2009**
Date First Seen: **05/28/2009**
Date Last Seen: **03/14/2012**
Received Date: **03/05/2012**
Perpetual Indicator: **Y**
Misc Details: **PURPOSE: EDUCATIONAL SERVICES**
Filing Office Name: **SECRETARY OF STATE/CORPORATIONS DIVISION**
Filing Office Address: **203 NORTH ST, HARRISBURG, PA 17101-1123 (DAUPHIN COUNTY)**
File Date: **03/15/2012**
Sec Status: **Active**

Reason: **Miscellaneous**
Description: **ARTICLES OF INCORPORATION-NON-PROFIT**

Incorporation State: **DE**
**SUMMIT CORPORATION (Primary)**
Address: **10050 CAMBRIC CT, COLUMBIA, MD 21046-1301 (HOWARD COUNTY)**
Filing Number: **F01912252**
Filing Office Link Number: **1807740005**
Corporation Type: **Profit**
Address Type: **Mailing**
Registration Type: **Corporation**
Verification Date: **12/05/2013**
Filing Date: **04/22/1985**
Sec State Status Date: **12/04/1987**
Date First Seen: **10/19/2000**
Date Last Seen: **12/13/2013**
Received Date: **12/06/2013**
Filing Office Name: **SECRETARY OF STATE/DEPARTMENT OF ASSESSMENTS AND TAXATION/CORPORATE CHARTER DIVISION**
Filing Office Address: **301 W PRESTON ST, BALTIMORE, MD 21201-2323 (BALTIMORE CITY COUNTY)**
File Date: **12/14/2013**
Sec Status: **Forfeited**

**Corporate Officers and Directors**
**MONICA C OSS** , Title: **Registered Agent**
10050 CAMBRIC CT, COLUMBIA, MD 21046-1301 (HOWARD COUNTY)

**Corporate Amendments**
Filing Date: **12/04/1987**
Reason: **Miscellaneous**
Description: **AUTHORITY TO DO BUSINESS IN MARYLAND FORFEITED**

Filing Date: **04/22/1985**
Reason: **Miscellaneous**
Description: **QUALIFICATION**

## Aircraft Records (None Found)

## Pilot Licenses (None Found)

## Voter Registrations (1 Found)

Name: **MONICA E OSS**
Address: **4465 OLD HARRISBURG RD, GETTYSBURG, PA 17325 (Adams COUNTY)**
Date of Registration: **05/02/1988**
DOB: **06/08/1956** (60)

# EXHIBIT 2



Corporations ▾     Search Business Entities (corpsearch.aspx)     Search UCC Transactions (uccsearch.aspx)     Forms ▾

Contact Corporations (http://www.dos.pa.gov/BusinessCharities/Pages/default.aspx)     Login (../Account/ValidateUser)

Register (../Account/Register_account)

Search entity / Select entity / Order documents

# Order Business Documents

Date: 09/12/2016

## Business Name History

| Name | Name Type |
|------|-----------|
| BEHAVIORAL HEALTH INDUSTRY NEWS, INC. | Current Name |

### Business Entity Details

| | |
|---|---|
| Name | BEHAVIORAL HEALTH INDUSTRY NEWS, INC. |
| Entity Number | 1573497 |
| Entity Type | Business Corporation |
| Status | Active |
| Citizenship | Foreign |
| Entity Creation Date | 06/28/1990 |
| Effective Date | 06/28/1990 |
| State Of Inc | DE |
| Address | 4465 OLD HARRISBURG RD GETTYSBURG PA 17325-0 ADAMS |

### Officers

| | |
|---|---|
| Name | MONICA E OSS |
| Title | PRESIDENT |
| Address | 163 YORK ST GETTYSBURG PA 17325-1933 |

| | |
|---|---|
| Name | MONICA E OSS |
| Title | TREASURER |
| Address | 163 YORK ST GETTYSBURG PA 17325-1933 |

## Filed Documents

The information presented below is for your reference. To place an order you will need to log in. If you do not have a PENN File account, you may register for an account by clicking here (/Account/Register_account).

Show [25 ▾] entries                    Filter Records

| Select | Date | Document | Pages | Plain Copy Quantity# | Price | Certified Copy Quantity# | Certified Copy Price | Microfilm # | Microfilm Start | Microfilm End | Line Tota |
|--------|------|----------|-------|----------------------|-------|-------------------------|---------------------|-------------|-----------------|--------------|-----------|

| Select | Date | Document | Pages | Plain Copy Quantity# | Price | Certified Copy Quantity# | Certified Copy Price | Microfilm # | Microfilm Start | Microfilm End | Line Tota |
|--------|------|----------|-------|---------------------|-------|-------------------------|---------------------|-------------|-----------------|---------------|-----------|
| ☐ | 06/28/1990 | CERTIFICATE OF AUTHORITY 1 | 1 | 1 | $3.00 | 0 | $40.00 | 192 | 691 | | 1 |

Showing 1 to 1 of 1 entries                    Previous | 1 | Next

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| ☐ | All Dates | All Certified Copies | 1 | Quantity #  1 | $43.00 | | |

### Certified Documents

| Select | Date | Document | Pages | Quantity# | Price | | Line Total |
|--------|------|----------|-------|-----------|-------|--|-----------|
| ☐ | 09/12/2016 | STATEMENT OF REGISTRATION | 1 | 1 | $40.00 | | |
| ☐ | 09/12/2016 | Index and Docketing Report | 1 | 1 | $15.00 | | |
| ☐ | 09/12/2016 | Index and Docketing Certified Report | 1 | 1 | $55.00 | | |

**Order Total :**

<< Back to Search Results                                        Login

# EXHIBIT 2A

Advertisement



YOU ARE HERE: LAT Home → Collections → **Federal Bureau Of Investigation**

Advertisement



# 10 Indicted Over Health-Care Plans : Fraud Alleged in Medical Insurance for Labor Unions

**September 23, 1988** | ROBERT L. JACKSON | Times Staff Writer

Email    Share    G+1  0    Tweet    Recommend 0

WASHINGTON — Ten people have been indicted in California and three other states in the largest fraud case ever brought involving prepaid health-care plans sold to labor unions, the Justice Department announced Thursday.

Federal grand juries in San Diego, San Francisco, Chicago, Atlanta and Baltimore unsealed indictments charging that Angelo T. Commito, 43, of Palm Desert, Calif., a reputed associate of organized crime figures, and his business partners paid kickbacks to obtain contracts to provide optical, dental and other services to unions and employee groups across the country.

Officials said that the three-year inquiry by FBI agents and Labor Department investigators was aided by an undercover "sting" operation known as Dentex, in which FBI men posed as corporate representatives seeking health-care plans.

Front Company

One of the front companies used by the FBI was called Sun Belt Diversified, the same front name used in the FBI's undercover investigation aimed at legislators in Sacramento.

FROM THE ARCHIVES

Clinton Health Care Plan
*February 15, 1994*



MORE STORIES ABOUT

Federal Bureau Of Investigation

Unions

Organized Crime

Sting Operations

Richard Held, head of the FBI office in San Francisco, attributed the double use of the name to "bureaucracy" and said there was no connection between the two investigations.

However, Held and Geoffrey A. Anderson, attorney in charge of the federal organized crime strike force in San Francisco, said that the continuing investigation could spread to include state and local officials.

"It is unlimited where this investigation can go," Held said at a press conference in San Francisco, one of the centers of the nationwide investigation.

The indictments mentioned only two unions, both in Chicago, as having been victimized by Commito and his associates--the Cement Masons Union and the Service Employees International Union. However, other unions, including the United Food and Commercial Workers, were named in FBI search warrants earlier this year, and authorities said that their inquiry will continue.

A government investigator said evidence was uncovered that kickbacks paid or promised by Commito's group totaled nearly $100,000. The kickbacks, paid to administrators of union welfare plans, were designed to persuade them to select Commito's group to provide health care to members, who contributed $5 to $15 a month, the source said.

Hundreds of Plans

Law enforcement authorities in San Francisco said that Commito has helped in the sales of hundreds of health plans nationwide affecting many thousands of workers since 1972.

"It's the classic example of sticking it to the little guy," Held said, adding that he believes the cost of kickbacks was borne by employees, who had to pay more for their health plans.

Commito and Carl A. Mattison, a plan administrator of Aptos, Calif., were specifically charged in one indictment with stealing benefit plan monies "which were added to the cost of the program in order to generate unlawful fees and things of value for Mattison."

Commito and Mattison were also charged with participating in a kickback scheme in connection with an alcohol and drug abuse counseling program for the members of Western Employers Trust, a welfare plan covering thousands of employees in central and northern California.

None of the defendants could be reached for comment. Officials said that the indictments were returned under seal in recent days so that the defendants could be arrested before any charges were made public.

Commito's lawyers have said that he would plead not guilty to any charges. Another defendant, Elliott F. Kusel, a Commito associate of San Diego, also believes that he did nothing wrong and will offer a vigorous defense, according to his attorney, Michael Lipman.

Besides Commito, Mattison and Kusel, other Californians charged in the case were Kusel's son, Marc Lee Kusel of Mission Viejo, and Cheryl E. Fyten of San Diego, both identified as business associates of Commito.

Commito's principal companies, headquartered in Chicago, are Labor Health and Benefit Plans Inc., Diversified Benefit Systems Inc. and Special Vision Services Inc., according to the indictment.

Commito maintained a home in Fairfax, a wealthy enclave in the hills of Marin County north of San Francisco. Federal authorities, alleging that he bought the home with the proceeds of a criminal enterprise, said that they hope to seize the property. However, Commito is said to have sold the home in April, and it burned in a fire earlier this week.

Other defendants named are former plan administrators William Wire and William Hainsworth, both of Chicago; Alan S. Cohn of Owings Mills, Md.; Thomas A. Parnham of Reston, Va., and Monica E. Oss of Washington.

Officials praised two firms, National Semiconductor of Santa Clara, Calif., and Munford Corp. of Atlanta, for having cooperated with the government by permitting FBI agents to pose as company representatives in dealing with members of the Commito group.

Staff writer Dan Morain in San Francisco contributed to this story.

Email    Share    G+1  0    Tweet    Recommend 0

**From the Web**                                                    Sponsored Links by Taboola

**Palo Alto: This Meal Service is Cheaper Than Your Local Store**
Home Chef

**Here's why transferring a credit card balance to a 21-month 0% APR is a good plan**
NextAdvisor

**I'm a Woman Who Joined Dollar Shave Club. Here's What Happened...**
Dollar Shave Club

**These 70s Child Stars Are Unrecognizable Now**

Trend Chaser

**Congress Give Homeowners Who Owe Less Than $625k A Once-In-A-Lifetime Mortga...**
LowerMyBills

**This Service in Palo Alto is Changing the Way People Cook at Home**
HelloFresh

**Is This The End of the Office Dress Code?**
MM.LaFleur

**100+ Essential Designer Pieces — 90% Off**
The RealReal

**MORE:**

Seizure Led to FloJo's Death

His 104 scores make his case

Restaurant review: South Beverly Grill

Brutal Murder by Teen-Age Girls Adds to Britons' Shock

Comaneci Confirms Suicide Attempt, Magazine Says

**Los Angeles Times**  Copyright 2016 Los Angeles Times    Index by Keyword | Index by Date | Privacy Policy | Terms of Service

# EXHIBIT 3



## OPEN MINDS

### Research & Consultative Services Agreement

December 7, 2010

Between
*OPEN MINDS*
And
Mental Health Systems, Inc.
ATTN: Orville Coonce, Executive Vice President Clinical Divisions
9465 Farnham Street, San Diego, California 92123
(656) 573-2600  ~  (658) 573-2802 Fax

**OPEN MINDS agrees:**

- To provide technical assistance in electronic medical records software selection and implementation for Mental Health Systems, Inc. (as outlined in Appendix A).

- The fee for this engagement is $51,500 plus actual expenses.

- It is not an employee or an agent of Mental Health Systems, Inc.

- *OPEN MINDS* will not disclose information about Mental Health Systems, Inc., or its clients, except with the permission of Mental Health Systems, Inc.

Mental Health Systems, Inc. agrees:

- To provide clear and concise direction, preferably in writing, with regard to the research and consultative services that it requires.

- To remit to *OPEN MINDS* a fee for this project of $51,500. The payment structure will be as follows: $15,500 due at the signing of the contract, $12,000 due on January 15, 2011, and $12,000 due on February 15, 2011, and $12,000 on March 15, 2011.

- To reimburse *OPEN MINDS* for actual pre-authorized expenses, plus all applicable state and local taxes, known and unknown, within 30 days of the receipt of an invoice for such services.

- To reimburse *OPEN MINDS* for any additional pre-authorized services, billed monthly at the following discounted hourly rates: research assistant, $50/hour; researchers, $80/hour; consultants, $110/hour; senior consultants, $200/hour; and senior associate, $300/hour. No additional services will be provided without authorization of Mental Health Systems, Inc.

- That should Mental Health Systems, Inc. hire or retain any consultant or employee of *OPEN MINDS* during or within one year of the conclusion of this agreement, Mental Health Systems, Inc. agrees to pay *OPEN MINDS* an amount equal to 40.0% of the annualized gross compensation paid by *OPEN MINDS* to such consultant or employee.

**Both parties agree that:**

- *OPEN MINDS* will provide technical assistance in electronic medical records software selection and implementation for Mental Health Systems, Inc. (as outlined in Appendix A).

- For all amounts, an interest charge of 2% per month will be charged on the overdue balance.

- This agreement may not be assigned and will continue in full force and effect, even if either party changes its name.

- Should either party to this agreement commence legal action to enforce its rights under this agreement, the prevailing party in the action will be entitled to collect all reasonable costs and expenses incurred, including attorney's fees.

Please complete the following accounting contact information:

Name/Title_____    _____

Organization_____    _____

Address_____    _____

_____

Phone_____    Fax_____

E-mail _____    _____

_____
**For OPEN MINDS**

_____
*January 2, 2011*
Date

_____
**For Mental Health Systems, Inc.**

_____
*12/21/10*
Date

2

**Appendix A**

*OPEN MINDS* will provide technical assistance in electronic medical records software selection and implementation for Mental Health Systems, Inc.

This initiative would have the following steps:

Component I: Development of functional specifications

Defining the functional specifications for a new software system is a crucial first step for a successful software selection process. The *OPEN MINDS* team will conduct an on-site assessment and review of organizational materials in order to provide a thorough documentation of the functional specifications needed by Mental Health Systems for an EMR system. In this component of the engagement, the *OPEN MINDS* team will:

1. Develop an overall proposed project plan
2. Determine a proposed list of organization materials and specifications to be reviewed
3. Develop a draft agendas and templates for conference calls and meetings
4. Conduct a kick-off conference call with organizational leadership to discuss the project and plan the site visit
5. Review the organizational materials provided
6. Conduct a thorough three-day on-site visit to assess current IT functionality and future business reporting needs
7. Write a draft of the Software Specifications Summary document with the following outline:
   I. Executive Summary
   II. Functional Specifications
   III. Assessment Findings and Recommendations
8. Review and finalize the draft of the Software Specifications Summary document with organizational leadership

Component I will develop the functional specifications for a successful EMR software selection process and will include two conference calls and one three-day site visit in order to accomplish the tasks listed above.

Component II: RFP Development

In this component of the process, the *OPEN MINDS* team will design an RFP that accurately reflects the identified functional specifications and business requirements for the organization. This RFP will then be issued to potential vendors. The *OPEN MINDS* team will:

1. Conduct a meeting with organizational leadership to review functional specifications, system priorities, knock-out factors, customer service priorities, and other factors to be incorporated in the RFP
2. Prepare meeting minutes for distribution summarizing discussion and assumptions
3. Develop an outline for the RFP, evaluation process description, and scoring process description
4. Conduct a conference call with organizational leadership to discuss the RFP outline, evaluation process, and scoring process description
5. Create a draft RFP to vendors, including software specifications and management requirements
6. Develop a list of potential vendors
7. Conduct a conference call with organizational leadership to review/finalize RFP and determine list of vendors to receive the RFP
8. Release the RFP to select vendors
9. Respond to vendor questions

3

Component II will design, develop, and release to vendors, an RFP detailing Mental Health Systems' functional specification requirements. This component will include three conference calls in order to accomplish the tasks listed above.

Component III: Assistance with vendor selection

*OPEN MINDS* can provide objective assistance during the vendor selection process and assist Mental Health Systems to find a best fit EMR solution that meets its identified business requirements. *OPEN MINDS* will evaluate vendors based on a finalist scoring sheet, check reference for selected vendors and assist Mental Health Systems leadership with on-site vendor demonstrations. The *OPEN MINDS* team will:

1. Develop a template for scoring vendor responses to the RFP
2. Develop a template for vendor reference checks
3. Receive proposals from all invited vendors
4. Evaluate proposals for "knock out" factors
5. Conduct customer satisfaction/service interviews with vendor customers
6. Tabulate the customer satisfaction/service interviews
7. Develop a scoring sheet for finalist on-site software demonstrations
8. Score vendor responses per the process approved by organizational leadership; prepare a summary of the scoring for organizational leadership review
9. Check the references for selected vendors
10. Conduct a conference call with organizational leadership to discuss the scoring summary and scoring sheet for demos, select vendors for on-site demonstrations, and set up logistics for on-site demos
11. Send letters to the vendors selected for on-site demonstrations
12. Schedule on-site demonstrations; create a master schedule
13. Sit in with organizational leadership for the first on-site vendor software demonstration day (additional days are optional)
14. Integrate the vendor demonstration with scoring with other items on the vendor scoring sheet
15. Conduct an on-site meeting with organizational leadership to review vendor functional scoring, pricing, and references
16. Final vendor selection; final vendor notification letters; schedule on-site day with selected vendor to start contract negotiation process

Component III will provide assistance in the RFP selection process by developing an RFP scoring criteria, evaluating vendor proposals, checking references of selected vendors, and assisting with on-site vendor demonstrations. This component will include one conference call and two one-day on-site visits in order to accomplish the tasks listed above.

Component IV: Assistance with vendor contracting

At the request of Mental Health Systems, Inc., *OPEN MINDS* can provide contract assistance during the process of contracting with the selected vendor. All assistance with vendor contracting will be provided at *OPEN MINDS* discounted hourly rates under a separate contract.

Component V: Assistance with implementation

*OPEN MINDS* can provide the organization with assistance during the implementation phase of the software selection process. All assistance with implementation will be provided at *OPEN MINDS* discounted hourly rates under a separate contract.

4

# EXHIBIT 4



**OPEN MINDS**

### Research & Consultative Services Agreement

June 22, 2012

Between
*OPEN MINDS*
And
Mental Health Systems, Inc.
ATTN: David Conn, Ph.D.
9465 Farnham Street
(858) 573-2600  ~  dconn@mhsinc.org

**OPEN MINDS agrees:**

- To provide research and consultative services to assist Mental Health Systems, Inc. (MHS) with acquisitions (as outlined in Appendix A).

- The fee for this engagement is $36,000 plus actual expenses.

- It is not an employee or an agent of MHS.

- *OPEN MINDS* will not disclose information about MHS, or its clients, except with the permission of MHS.

**MHS agrees:**

- To provide clear and concise direction, preferably in writing, with regard to the research and consultative services that it requires.

- To remit to *OPEN MINDS* a fee for this project of $36,000. The payment structure will be as follows: $9,000 due at the signing of the contract, $9,000 due on August 1, 2012, and $9,000 due on September 1, 2012, and $9,000 on October 1, 2012.

- To reimburse *OPEN MINDS* for actual pre-authorized expenses, plus all applicable state and local taxes, known and unknown, within 30 days of the receipt of an invoice for such services.

- To reimburse *OPEN MINDS* for any additional pre-authorized services, billed monthly at the following discounted hourly rates: research assistant, $50/hour; researchers, $80/hour; consultants, $110/hour; senior consultants, $200/hour; and senior associate, $300/hour. No additional services will be provided without authorization of MHS.

- That should MHS hire or retain any consultant or employee of *OPEN MINDS* during or within one year of the conclusion of this agreement, MHS agrees to pay *OPEN MINDS* an amount equal to 40.0% of the annualized gross compensation paid by *OPEN MINDS* to such consultant or employee.

**Both parties agree that:**

- *OPEN MINDS* will provide research and consultative services to assist MHS with acquisitions (as outlined in Appendix A).

- For all amounts, an interest charge of 2% per month will be charged on the overdue balance.

- This agreement may not be assigned and will continue in full force and effect, even if either party changes its name.

- Should either party to this agreement commence legal action to enforce its rights under this agreement, the prevailing party in the action will be entitled to collect all reasonable costs and expenses incurred, including attorney's fees.

Please complete the following accounting contact information:

Name/Title ___Michael L. Hawkey___

Organization ___Mental Health Systems, Inc.___

Address ___9465 Farnham Street___

___San Diego, CA 92123___

Phone ___(858) 573-2600___   Fax ___(858) 573-2602___

E-mail ___mhawkey@mhsinc.org___

_____   ___August 28, 2012___
For OPEN MINDS                       Date

_____   ___8/9/12___
For MHS                              Date

**Appendix A**

*OPEN MINDS* will provide research and consultative services to assist MHS with acquisitions.

This initiative would have the following steps:

Research & Provider Acquisition Candidate Selection

1. Initial kick-off conference call with MHS to discuss the project workplan and project deliverables

2. On-site meeting with key members of the MHS team to review the project plans, key strategic objectives as they relate to acquisition of an autism provider, discuss and finalize both required and desired attributes of provider targets, and finalize timelines and next steps

3. Conduct preliminary research to identify and select providers to receive an inquiry letter and develop and maintain a provider database

4. Conference call with MHS to review preliminary research findings, provider inquiry letter, and provider database

5. Conduct research to identify interested providers; update database

6. Complete profiles for interested providers

7. One-day on-site meeting with MHS to review the research process, review the profiles for selected providers and discuss and select providers for the due diligence process. *OPENMINDS* will be responsible for presenting provider acquisition options that are the closest match to the provider attributes and viability criteria (including minimal revenue stream) desired by MHS.

At the conclusion of this engagement, MHS will receive a memo outlining decisions from the on-site meeting and selected providers and profiles as a final deliverable.

To support the completion of this initiative, *OPEN MINDS* will conduct a total of:

* Two one-day on site meetings with the MHS team
* Two conference call to review and approve project materials and engagement goals

Additional work for phase two, provider meetings, due diligence and integration planning will be conducted and billed at *OPEN MINDS* discounted hourly rates. Additional conference calls and on-site days may be added to the scope at the discretion of MHS and will be billed on an hourly basis.

# EXHIBIT 5



## OPEN MINDS

### Interim Business Development Services Agreement

March 1, 2013

Between
*OPEN MINDS*
And
Mental Health Systems, Inc.
ATTN: David Conn, Senior Vice President, Business Development & Public Policy
9465 Farnham Street, San Diego, CA 92123
858-395-9085 ~ dconn@mhsinc.org

**OPEN MINDS agrees:**

- To provide Mental Health Systems, Inc. with an Interim Business Development Director on a half-time basis for the period of March 1, 2013 to June 28, 2013 as outlined in Appendix A.

- To facilitate this role, an *OPEN MINDS* Senior Associate will have the following availability:

  - Serve as Interim Business Development Director for Novata Initiative on a half-time basis, 80 hours per month, with combination work at the Mental Health Systems offices in San Diego and the senior associate's office.

  - Schedule for the senior associate to be developed in conjunction with the team at Mental Health Systems, Inc.

- The fee for this engagement is $14,400 per month, plus actual expenses, for a minimum of a four-month commitment.

- It is not an employee or an agent of Mental Health Systems, Inc.

- *OPEN MINDS* will not disclose information about Mental Health Systems, Inc., or its clients, except with the permission of Mental Health Systems, Inc.

**Mental Health Systems, Inc. agrees:**

- To provide clear and concise direction, preferably in writing, with regard to the research and consultative services that it requires.

- To remit to *OPEN MINDS* a fee for this project of $14,400 due on March 1, 2013; $14,400 due on April 1, 2013; $14,400 due on May 1, 2013, and $14,400 on June 1, 2013.

- To reimburse *OPEN MINDS* for actual pre-authorized expenses, plus all applicable state and local taxes, known and unknown, within 30 days of the receipt of an invoice for such services.

- To reimburse *OPEN MINDS* for any additional pre-authorized services billed monthly at the following discounted hourly rates: research assistant, $50/hour; researchers, $80/hour; consultants, $110/hour; senior consultants, $200/hour; and senior associate, $300/hour.  No additional services will be provided without authorization of Mental Health Systems, Inc.

- That should Mental Health Systems, Inc. hire or retain any consultant or employee of *OPEN MINDS* during or within one year of the conclusion of this agreement, Mental Health Systems, Inc. agrees to pay *OPEN MINDS* an amount equal to 40.0% of the annualized gross compensation paid by *OPEN MINDS* to such consultant or employee.

**Both parties agree that:**

- This agreement can renew on a month-to-month basis at the discretion of both parties, with 30-day notice.

- For all amounts, an interest charge of 2% per month will be charged on the overdue balance.

- This agreement may not be assigned and will continue in full force and effect, even if either party changes its name.

- Should either party to this agreement commence legal action to enforce its rights under this agreement, the prevailing party in the action will be entitled to collect all reasonable costs and expenses incurred, including attorney's fees.

Please complete the following accounting contact information:

Name/Title __Kimberly Bond, President & CEO_____

Organization__Mental Health Systems_____

Address ___9465 Farnhem Street_____

          __San Diego, CA 92123_____

Telephone __858-573-2600_____ Fax __858-573-2602_____

E-mail ___kbond@mhsinc.org_____

_____   _____
For *OPEN MINDS*                                    Date  3/4/13

_____   _____
For Mental Health Systems, Inc.                    Date  3/4/13

<u>Appendix A</u>

*OPEN MINDS* will provide Mental Health Systems, Inc. with the role of an Interim Business Development Director on a half-time basis for the period of March 1, 2013 to June 28, 2013.

The *OPEN MINDS* Senior Associate will have the following key responsibilities:

1. Lead the recruitment initiative for Novate's Business Development Director
2. Direct the completion of the competitor analysis and the payer analysis
3. Initiate contact with the payer organizations – both developing fee-for-service contracts with them and developing new 'service packages' that meet their specific needs
4. Identifying and developing complete strategies for at least:
   - Five health plans that are open to contracting in the San Diego region.
   - Three health plans that are open to contracting in the Inland Empire region.
   - One health plan that is open to contracting in the Central Valley region.
   - Six self-insured large employers (or entities providing the health care to such) in the San Diego Region.
   - Four self-insured large employers (or entities providing the health care to such) in the Inland Empire Region.
   - Two self-insured large employers (or entities providing the health care to such) in the Central Valley Region
5. Initial personal contact with at least 75% of the payers identified above.
6. Training the permanent Business Development Director in how to complete the above tasks and engage in the research to expand the potential customer base.
7. Other business development duties as assigned by Mental Health Systems

# EXHIBIT 6





# Novata Behavioral Health Acquires Local Autism Organization

January 07, 2014 10:30 AM Eastern Standard Time

SAN DIEGO--(BUSINESS WIRE)--Novata Behavioral Health, a subsidiary of Mental Health Systems (MHS), has acquired the San Diego-based autism organization Center for Autism Research, Evaluation and Service (CARES).

CARES works with individuals with autism diagnoses ages one to adult. Services offered include functional behavior analysis, discrete trial training, social skill builders, counseling, parent education workshops, assessments, therapy and psychiatric support.

With options such as home and school-based programs, the center accepts private pay and insurance-based services throughout California's San Diego, Orange, Imperial and Riverside Counties.

"This is history-making news for us," said MHS President and CEO Kimberly Bond. "The Novata-CARES partnership opens new doors to improving the quality of life for children and young adults with neurodevelopmental disorders and their families."

CARES will now operate under the umbrella of privately operated Novata Behavioral Health. The center has offices in Scripps Ranch, San Juan Capistrano, Temecula and El Centro, Calif.

The addition of CARES will add 140 employees to Novata's current staff.

"There continues to be an increasing need for autism spectrum services, resulting from an elevated prevalence and increased public awareness," said Bond. "As we learned about the CARES philosophy, mission and expertise, it became clear that this opportunity is ideal for us to expand our capacity to serve this population."

CARES co-founder Dr. Kathie Sweeten will serve as vice president of Novata CARES and all autism services. The other CARES co-founder, Dr. Alan Lincoln, is now vice president of Clinical Services with a focus on the Board Certified Behavioral Analysts (BCBA) intern program, Intensive Outpatient Program (IOP), outpatient services and research.

The BCBA program teaches clinical psychology to graduate students at all year levels. Students carry out ethical and effective behavior analytic interventions based on published research and designs, while delivering instruction in behavior analysis.

Under Novata's guidance, CARES will continue its support for workforce development in the field of behavioral health both locally and throughout the state.

Individual and family therapy will continue to be available to all CARES patients as well as a variety of social skills groups.

For additional information about programs and services that Novata Behavioral Health offers, please visit www.novatabh.com.

**About Novata Behavioral Health**

Novata Behavioral Health, a subsidiary of Mental Health Systems (MHS), offers affordable and effective behavioral health treatment options for individuals and families throughout Southern California.

Novata Behavioral Health provides services to privately insured individuals and families throughout Southern California, while drawing upon the extensive resources and clinical expertise of MHS. All services are provided in a client-focused, compassionate manner that underscores its founding values of Integrity, Excellence, Hope, Action, Innovation and Dignity. To learn more about Novata Behavioral Health, please visit: www.novatabh.com.

## Contacts

Novata Behavioral Health

Nicole Murphy, 858-573-2600

nmurphy@novatabh.com

or

MJE Marketing Services

Patrick Pierce, 619-682-3841

patrick@mjemarketing.com

# EXHIBIT 7



## OPEN MINDS

**California Planning & Performance Management Institute Collaboration Agreement**

August 27, 2013

Between
*OPEN MINDS*
And
Mental Health Systems, Inc.
Attn: Kimberly Bond, President and Chief Executive Officer
9465 Farnham Street, San Diego, CA 92123
858-573-2600   telephone; kbond@mhsinc.org email

Both parties will collaborate to design, develop, and deliver the California Planning & Performance Management Institute.

**OPEN MINDS** will:

Institute Agenda Planning and Program Development

- Work with Mental Health Systems to review and finalize the institute theme, meeting logistics, and all event items including: programming agenda; potential faculty; speaker contracts; document templates; attendee brochures and invitations; and registration spreadsheet.

Faculty Recruitment, Presentation Development, and Presentations

- Identify potential faculty from its own organization who will present at the institute as well as identify potential speakers and panelists to participate in delivering programming during the event.  Mental Health Systems can collaborate with *OPEN MINDS* to identify potential speakers with expertise specific to California's behavioral health and human services market.
- Prepare and finalize all speaker agreements, presentation slide decks, and next steps.

Institute Promotion, Marketing & Registration Management

- Manage all of the promotional activities for the two-day institute, including the development of all design and copy for promotional materials.

- Manage the entire registration process, including the development and distribution of marketing materials, attendee registrations, and all follow-ups to vendors and invited guests.
- Assume all responsibility for obtaining sponsorship materials for placement in participant tote bags.
- Handle on-site preparations including, but not limited to:  creating and assembling attendee nametags, gathering materials for the event including computers, attendee tote bags, marketing materials, projectors, and coordinating as to how materials will be delivered to the event site.

Institute Wrap-Up

- *OPEN MINDS* will conduct essential tasks to properly close out the event and conduct a debriefing to determine overall success for the California institute.  Other activities involved in closing out the institute include: expense processing, posting of presentations to the *OPEN MINDS* institute web site, which would be co-branded to feature Mental Health Systems on all web pages; follow-up notices to attendees, thank you notes to presenters, posting photos on both the *OPEN MINDS* website and our social networking pages, and briefings to discuss lessons learned.
- Provide Mental Health Systems with a reconciliation of the institute revenue – both sponsor revenue and registration revenue – within 60 days after the event.
- Pay Mental Health Systems its share of the revenue (based on institute reconciliation provided by *OPEN MINDS* – see above) within 90 days following the event.

**Mental Health Systems will:**

Site Selection & Contracting

- Coordinate all venue logistics such as finalizing venue dates and rates; requesting contracts for meeting space, catering, and A/V services; reviewing and finalizing contracts; scheduling on-site tech support; planning and finalizing meeting room set up and any change-overs with the venue.
- Review and finalize event venue and venue contract terms with *OPEN MINDS*.

On-Site Management

- Develop an event meeting plan and finalize with *OPEN MINDS*.
- Coordinate and manage all on-site activities involved during the two-day institute including registration, room set-up, and networking events.

**Both parties agree:**

- At the closure of the event, the event revenue and expenses will be reconciled.

- Expense budgets for each element included in the event are outlined in this agreement (see Appendix A). No expenses will be paid to either party above those budgeted amount without mutual written consent. Both parties much submit documentation of expenditures for reimbursement.
- After all expenses as outlined in Appendix A are paid, *OPEN MINDS* and Mental Health Systems will share profits or losses on an 83%/17% split, respectively.
- Conference registration rate will be set at $695 for standard registration and $495 for early bird registration.
- Both parties share responsibility for securing sponsors for the California institute. Labor associated with securing sponsors will be considered business development and will not be included in the estimated expenses.
- This agreement may not be assigned and will continue in full force and effect, even if either party changes its name.
- Should either party to this agreement commence legal action to enforce its rights under this agreement, the prevailing party in the action will be entitled to collect all reasonable costs and expenses incurred, including attorney's fees.

For *OPEN MINDS* _____          Date _____

_____

For Mental Health Systems                              Date    8/28/13

## Appendix A

Below is the list of expenses for conducting the California Planning and Performance Management Institute in 2014.

Any expenses incurred that exceed the budgeted amount listed below must be pre-approved by both parties prior to purchase or contract signature.

1. Institute Concept Planning: MHS & *OPEN MINDS* (Total: $80)

    a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $80

2. Institute Agenda Planning & Program Development: *OPEN MINDS* (Total: $5,600)

    a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $200

    b. Expense budget – program guide: $3,000

    c. Expense budget – shipping of materials to event: $1,200

    d. Expense budget – lanyards: $1,000

    e. Expense budget – name tags: $200

3. Site Selection & Contracting: MHS (Total: $475)

    a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $200

    b. Expense budget – mileage for site visits: $275

4. Faculty Recruitment, Presentation Development & Presentations: *OPEN MINDS* (Total: $22,200)

    a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $200

    b. Expense budget – travel/lodging for guest speakers: $6,000

    c. Expense budget – speaker fees: $6,000

    d. Expense budget – estimated travel: $10,000

5. Institute Promotion, Marketing & Registration Management: *OPEN MINDS* (Total: $14,860)

    a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $200

    b. Expense budget – brochure #1 printing & postage: $5,000

    c. Expense budget – brochure #2 printing & postage: $5,500

    d. Expense budget – press releases: $1,660

    e. Expense budget – signage: $1,200

    f. Expense budget – travel for on-site marketing team member: $1,300

6. On-Site Management: MHS (Total: $59,025)

    a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $200

    b. Expense budget – estimated travel for 6 MHS staff members: $1,200

    c. Expense budget – estimated cost for all-day coffee/tea throughout event for 300 attendees: $15,625

     d. Expense budget – breakfast day 1: $6,250

     e. Expense budget – breakfast day 2: $6,250

     f. Expense budget – catering for reception day 1: $11,250

     g. Expense budget – estimated room rental: $1,250

     h. Expense budget – A/V equipment rental: $10,000

     i. Expense budget – easels and power at registration table: $313

     j. Expense budget – hotel package handling: $500

     k. Expense budget – exhibitor contractor: $6,188

7. Institute Wrap-Up: *OPEN MINDS* (Total: $200)

     a. Expense budget – miscellaneous research supplies, rapid mail, etc.: $200

# EXHIBIT 8



OPEN
MINDS

November 20, 2014

Kimberly Bond
Chief Executive Officer
Mental Health Systems, Inc.
9465 Farnham Street
San Diego, CA 92123

Dear Ms. Bond,

On behalf of *OPEN MINDS*, we want to thank you for collaborating with us on the 2014 California Planning & Performance Management Institute held August 20-21, 2014 at the San Diego Marriott Mission Valley.  We are pleased to let you know it was a very successful and profitable event.

Per our signed collaboration agreement with Mental Health Partners (MHS) a profit share check will be mailed to you in the amount of $9,848.66. This total was calculated via the agreement as follows:

As partners in the design, development, and delivery of the 2014 California Planning & Performance Management Institute, *OPEN MINDS* and MHS will share profits or losses on an 83% / 17% split, respectively.

**2014 CPPMI revenue and expenses**

$63,833.00 = Registration Revenue
$77,515.00 = Sponsorship Revenue
$141,348.00 = Total Event Revenue
($83,414.70) = Event Expenses
**$57,933.30 = Total Event Profit**
     $9,848.66 = 17% MHS share of 2014 CPPMI profit

We look forward to future collaborations and wish your organization continued success.

Sincerely,

Monica E. Oss
Chief Executive Officer

cc:    Sarah Threnhauser, Executive Vice President
       Brenda Leister, Education Event Manager

# EXHIBIT 9

# California As A National Policy Bellwether For Health & Human Services



## *OPEN MINDS*

## Briefing Report

### Released August 6, 2015

## Featured Publications

*California As A Bellwether,* released July 24, 2015

*Innovation, California Style,* released July 27, 2015

*California & The Mental Health Carve Out,* released July 28, 2015

*Big Shifts Ahead In The California IDD Landscape,* released July 29, 2015

*Carve-Out Or No,* released July 30, 2015

*Child Welfare's Moving Target – Towards Community-Based Care,* released August 1, 2015

# California As A Bellwether

Executive Briefing | By Athena Mandros | July 24, 2015



Athena Mandros

If you are looking for trends in the health and human services industry, you should be looking towards California, as it may very well be the "bellwether" of policy change. If you aren't familiar with the term, it references an archaic practice wherein shepherds would place a bell on one of the sheep leading their flock. The bell alerted the shepherd to where the flock was heading. Today, the term is used to describe a leader or trendsetter.

So why is California a bellwether? Part of the reason is its size. California has over 38 million residents and more than 12 million Medicaid enrollees. Additionally, California is geographically diverse – there are dense urban areas, suburbs, rural areas, and nearly empty deserts. With this diversity, parts of California mimics nearly every state in the country. California's demographics alone, however, do not make it a bellwether – it's also a center for rapid policy innovation.

California was one of the first states to expand Medicaid under the Patient Protection and Affordable Care Act (PPACA). And looking across the Medicaid system (or Medi-Cal, as the program is named in California), behavioral health system, intellectual/developmental disabilities (I/DD) system, and child welfare system, there are large changes on the horizon. From more managed care, to increased performance transparency, and a greater focus on community-based care, these state policies embody many of the national trends that are shaping the health and human services field. We'll cover all of these trends over the next week, but today I want to focus specifically on the changes that are influencing the Medi-Cal delivery system.

Like many states, California has largely moved to a managed care delivery system. Just last December, 68% of the population was enrolled in managed care. Seven months later, 80% of the population was enrolled in managed care (see California Behavioral Health System State Profile Report). This jump occurred because in December 2014, the remaining seniors and persons with disabilities were enrolled in managed care (see California Shifting 24,000 Seniors & Persons With Disabilities In 19 Counties To Medi-Cal Managed Care). Additionally, California has pushed to enroll dual eligibles in managed care plans.

In 2013, California adopted the Coordinated Care Initiative (CCI). The CCI is designed to better coordinate care for individuals with complex care needs, including dual eligibles. The CCI has three components: a dual eligible demonstration, Medicaid managed care for dual eligibles, and managed long-term services and supports (LTSS). In 2014,



California partnered with the Centers for Medicare and Medicaid Services (CMS) to implement a dual demonstration, called Cal Medi-Connect. Cal Medi-Connect enrolls dual eligibles in seven counties (Los Angeles, San Diego, Riverside, San Bernardino, San Mateo, Santa Clara, and Orange County) into managed care plans that receive a blended rate to provide physical health, some behavioral health, and LTSS. Like many other states, however, the demonstration has had some hiccups and may not be scalable (see CalOptima's OneCare Health Plan Problems Delay Participation In California Dual Eligible Pilot, New Lawsuit Filed To Block Duals Plan, and Orange County Enrollment Update). Additionally, California is requiring dual eligibles in these counties to receive their Medi-Cal benefits through managed care if they choose not to participate in the demonstration (see California Creates Two Options For Dual Eligibles – Mandatory Enrollment In Medicaid Managed Care Or Dual Eligibles Demonstration).

Finally, like many other states, California is testing whether managed LTSS is a viable option for all Medi-Cal enrollees. As the last part of CCI, individuals who reside in the dual eligible demonstration counties must receive long-term services and supports from the Medicaid plan. If this demonstration is successful, California will expand managed LTSS to the rest of the state.

The behavioral health system is California also differs from the rest of the country and can be considered a bit of an anomaly. Behavioral health services are managed by a variety of different systems. The physical health plans are responsible for traditional behavioral health services for individuals without serious mental illness (SMI). For individuals in need of more intensive behavioral health services, each county operates a mental health plan (MHP) that provides specialty mental health services. MHPs are reimbursed for all services by the state and are not at-risk for services provided. The Medicaid waiver that allows for this system of carving out management of specialty behavioral health services to county mental health plans was just renewed for another five years (see California's Mental Health Carve-Out Preserved For Five Years, But With New Performance Transparency Requirements). Finally, the state provides some addiction treatment services and mental health pharmacy through Drug Medi-Cal, a fee-for-service program run by the state.

Tune in over the next week as we take a closer look at the California market and what is in store for the behavioral health market. And, be sure to join us in San Diego on August 26 and 27 for The 2015 *OPEN MINDS* California Management Best Practices Institute where Joseph P. Naughton-Travers, Ed.M., Senior Associate, *OPEN MINDS* and Kimberly Bond, MFT, President & CEO, Mental Health Systems will discuss how provider organizations can plan a successful strategy amid all of these changes in their session: Strategic Planning Success: How To Find The Right Path For Your Organization In A Changing California Market.



# Innovation, California Style

Executive Briefing | By Monica E. Oss | July 27, 2015



Monica E. Oss

I had a great conversation last week with Toby Ewing, Ph.D., the Executive Director of California's Mental Health Services Oversight and Accountability Commission. I knew we were kindred spirits when he started talking about using analytics to help us understand what is working in behavioral health, the importance of provider organizations overcoming their aversion to risk, and how public/private partnerships can be used to drive change. But first, a little background about Dr. Ewing and his role in the California mental health system.



Toby Ewing, Ph.D.

Dr. Ewing has served as a consultant to the California State Senate Governance and Finance Committee for the past four years, and in February 2015, he was announced as the new Executive Director of the Mental Health Services Oversight and Accountability Commission (MHSOAC). In November 2004, California voters passed California's Mental Health Services Act (MHSA), Proposition 63, which called for the establishment of MHSOAC to oversee the implementation of the Act, and to develop strategies and advise the Governor or the Legislature on mental health policy.

The MHSA – which has raised over $8 billion since its inception, averaging $1 billion per year (see MHSA Statewide Progress & Highlights Fact Sheet) – is designed to promote innovation and transformation of the mental health system. The MHSA levies a one percent tax on individuals with annual personal incomes of $1 million or more, and the funds are dedicated towards spending on new mental health services and programs – including community services and supports, capital facilities and technology, workforce education and training; and prevention and early intervention services (see California's Proposition 63 Passes with 53.4% of Vote). Since its passage in 2004, about 1,500 programs have been developed through MHSA funding and about $8 billion has been raised for specialty mental health services.



Most recently in December 2014, the state began developing new performance metrics for the public community-based mental health system funded by the state's Mental Health Services Act. (For more on recent MHSA developments, check out California Developing New Performance Metrics For Public Community-Based Mental Health System, Lack Of Data Stymies Full Evaluation of California's $13 Billion Spending Through State Mental Health Services Act, and Mental Health Services Act: Report 2012-122—The State's Oversight Has Provided Little Assurance of the Act's Effectiveness, and Some Counties Can Improve Measurement of Their Program Performance.)

My conversation with Dr. Ewing was all about how to make change happen on the ground – in ways that are meaningful to consumers and communities. The MHSA's focus on innovation and prevention makes it a unique opportunity – not only in California, but for the mental health field in general. As Dr. Ewing noted, "This act encourages organizations to go and experiment; to take risks; to innovate; and to engage in partnerships that may not have been considered before. What we've done is 'innovation-light,' and now the door is open for a broader view of innovation. We can't fund our way out of our problems. We have to be willing to take risks and get creative."

Dr. Ewing outlined a three-pronged approach for better results for consumers with behavioral disorders. The first element is analytics – the need for data to understand what is working. The second is innovation and facilitating risk-taking on new models of service delivery – by incentivizing innovation, rather than just paying for services. The third is non-traditional partnerships to improve quality. He noted, "As long as the mental health system in California is a closed system, we won't see progress. We must open up to non-traditional partnerships and leverage public dollars in a very different way." Over the next five years or so, the MHSOAC has plans to help transform the California mental health system through analytics, innovation, and nontraditional partnerships – and the Mental Health Services Act is contributing about half a billion dollars to make it happen.

For more, check out Disruptive Innovation In Integrated Care Delivery Systems: The Market Trends We Were Surprised Not To See and The Shark Tank Solution To Innovation Ideas. To learn more about how California is driving innovation in mental health, join us on August 26 in San Diego at The 2015 *OPEN MINDS* California Management Best Practices Institute, where Dr. Ewing will present the opening keynote address, Innovation, Integration & The Future Of Mental Health Services In California. His final words on our call set the stage for an exciting event: "I think the non-profit sector is in the position to drive that change. I'm looking for partners who are interested in having this conversation."



# California & The Mental Health Carve-Out

Executive Briefing | By David Conn, Ph.D., Senior Vice President of Business Development and Public Policy, MHS, and *OPEN MINDS* Advisory Board Member | July 28, 2015



David Conn, Ph.D.

Last week, *OPEN MINDS* Market Intelligence Analyst Athena Mandros gave a great overview of all the many changes happening in California's Medicaid program (Medi-Cal) and discussed why it's important for other states to keep an eye on California's system (see California As A Bellwether). Amid all of these changes, one of the most important policies that California's behavioral health community is keeping an eye on, is the mental health carve-out. At the end of June, the Centers for Medicare and Medicaid Services (CMS) approved California's 1915(b) Specialty Mental Health Services (SMHS) waiver for an additional five years. This preserves California's county-based mental health system until at least 2020. In spite of the approval, CMS did voice some concerns about program integrity and access – this resulted in increased reporting and transparency requirements (see California's Mental Health Carve-Out Preserved For Five Years, But With New Performance Transparency Requirements).

This was considered a success for those (e.g., California Coalition of Community Mental Health Agencies) that wanted to preserve the existing structure for financing and providing specialty mental health services in California. Others, such as the California Hospital Association, had wanted to revise the 1915 Waiver to bolster problem areas, such as involuntary holds. In my opinion, the renewal of the waiver has both benefits and challenges.

The five-year carve out approval removes ambiguity among many mental health provider organizations as to whether they will need to switch from traditional (county) funding sources to new managed care plan (MCP) funding and rules. This is maintaining the status quo in a manner that removes anxiety for both provider organizations and consumers with serious mental illness (SMI).

On the other hand, CMS has also taken a different approach to concerns regarding past deficits caused by audits. Rather than waiting for retrospective audits (which often were received and shelved, since no corrective action plan was attached), every county will be required to report on current activities, require the state Department of Health Care Services (DHCS) to issue and publish corrective action plans (CAPs) based on these reports, and truly monitor service delivery for quality, access, and timeliness. In part this is a means of ensuring that the MHPs conform to parity requirements.



California has 56 counties, ranging in size from under 100,000 to over 12 million in population. Some counties contract out for all services. Some provide all services themselves, and some form consortia to jointly provide/contract for the full array of services. Even the definition of SMI is left to counties to decide (in negotiation with the managed care plans for that county), so it is not surprising that there is wide divergence among mental health plans. The dashboards will provide the first data set to discern whether some counties are performing better or worse than other counties, which will presumably lead to pressure for all counties to improve their performance. Everyone is very interested to see if counties comply in earnest with these reporting requirements and what the results will look like.

The new reporting requirement CMS is imposing on both the DHCS and the county mental health plans may either increase the bureaucratic burden born by subcontractors or allow the counties to work with subcontractors to establish performance measures that are more meaningful. If the latter occurs, it may even pave the way for pay-for-performance contracts that will improve consumer care and make the counties look better to DHCS and CMS. If all levels in the delivery system start focusing on meaningful performance, that should enhance consumer client care.

To learn more about California's county-based mental health system, check out my article California's Mental Health Carve Out: Past, Present & Future, Innovation, California Style, and California Behavioral Health System State Profile Report. And be sure to join me in San Diego on August 27 for The 2015 *OPEN MINDS* California Management Best Practices Institute where Steve Ramsland, Ed.D., Senior Associate, *OPEN MINDS*; Dawan Utecht, Mental Health Director, County of Fresno; Manuel Jimenez, Jr., MA, LMFT, Mental Health Director, Alameda County; and Alfredo Aguirre, LCSW, Director, Behavioral Health Services Division, Health and Human Services Agency, County of San Diego will discuss where the California mental health system is headed in their panel session: California's County Mental Health System: An Update On Policies, Programs & Funding.



# Big Shifts Ahead In The California IDD Landscape

Executive Briefing | By Monica E. Oss | July 29, 2015



Monica E. Oss

Not only is California's Medi-Cal system and its public behavioral health system changing (see California As A Bellwether, California & The Mental Health Carve-Out, and Innovation, California Style), some of the basic policies and practices for serving people with intellectual and developmental disabilities (IDD) are evolving as well. The California State Department of Developmental Disabilities (DDS) is responsible for this population through the administration of the Lanterman Developmental Disabilities Services Act and the Early Intervention Services Act, laws which ensure the coordination and provision of services and supports for people with developmental disabilities. The DDS does this through 21 community-based, non-profit corporations known as "regional centers" (RC) and through state-operated facilities – a system that will serve over 274,000 consumers in fiscal year 2014-2015.

The system is in flux with a number of major changes in policy and service delivery. There are three major changes with significant implications for consumers, professionals, and provider organization alike – self-determination, the de-population of the developmental centers, and community crisis homes and behavioral support centers.

*Self-Determination* – On October 9, 2013, Governor Brown signed Senate Bill 468 into law, mandating Regional Centers to implement a Self Determination Program (SDP), allowing families and individuals with developmental disabilities greater control of their services. Once there is federal approval, the program will be made available in all Regional Centers. In December 2014, California submitted a home- and community-based services (HCBS) waiver for the SDP to the federal Centers for Medicare and Medicaid Services (CMS) for approval, and in May 2015, CMS stated their conceptual agreement with the plan. As part of the SDP program, each Regional Center is required to establish a Local Volunteer Advisory Committee to assure that the SDP is implemented effectively. The committee must include consumers, family members, the Regional Center clients' rights advocate, other advocates, and community leaders. Their role will be to share best practices, facilitate training, and review the progress of the program's implementation. For the first three years, the number of participants statewide will be limited to 2,500, followed by no limits after the three-year phase in period (see California Senate Bill 468 Of 2013 To Implement Self-Direction For Regional Center Services).



*De-Population of The Developmental Centers* – The state currently operates three Developmental Centers, which are residential facilities that are licensed and certified as Skilled Nursing Facility (SNF), Intermediate Care Facility/Mentally Retarded (ICF/MR), and General Acute Care hospitals (GAC). As more consumers are moving from these facility-based support programs to the community, there has been a decrease in the Developmental Center population. In fact, the Developmental Center population has declined by roughly 20% over the last decade – from 5,713 in 1994, to 1,084 in June of 2015 (see Population of Developmental Centers and State-Operated Community Facilities).

This shift has created a growing need for more community-based services. The Secretary of Health & Human Services created a Task Force to consider how to transition consumers from Developmental Centers to the community (see California Health and Human Services Secretary Diana S. Dooley to Establish Task Force for State Developmental Centers). The task force recommends new models of behavioral care in the community; additional services and supports in the community using existing models of care; and expanding the Community State Staff Program to support individuals moving from developmental centers and enhance regional center staffing.

*Community Crisis Homes & Behavioral Support Centers* – In July 2014, the state passed Senate Bill No. 856, which created two new types of organizations to serve individuals with IDD who are in need of crisis or behavioral support services. The legislation authorized the development of two community crisis homes, that would serve a maximum of eight adults and provide 24-hour non-medical care to individuals with developmental disabilities receiving Regional Center service, in need of crisis intervention services, and who would otherwise be at risk of admission to acute crisis centers, an out-of-state placement, a general acute hospital, an acute psychiatric hospital, or an institution for mental disease. The legislation also created a pilot program to develop up to six enhanced behavioral support homes. A behavioral support home would serve a maximum of four clients, and provide 24-hour, intensive behavioral services and supports to adults and children with developmental disabilities.

What does this mean for service provider organizations in California? This is the perspective of my colleague, Richard Louis, III, Executive Director, Strategic Development and Planning at Providence Human Services, and a member of the *OPEN MINDS* Advisory Board:





*As California health care delivery systems continue to embrace care management models that rely less on institutional care for long-term care, there is continued focus on the development of community-based treatment and support options to better manage complex clients such as some IDD populations. This is a great opportunity for provider organizations with a community focus. There is a growing need for management teams of provider organizations to develop collaborative partnerships and offer new consumer-focused integrated treatment modalities that includes services like mental health treatment and primary care. Community-based care management strategies, to ensure client access to vital community supports (i.e. housing, primary care, education, and employment), are also critical to assure long term stability for consumers in the community. This is the evolving formula for improving consumer well-being and reducing the costs of facility-based services.*

Richard Louis

For updates on these developments, as well as an in-depth look at the California market, be sure to join us in San Diego on August 26 for the session, Navigating The Challenges Of Serving Individuals With Intellectual & Developmental Disabilities: An Update On The Transitioning California Market, with Carlos Flores, Executive Director San Diego Regional Center; Javier Zaldivar, Director, San Andreas Regional Center; and Richard Louis, Executive Director, Strategic Development and Planning at Providence Human Services.



# Carve-Out Or No

Executive Briefing | By Monica E. Oss | July 30, 2015



Monica E. Oss

The primary carve-out model of financing and managing behavioral health services is on the wane. In a number of states – the primary behavioral health carve-out in Medicaid has either been replaced (New Mexico and Oregon), or is in the process of being replaced (Colorado, Washington, and Louisiana) by integrating financing for behavioral health services through health plans. The recent approval of a primary behavioral health carve-out for consumers with serious mental illness (SMI) in California (see California & The Mental Health Carve-Out and California's Mental Health Carve-Out Preserved For Five Years, But With New Performance Transparency Requirements) was one of the few exceptions to this trend.



Brian Wheelan

Why the change in financing models? This move from horizontal specialty management models to vertically-integrated financing through health plans, accountable care organizations (ACOs), and medical homes is being done purportedly to accomplish "integration" of service management for consumers. Whether or not integrated financing accomplishes integrated service management has yet to be seen. Are specialty management programs a better choice for consumers? Brian Wheelan, executive vice president and chief strategy officer for Beacon Health Options, thinks that a specialist-driven care management model is a better choice for many consumers and that policymakers have an "oversimplified" understanding of what integrated care is, and for whom it is most appropriate. In a recent *Managed Care* article (see Don't Blame Carve-Outs), Mr. Wheelan states:

*There's a narrative that says, 'Just put all your money for behavioral health and primary care in one place and you'll magically integrate care'....No one is arguing that individuals should not be screened and treated for all their medical and behavioral health needs, but to place the blame for fragmented care squarely at the feet of so-called carve-outs is a false premise.*



For him, one size doesn't fit all, and consumers need specialty systems that are a fit with their care coordination needs. His perspective on how best to customize the delivery system by consumer needs is an interesting one with five key consumer cohorts:

1. <u>The most seriously mentally ill</u> – Consumers with the most serious mental illness need to be served by specialty care because their needs are beyond the scope of primary care practices.
2. <u>Severe substance abuse disorders</u> – Consumers with severe addictive disorders need care management that understands addiction treatment – and this is usually beyond the care management capabilities of primary care.
3. <u>Consumers with mild and moderate behavioral disorders</u> – These consumers are best served in a primary care setting as long as PCPs don't overly rely on psychotropic medications at the expense of effective outpatient therapies.
4. <u>Consumers with specific high-cost medical conditions</u> – Consumers with serious illnesses (cancer, IBD, diabetes, pain, etc.) who need specific specialist-informed care are a good fit for specialty medical homes financed through bundled payments.
5. <u>Comorbid chronic physical and mental health conditions</u> – For consumers with chronic physical health conditions and comorbid mental health conditions, effective consumer care management is possible in primary care practices, but it depends on the practice. Some are large enough to develop specialized approaches, while smaller practices will need to contract out with a behavioral health specialist.

I think we are in the "first generation" of testing integrated care coordination models – and, using analytics and practice-based evidence, I expect we will see a return to specialty management for consumer groups over the next few years. And Brian Wheelan's perspectives are a good starting point for putting these new tools to work.

To hear more from Brian Wheelan, I hope you'll join me on August 27 in San Diego where he opens the second day of The 2015 *OPEN MINDS* California Management Best Practices Institute with his keynote address, [The Future Of Behavioral Health Carve-Out Models In An Integrated World](#).

P.S. For more on the changing status of Medicaid behavioral health financing in the states mentioned above, check out:

1. California, see [California Behavioral Health System State Profile Report](#)
2. Colorado, see [Colorado Behavioral Health System State Profile Report](#)
3. Louisiana, see [Louisiana Behavioral Health System State Profile Report](#)
4. New Mexico, see [New Mexico Behavioral Health System State Profile Report](#)
5. Oregon, see [Oregon Behavioral Health System State Profile Report](#)
6. Washington, see [Washington Behavioral Health System State Profile Report](#)



# Child Welfare's Moving Target — Towards Community-Based Care

Executive Briefing | By Monica E. Oss | August 1, 2015



Monica E. Oss

If you look back over the past decade, the use of residential facilities to house children in the child welfare system has dropped continuously. In 2013, there were 402,378 children in the child welfare system – this is a 22% decrease from 2004, when there were 517,000 children in the child welfare system. In 2004, roughly 8% of children in out-of-home placements were in group homes, 10% were in institutions, 24% were in relative foster homes, and 46% were in non-relative foster homes. In 2013, roughly 6% of children in out-of-home placements were in group homes, 8% were in institutions, 28% were in relative foster homes, and 47% were in non-relative foster homes (see Foster Care Statistics 2013).

This change has been due to the continued focus on keeping children with their families, the increased use of kinship care models, and the use of enhanced foster care models. There have been a number of policy and advocacy organizations that have supported this move – see National Resource Center for Family-Centered Practice & Permanency Planning – Kinship Care, Supporting Kinship Care:Towards A New Practice Framework, and Congregate Care Placements Average 14% For U.S. Children In State Custody.

The most recent example of this evolution in the child welfare field is in California. The California Department of Social Services is planning to implement a "continuum of care" reform initiative for foster care that will eliminate lower level group homes and put restrictions on the use of out-of-state placements.

Currently, *Assembly Bill 403: Foster Youth: Continuum of Care Reform*, is making its way through the state legislature, and would establish a core practice model to govern all services, whether delivered by a county or licensed provider organization, to create consistency and continuity of care. It also ensures that medically necessary mental health services will be made available to children and youth in foster care, regardless of their placement setting (see California Launching "Continuum Of Care" Reform Initiative For Foster Care). The bill has the following provisions to create the Continuum of Care Reform (CCR) initiative:



1. CCR will establish a core practice model that requires that service delivery is orchestrated through a Child and Family Team (CFT) process. The CFT will conduct an assessment of the child's safety, permanency, and well-being to determine what services are needed. The CFT will then create a plan that outlines the most appropriate family-based or placement setting, the services and supports needed to achieve permanency, and treatments and therapies needed for the child to achieve well-being. The plan will include performance measures to increase accountability for provider organizations.
2. All services and placement decisions will be based on a comprehensive, trauma-informed Assessment Process. The needs of the child or youth will determine services and placement; not costs, available space, social worker preferences, or probation officer preferences.
3. The CCR will remove barriers for serving children/youth in licensed, certified, adoptive, kinship, and non-related extended family members families.
4. Access to mental health services will be standardized across each county; children and youth will not need to be placed in a certain type of program in order to receive necessary services.

What does all that mean for provider organizations? This is the perspective of my colleague and *OPEN MINDS* Senior Associate, Howard Shiffman:



Howard Shiffman

*I believe the phrase that will define the residential market in the future is, "a small percentage of children." Only a small percentage of children will be placed in residential care and only for the purpose of either crisis stabilization or to get them prepared for treatment in a community setting. These realities must be recognized and understood by the executives of child serving organizations.*

*Why is this happening? Payers recognize the high cost of group care and are moving toward utilizing treatment foster care and providers that offer lower cost community-based services. This is happening because the analytics are now available that show outcomes are comparable. Right now, kinship care is the preferred placement option in many states and millions of dollars are being spent to influence policy and fund alternative services. Contract awards are going to the provider organizations that can demonstrate their ability to keep children in the community, achieve outcomes, and accept different pay for performance reimbursement.*

For more on the changing landscape in the child welfare field, check out these resources:

1. The Future Of Child Welfare Services – What The Thoughtleaders Think
2. Making Foster Care & Managed Care Work
3. A New (& Sometimes Uncomfortable) Combination – Children's Services, Medicaid, & Managed Care
4. The Brave New Title IV-E World



5. A Child Welfare Funding Change – For The Better
6. Managed Care In Child Welfare – An Encore
7. Will The Massachusetts Model Be THE New Child Welfare System Management Model?
8. Narrow Networks & Children's Services: Another Perspective
9. Big Changes In Federal Child Welfare Funding
10. Growth & Opportunity In Kinship Care

And make sure to join me and my colleague Howard Shiffman on August 26 at The 2015 *OPEN MINDS* California Management Best Practices Institute for his session, Increasing Challenges & Opportunities In The California Children's Service Market.



# EXHIBIT 10



# Reinvent Your Strategy For Sustainability

August 24-25, 2016 | Marriott Mission Valley Hotel, San Diego, California

# THE 2016 OPEN MINDS
# CALIFORNIA
## MANAGEMENT BEST PRACTICES INSTITUTE

For over 25 years, exclusively focused on the needs of payer and provider organizations serving complex consumers
Chronic Care Management ▪ Disability Supports & Long-Term Care ▪ Mental Health Services ▪ Addiction Treatment ▪ Social Services
Intellectual & Developmental Disability Supports ▪ Child & Family Services ▪ Juvenile Justice ▪ Corrections Health Care



# THE 2016 OPEN MINDS
# CALIFORNIA
## MANAGEMENT BEST PRACTICES INSTITUTE

## READY. SET. REINVENT.

**Success in the emerging California market will belong to the leadership teams that can identify disruptive opportunities and develop a business model built for long-term sustainability.**

The 2016 *OPEN MINDS* California Management Best Practices Institute is designed to help executives prepare their organizations for the changing health and human service market and give organizations all the tools they need to develop a sustainable business model built for long-term success.

Our information-packed agenda features four exciting plenary sessions – with each of our dynamic speakers giving new insight into the business best practices you need to reinvent your organization during a time of system transformation.

Join 350+ executives in San Diego for the only event focused exclusively on the challenges facing California, and the solutions executives need to build stronger, more competitive, high-performing organizations.

## Hotel

### Marriott Mission Valley Hotel

8757 Rio San Diego Drive, San Diego, California 92108

Reserve your room by July 25, 2016 and mention *OPEN MINDS* to get the discounted group rate of $153/night!

Call: 1-888-236-2427

Visit: california.openminds.com/venue

> *California isn't alone as a market overwhelmed by change. But in a market that is evolving this quickly, organizations need to be proactive about reinventing their business models for sustainability – with an emphasis on growth and innovation to gain the edge over the competition. Optimizing your strategy for the future requires rethinking core programs, looking for new opportunities for diversification, and considering new technologies.*

*- Monica E. Oss, CEO, OPEN MINDS*



# AUGUST 24-25, 2016 • SAN DIEGO, CALIFORNIA


**Deb Adler**
Senior Vice President,
Network Strategy
Optum Behavioral Health


**Ken Bachrach, Ph.D.**
Clinical Director
Tarzana Treatment Centers


**Daniel Fishbein, Ph.D.**
Vice President, Corporate
Business Development
Jefferson Center for
Mental Health


**Dennis Freeman, Ph.D.**
Chief Executive Officer
Cherokee Health System


**Monica E. Oss**
Chief Executive Officer
*OPEN MINDS*


**Corey McCann, M.D., Ph.D.**
Founder & CEO
Pear Therapeutics


**Eve Phillips**
Co-Founder & CEO
Empower Interactive, Inc.


**Anupam Khandelwal**
Chief Executive Officer
SageSurfer


**Lupe Trevizo-Reinoso**
Vice President, Living
Options, Easter Seals of
Southern California


**Marco Giordano, CPA**
Chief Financial Officer
Resources for Human
Development


**Sandra Naylor Goodwin, Ph.D.**
President & CEO
California Institute
for Behavioral Health
Solutions (CIBHS)


**Steve Hornberger, MSW**
Director
Social Policy Institute
San Diego State University
School of Social Work


**Richard S. Knecht, MS**
Transformation Manager
California Department of
Healthcare Services &
Department of Social
Services


**Steve Ramsland, Ed.D.**
Institute Chair &
Senior Associate
*OPEN MINDS*


**Dyann Roth, MS**
Chief Executive Officer
Resources for
Human Development


**Judy Webber, LCSW**
Deputy Director
Department of Children &
Family Services
County of Ventura

More information on this year's institute can be found online at

# CALIFORNIA.OPENMINDS.COM

# Agenda

## PRE-INSTITUTE

### August 23, 2016 | 10:00 am - 4:00 pm

**Reinventing Your Organization In A Complex Market: A Guide To Building A Sustainable, Performance-Driven Organization**

Expand your experience with a "deep dive" into timely topics by joining us the day before the institute for a pre-institute seminar! In this essential seminar, we will discuss the challenges – and opportunities – for service provider organizations operating in the evolving California market. The seminar will include the following sessions:

• Positioning For Success: Developing The "Future Vision" For Your Organization
• Creating A Long-Term Vision – Defining Success & Sustainability
• Testing The Feasibility Of Your Vision – Scenario-Based Planning & Analysis
• Strategic Planning In A Complex Market: Developing Your Strategy For Success
• Understanding Diversification As An Option
• Steps In Creating New Service Lines & Entering New Markets
• Addressing Issues Of Financing & Scale
• Excellence In Execution: Moving From Plan To Action

*Monica E. Oss, Chief Executive Officer, OPEN MINDS & Sharon Hicks, Senior Associate, OPEN MINDS*

## DAY ONE

### August 24, 2016 | 7:00 am - 8:30 am

Registration & Executive Networking Breakfast

### August 24, 2016 | 8:30 am - 9:45 am

**Using Technology To Improve Consumer Access: Optum California's Investment In Telemental Health Initiatives**

Rapid consumer access to treatment services is a big part of consumer satisfaction and consumer engagement. Both are essential to attracting consumers to a health plan or provider organization - and to assuring great care coordination. For mental health in particular, consumer access is a challenging issue. Shortages of psychiatrists, scheduling systems, and geographic distance between consumers and health care facilities are just a few of the specific issues that make rapid access to mental health services challenging. New tech platforms and tech-related practices have emerged that could possibly be deployed to improve consumer access to mental health services - but they are in their infancy. One organization, Optum, is taking the lead in its California market to deploy technologies to improve the consumer experience and consumer access to mental health services. Join us for this timely plenary presentation by Deborah Adler, Senior Vice President, Network Strategy, at Optum Behavioral Health for an up-to-the-minute update on Optum's telemental health and innovative access strategies in California.

*Deb Adler, Senior Vice President, Network Strategy, Optum Behavioral Health*

### August 24, 2016 | 10:00 am - 11:15 am

**Strategic Planning For Sustainability: A Step-By-Step Model For Executive Teams**

*Joseph P. Naughton-Travers, EdM, Senior Associate, OPEN MINDS*
*Dyann Roth, MS, Chief Executive Officer, Resources for Human Development*
*Marco Giordano, CPA, Chief Financial Officer, Resources for Human Development*

**The Changing Landscape Of Children's Services In California: The Challenges & Opportunities Presented By Katie A. & The Continuum Of Care Reform**

*Richard Louis, III, Senior Associate, OPEN MINDS*
*Steve Hornberger, MSW, Director, Social Policy Institute, San Diego State University School of Social Work*
*Richard S. Knecht, MS, Transformation Manager, California Department of Healthcare Services, Department of Social Services*
*Judy Webber, LCSW, Deputy Director, Department of Children & Family Services, County of Ventura*
*Briana Duffy, MBA, LSW, Senior Vice President, National Client Partnerships, Beacon Health Options*

**DAY ONE**

## August 24, 2016 | 11:30 am - 12:45 pm

### California's Mental Health System: The Shifting Role Of Counties & Future Of Service Delivery

*Steve Ramsland, Ed.D., Senior Associate, OPEN MINDS*
*Wayne Clark, Ph.D., Executive Director, California Mental Health Services Authority*

### Navigating The Challenges Of Serving Individuals With Intellectual & Developmental Disabilities: A Discussion Of The Transitioning California Market

*Richard Louis, III, Senior Associate, OPEN MINDS*
*Stephen Mouton, Psy.D., MBA, Clinical Psychologist & Policy Liaison, Los Angeles County Regional Center*
*Marty Giffin, Ph.D., Senior Vice President, Southern California Operations, ANKA Behavioral Health, Inc.*
*Lupe Trevizo-Reinoso, Vice President, Living Options, Easter Seals of Southern California*

### The Health Integration Meeting: A Concrete Example Of Integration Between Behavioral Health & Primary Medical Care - *Sponsored By Welligent*

*Cassandra Eslami, Managing Director of Mental Health, HealthRight 360*

## August 24, 2016 | 12:45 pm - 2:15 pm – Lunch On Your Own

## August 24, 2016 | 2:15 pm - 3:30 pm

### Diversifying Your Revenue Streams: How To Successfully Launch A New Service Line

*Joseph P. Naughton-Travers, EdM, Senior Associate, OPEN MINDS*

### Expanded Coverage For Addiction Treatment: Finding The Opportunities With The Drug Medi-Cal Organized Delivery System

*Richard Louis, III, Senior Associate, OPEN MINDS*
*Sandra Naylor Goodwin, Ph.D., MSW, President & CEO, California Institute for Behavioral Health Solutions (CIBHS)*
*Michael Hutchinson, MFT, Division Director, Quality Improvement and Data Support, Substance Use Treatment System Division, Santa Clara County Health and Hospital System*
*David Lisonbee, Chief Executive Officer, Twin Town Treatment Centers*

### Total Cost Of Ownership: The Important Operational Assessment You're Probably Not Conducting - *Sponsored By Valant Medical Solutions*

*David Lischner, M.D., Chief Executive Officer, Valant Medical Solutions*

## August 24, 2016 | 3:45 pm - 4:45 pm

### The Future Of Health Care Technology: A Town Hall Discussion With Digital Health Executives

In today's health care market, the use of treatment technologies is changing the paradigm for consumer care management and service delivery. Health care technologies are quickly becoming key to meeting consumer expectations, increasing access to care, lowering costs, and improving outcomes. In this can't-miss town hall discussion session, we'll discuss the growing use of treatment technologies and how they are shaping service delivery. We'll hear from several top executives in the digital health space about technologies that are currently being used and their thoughts on what we can expect to see in the future.

*Corey McCann, M.D., Ph.D. Founder & CEO, Pear Therapeutics*
*Eve Phillips, Co-Founder & CEO, Empower Interactive, Inc.*
*Anupam Khandelwal, Chief Executive Officer, SageSurfer*

## August 24, 2016 | 4:45 pm - 5:45 pm

### Networking Reception In The Institute Exhibit Hall

**DAY TWO**

### August 25, 2016 | 7:30 am - 8:30 am

Executive Networking Breakfast In The Institute Exhibit Hall

### August 25, 2016 | 8:30 am - 9:45 am

**How Do You Develop & Manage An Integrated Primary Behavioral Health Practice: Lessons Learned From Executives Who Are Making It Work**

Behavioral health organizations across the country are developing a number of initiatives to better meet the needs of clients via the integration of primary and behavioral health care. However, in an era when everyone in health care is talking about integration, few organizations have been able to master the process. In this exciting session, we will review several organizations' paths to integration, the service delivery models they have created, how they work with payers under their models, and their advice for other provider organizations considering how to expand their practices into primary care.

*Ken Bachrach, Ph.D., Clinical Director, Tarzana Treatment Centers*
*Dennis Freeman, Ph.D., Chief Executive Officer, Cherokee Health Systems*
*Daniel Fishbein, Ph.D., Vice President, Corporate Business Development, Jefferson Center for Mental Health*

### August 25, 2016 | 10:00 am - 11:15 am

**Optimizing Your Business Development Budget: How To Develop A Focused Plan For New Contracts**

*Steve Ramsland, Ed.D., Senior Associate, OPEN MINDS*

**Does Measuring Performance Change Outcomes? Moving To Metrics-Based Management**

*Joseph P. Naughton-Travers, EdM, Senior Associate, OPEN MINDS*

### August 25, 2016 | 11:30 am - 12:30 pm

**Building Your Bicycle While Riding It: How To Overcome The Challenges To Innovation In Serving Complex Consumers**

There are shifts in the health and human service markets in many states – but few can top California in terms of both size and the magnitude of change. It appears that across the spectrum – from Medicaid, the dual eligible population, county health and human services, corrections, support services for the IDD population, child welfare financing, and more – "redesign" is the norm. Success in this market will belong to the leadership teams that can identify disruptive opportunities and develop strategies for financially viable programs and service lines. In this engaging closing session, *OPEN MINDS* Chief Executive Officer, Monica Oss, will discuss how to reinvent your business model for sustainability now and optimize your strategy for the future.

*Monica E. Oss, Chief Executive Officer, OPEN MINDS*

### August 25, 2016 | 12:30 pm - 12:45 pm

Raffle Prize Drawing In The Institute Exhibit Hall

## SPONSORS




















# Registration Form

## The 2016 *OPEN MINDS* California Management Best Practices Institute
### August 24-25, 2016 | San Diego, California

| Individual Registration | Regular Rate |
|---|---|
| Registration: 1 attendee | ❏ $595 |
| **Group Registration** | |
| Registration: 2 attendees | ❏ $595 each / $1,190 total |
| Registration: 3 attendees | ❏ $550 each / $1,650 total |
| Registration: 4 attendees | ❏ $525 each / $2,100 total |
| Registration: 5 attendees | ❏ $500 each / $2,500 total |
| Registration: 6+ attendees | ❏ $475 each / #_____ |

| Add An Optional Pre-Institute Seminar (August 23, 2016 | 10:00am - 4:00pm) | |
|---|---|
| Reinventing Your Organization In A Complex Market: A Guide To Building A Sustainable, Performance-Driven Organization | ❏ $195 each / #_____ |

**Total Charge:**   $ _____

## Attendee Information
*(For multiple registrations, duplicate form below or send attendee details via an attached document or email)*

Name                                                    Credentials

Title

Organization

Address

City/State/Zip

Telephone                                        Fax

Registrant Email                                 Additional Email Contact

## Payment Information

❏ Visa   ❏ MasterCard   ❏ American Express   ❏ Discover   ❏ Check Enclosed

Card Number                                        Expiration Date

Cardholder's Printed Name

Cardholder's Signature

### REGISTER ONLINE
https://california.openminds.com

### EMAIL THIS FORM TO
info@openminds.com

### FAX THIS FORM TO
717-334-0538

### MAIL THIS FORM TO
*OPEN MINDS*
163 York Street
Gettysburg, PA 17325

### QUESTIONS? Call Us!
Do you have questions about the institute or would you prefer to register over the phone? Give our events team a call at 877-350-6463

Registration Guidelines: Requests for refunds must be received in writing at least 30 days prior to the event and are subject to an administrative charge of $50. No refund will be made less than 30 days prior to the event. Substitute enrollment for another *OPEN MINDS* event on another date will be accepted for an administrative fee of $25, plus the difference in registration fees. An alternate individual may attend in place of the registered attendee for a $25 administrative fee. Requests for refunds are not accepted for group purchases. Replacement registrants are accepted at no additional charge. Unused registrations for a particular event will be added to a group registration subscription for the organization to use for an alternate *OPEN MINDS* event within one (1) calendar year from the date of purchase.



Gettysburg, PA 17325-1933

Phone: (717) 334-1329
Fax: (717) 334-0538
info@openminds.com

**Return Service Requested**



# Reinvent Your
# Strategy For
# Sustainability

The only event focused exclusively on the challenges facing California, and the solutions executives need to build stronger, more competitive, high-performing organizations.

Reserve Your Seat Today!

# EXHIBIT 11

# OPEN MINDS Expense Report

**NAME** Joe Naughton Travers
**DEPARTMENT NAME** Consulting
**EXPENSES BILLABLE TO** MHS 2133

| DATE | EXPENSE TYPE | DESCRIPTION | MILES | AMOUNT |
|---|---|---|---|---|
| 11/14/2015 | Airfare | Roundtrip from Newark, NJ to San Diego, CA | | $ 1,171.28 |
| 11/14/2015 | Taxi/Limo | To and from the airport in San Diego, CA | | $ 160.00 |
| 11/14/2015 | Lodging | Coronado Island Marriott Resort | | $ 443.43 |
| 11/14/2015 | Dinner | | | $ 64.42 |
| 11/14/2015 | Phone/Internet | | | $ 49.95 |
| 11/15/2015 | Lodging | Coronado Island Marriott Resort | | $ 443.43 |
| 11/15/2015 | Breakfast | | | $ 23.14 |
| 11/15/2015 | Lunch | | | $ 23.44 |
| 11/15/2015 | Dinner | | | $ 29.80 |
| 11/15/2015 | Supplies | Groceries for meals in room | | $ 52.91 |
| 11/16/2015 | Lodging | Coronado Island Marriott Resort | | $ 443.43 |
| 11/16/2015 | Breakfast | | | $ 21.42 |
| 11/16/2015 | Lunch | | | $ 28.76 |
| 11/17/2015 | Lodging | Coronado Island Marriott Resort | | $ 443.43 |
| 11/17/2015 | Breakfast | | | $ 25.74 |
| 11/17/2015 | Lunch | | | $ 26.57 |
| 11/18/2015 | Lodging | Coronado Island Marriott Resort | | $ 443.43 |
| 11/18/2015 | Breakfast | | | $ 25.52 |
| 11/18/2015 | Dinner | | | $ 37.06 |
| 11/19/2015 | Lodging | Coronado Island Marriott Resort | | $ 443.43 |
| 11/19/2015 | Breakfast | | | $ 32.00 |
| 11/19/2015 | Lunch | | | $ 26.87 |
| 11/19/2015 | Dinner | | | $ 25.47 |
| 11/20/2015 | Auto Rental | Transportation for the week | | $ 336.00 |
| | | | **TOTAL** | $ 4,820.93 |

MHS    780.85

From: **Delta Air Lines** DeltaAirLines@e.delta.com
Subject: Your Flight Receipt - JOSEPH PAUL NAUGHTONTRAVERS 15NOV15
Date: June 4, 2015 at 7:49 PM
To: joepaulnt@me.com

# ▲ DELTA

**Hello, JOSEPH PAUL**                    SkyMiles® #*******589 >

**Your Trip Confirmation #: GIM29I**              MANAGE MY TRIP >

| **Sun, 15NOV** | **DEPART** | **ARRIVE** |
|---|---|---|
| DELTA 1335 | NEWARK | DETROIT |
| FIRST (A) | 12:40pm | 2:32pm |
| **Mon, 16NOV** | **DEPART** | **ARRIVE** |
| DELTA 1635 | DETROIT | SAN DIEGO |
| FIRST (A) | 7:35pm | 9:27pm |
| **Sat, 21NOV** | **DEPART** | **ARRIVE** |
| DELTA 1592 | SAN DIEGO | ATLANTA |
| FIRST (P) | 6:30am | 1:38pm |
| DELTA 2537 | ATLANTA | NEWARK |
| FIRST (P) | 3:05pm | 5:19pm |

## Passenger Info

| **NAME** | **FLIGHT** | **SEAT** |
|---|---|---|
| JOSEPH PAUL NAUGHTONTRAVERS | DELTA 1335 | Select Seat |
| SkyMiles #*******589 | DELTA 1635 | Select Seat |
| Diamond | DELTA 1592 | Select Seat |
| | DELTA 2537 | Select Seat |

Visit delta.com or use the Fly Delta app to view, select or change your seat.
If you purchased a Trip Extra, please visit My Trips to access a receipt of your purchase.

## Flight Receipt

Ticket #: 0062195947083

Place of Issue: Delta Reservations

Issue Date: 04JUN15

Expiration Date: 04JUN16

## METHOD OF PAYMENT

AX***********2004                                            **$1561.70 USD**

## CHARGES

### Air Transportation Charges

Base Fare                                                      $1410.69 USD

### Taxes, Fees and Charges

| | |
|---|---:|
| United States - September 11th Security Fee(Passenger Civil Aviation Security Service Fee) (AY) | $11.20 USD |
| United States - Passenger Facility Charge (XF) | $18.00 USD |
| United States - Flight Segment Tax (ZP) | $16.00 USD |
| United States - Transportation Tax (US) | $105.81 USD |

## TICKET AMOUNT                                            **$1561.70 USD**

This ticket is non-refundable unless the original ticket was issued at a fully refundable fare. Some fares may not allow changes. If allowed, any change to your itinerary may require payment of a change fee and increased fare. Failure to appear for any flight without notice to Delta will result in cancellation of your remaining reservation.

Note: When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply.

Fare Details: EWR DL DTT240.93UF07A0NQ/WNUP DL SAN519.06KF14A0QQ/WNUPA DL X/ATL DL EWR630.70HA00A0QD/WNUP 1S20.00 USD1410.69END ZP EWRDTWSANATL XF EWR4.5DTW4.5SAN4.5ATL4.5

## Checked Bag Allowance

The fees below are based on your original ticket purchase. **If you qualify for free or discounted checked baggage,** this will be taken into account when you check in.

| Sun 15 Nov 2015 | DELTA: EWR ▶ DTW | |
|---|---|---|
| CARRY ON | FIRST | SECOND |
| FREE | FREE | FREE |

Visit delta.com for details on baggage embargos that may apply to your itinerary.

| Mon 16 Nov 2015 | DELTA: DTW ▶ SAN | |
|---|---|---|
| CARRY ON | FIRST | SECOND |

Part.001

My trip to Starr Commonwealth in November has been cancelled.  Was a three way
shared airfare, Prestera, Starr, and MHS.  I think this is what was billed for
Starr.  Do not bill Starr for this, rather split it between Prestera and MHS.  I
have a minor credit I'll use for a next MHS trip.

Sorry, about complex travel

J



**From:** "Joseph P. Naughton-Travers" <joepaulnt@me.com>
**To:** "Josue Santoyo, Accounting Manager, OPEN Minds" <jsantoyo@openminds.com>
**CC:** "Casey Miller, Executive Vice President, Administration, OPEN Minds" <cm...
**Date:** 10/30/2015 5:14 PM
**Subject:** Bill Prestera airfare

Josue

My last trip to Prestera is billing bumped at the last minute due to delays on their end.  It is being replaced by a conference call.  Since the ticket is shared with MHS, I changed it but you still have to bill Prestera for their part as it was non-refundable.  There was not extra fee to nix the WV part of the trip, but I used the whole ticket price to make the change to still go to San Diego.  I gave Karen the head's up for this. (Still cheaper than a site day as she saves the hotel and other travel.)

J



MHS    780.85

**From:** **Delta Air Lines** DeltaAirLines@e.delta.com
**Subject:** Your Flight Receipt - JOSEPH PAUL NAUGHTONTRAVERS 15NOV15
**Date:** June 4, 2015 at 7:49 PM
**To:** joepaulnt@me.com



# DELTA

**Hello, JOSEPH PAUL**                                     SkyMiles® #*******589 >

**Your Trip Confirmation #: GIM29I**          MANAGE MY TRIP >

| **Sun, 15NOV** | **DEPART** | **ARRIVE** |
|---|---|---|
| DELTA 1335 | NEWARK | DETROIT |
| FIRST (A) | 12:40pm | 2:32pm |
| **Mon, 16NOV** | **DEPART** | **ARRIVE** |
| DELTA 1635 | DETROIT | SAN DIEGO |
| FIRST (A) | 7:35pm | 9:27pm |
| **Sat, 21NOV** | **DEPART** | **ARRIVE** |
| DELTA 1592 | SAN DIEGO | ATLANTA |
| FIRST (P) | 6:30am | 1:38pm |
| DELTA 2537 | ATLANTA | NEWARK |
| FIRST (P) | 3:05pm | 5:19pm |

## Passenger Info

| **NAME** | **FLIGHT** | **SEAT** |
|---|---|---|
| JOSEPH PAUL NAUGHTONTRAVERS | DELTA 1335 | Select Seat |
| SkyMiles #*******589 | DELTA 1635 | Select Seat |
| Diamond | DELTA 1592 | Select Seat |
|  | DELTA 2537 | Select Seat |

Visit delta.com or use the Fly Delta app to view, select or change your seat.
If you purchased a Trip Extra, please visit My Trips to access a receipt of your purchase.

## Flight Receipt

Ticket #: 0062195947083

Place of Issue: Delta Reservations

Issue Date: 04JUN15

Expiration Date: 04JUN16

## METHOD OF PAYMENT

AX***********2004                                         **$1561.70 USD**

## CHARGES

### Air Transportation Charges

Base Fare                                                 $1410.69 USD

### Taxes, Fees and Charges

| | |
|---|---|
| United States - September 11th Security Fee(Passenger Civil Aviation Security Service Fee) (AY) | $11.20 USD |
| United States - Passenger Facility Charge (XF) | $18.00 USD |
| United States - Flight Segment Tax (ZP) | $16.00 USD |
| United States - Transportation Tax (US) | $105.81 USD |

## TICKET AMOUNT                                          **$1561.70 USD**

This ticket is non-refundable unless the original ticket was issued at a fully refundable fare. Some fares may not allow changes. If allowed, any change to your itinerary may require payment of a change fee and increased fare. Failure to appear for any flight without notice to Delta will result in cancellation of your remaining reservation.

Note: When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply.

Fare Details: EWR DL DTT240.93UF07A0NQ/WNUP DL SAN519.06KF14A0QQ/WNUPA DL X/ATL DL EWR630.70HA00A0QD/WNUP 1S20.00 USD1410.69END ZP EWRDTWSANATL XF EWR4.5DTW4.5SAN4.5ATL4.5

## Checked Bag Allowance

The fees below are based on your original ticket purchase. **If you qualify for free or discounted checked baggage,** this will be taken into account when you check in.

| Sun 15 Nov 2015 | DELTA: EWR ▶ DTW | |
|---|---|---|
| CARRY ON | FIRST | SECOND |
| FREE | FREE | FREE |

Visit delta.com for details on baggage embargos that may apply to your itinerary.

| Mon 16 Nov 2015 | DELTA: DTW ▶ SAN | |
|---|---|---|
| CARRY ON | FIRST | SECOND |



Transaction Details Prepared for
**J P Naughton-Travers**
Account Number
**XXXX-XXXXXX-61004**

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| NOV 15 2015 | *VONS* | $52.91 |

Doing business as:

**VONS**

868 ORANGE AVE

CORONADO

CA

92118-2619

UNITED STATES OF AMERICA (THE)

Category: Merchandise & Supplies - Groceries

 Transaction Details Prepared for
**J Naughton-Travers**
Account Number
**XXXX-XXXXXX-42004**

| DATE | DESCRIPTION | CARD MEMBER | AMOUNT |
|------|-------------|-------------|--------|
| NOV 12 2015 | GoGoAir.Com INFLIGHT877-350-0038 CO | J NAUGHTON-TRAVERS | $49.95 |

Doing business as:

**GoGoAir.COM IN FLIGHT INTERNET**

303 S TECHNOLOGY CT

# A

BROOMFIELD

CO

80021-3411

UNITED STATES OF AMERICA (THE)

Additional Information: 18756698MPD INTERNET ACC

INTERNET ACC

Reference: 320153170476239439

Category: Communications - Other Telecom



**From: En Route Limousine Transportation via Square** receipts@messaging.squareup.com
**Subject:** Receipt from En Route Limousine Transportation
**Date:** November 22, 2015 at 3:58 AM
**To:** joepaulnt@me.com

Reply to this email to leave feedback for En Route Limousine
Transportation



# $336.00

| | |
|---|---|
| Custom Amount | $336.00 |
| Trips 130097 to 13102 transfers from Marriott Coronado | |
| | |
| Total | $336.00 |

### En Route Limousine Transportation

http://www.ertlimo.com

619-276-8300

SHOP ONLINE

From: **Thanks for staying!** efolio@marriott.com
Subject: Your Nov 14, 2015 - Nov 20, 2015 stay at the Coronado Island Marriott Resort & Spa
Date: November 22, 2015 at 4:11 PM
To: joepaulnt@me.com

Thank you for choosing the Coronado Island Marriott Resort & Spa for your recent stay.

As requested, below is a billing summary or adjustment for your stay. **If you have questions about your bill**, please contact us at (619) 435-3000 or mhrs.sanci.ays@marriott.com.

Make another reservation on Marriott.com >>



**MARRIOTT**

You have elected to receive eFolio email messages after every stay.

Modify your email preferences >>

## ]Summary of Your Stay

**Hotel: Coronado Island Marriott Resort & Spa**
2000 Second Street
Coronado, California 92118
USA
(619) 435-3000

**Guest: NAUGHTONTRAVERS/JOSEPH/MR**
1320 CHETWYND AVE
PLAINFIELD, NJ 070603114
USA

**Dates of stay:** Nov 14, 2015 - Nov 20, 2015
**Guest number:** 8855
**Marriott Rewards number:** XXXXX6869

**Room number:** 412
**Group number:**

| Date | Description | Reference | Charges | Credits |
|------|-------------|-----------|---------|---------|
| 11/13/15 | TELECOMM | FREEHSIA | 0.00 | |
| 11/14/15 | RM SERV | 2777 | 64.42 | *dinner* |
| 11/14/15 | TELECOMM | FREEHSIA | 0.00 | |
| 11/14/15 | ROOM | 412, 1 | 399.00 | |
| 11/14/15 | ROOM TAX | 412, 1 | 39.90 | *443.43* |
| 11/14/15 | CA FEE | 412, 1 | 0.54 | *room* |
| 11/14/15 | CTID FEE | 412, 1 | 3.99 | |
| 11/15/15 | RESTAURN | 1868 | 23.14 | *breakfast* |
| 11/15/15 | TELECOMM | FREEHSIA | 0.00 | |
| 11/15/15 | ROOM | 412, 1 | 399.00 | |
| 11/15/15 | ROOM TAX | 412, 1 | 39.90 | *room* |
| 11/15/15 | CA FEE | 412, 1 | 0.54 | |
| 11/15/15 | CTID FEE | 412, 1 | 3.99 | |
| 11/16/15 | RESTAURN | 1965 | 21.42 | *breakfast* |
| 11/16/15 | TELECOMM | FREEHSIA | 0.00 | |
| 11/16/15 | ROOM | 412, 1 | 399.00 | |

| Date | Description | | Amount |
|------|-------------|---|--------|
| 11/16/15 | ROOM | 412, 1 | 399.00 |
| 11/16/15 | ROOM TAX | 412, 1 | 39.90 |
| 11/16/15 | CA FEE | 412, 1 | 0.54 |
| 11/16/15 | CTID FEE | 412, 1 | 3.99 |
| 11/17/15 | RESTAURN | 1020 | 25.74 |
| 11/17/15 | TELECOMM | FREEHSIA | 0.00 |
| 11/17/15 | ROOM | 412, 1 | 399.00 |
| 11/17/15 | ROOM TAX | 412, 1 | 39.90 |
| 11/17/15 | CA FEE | 412, 1 | 0.54 |
| 11/17/15 | CTID FEE | 412, 1 | 3.99 |
| 11/18/15 | RESTAURN | 1059 | 25.52 |
| 11/18/15 | RM SERV | 2919 | 37.06 |
| 11/18/15 | TELECOMM | FREEHSIA | 0.00 |
| 11/18/15 | ROOM | 412, 1 | 399.00 |
| 11/18/15 | ROOM TAX | 412, 1 | 39.90 |
| 11/18/15 | CA FEE | 412, 1 | 0.54 |
| 11/18/15 | CTID FEE | 412, 1 | 3.99 |
| 11/19/15 | RESTAURN | 1114 | 32.00 |
| 11/19/15 | RESTAURN | 1129 | 26.87 |
| 11/19/15 | TELECOMM | FREEHSIA | 0.00 |
| 11/19/15 | ROOM | 412, 1 | 399.00 |
| 11/19/15 | ROOM TAX | 412, 1 | 39.90 |
| 11/19/15 | CA FEE | 412, 1 | 0.54 |
| 11/19/15 | CTID FEE | 412, 1 | 3.99 |
| 11/20/15 | Payment - Visa XXXXXXXXXXXX9289 | | 2,916.75 |

**Total balance**                                              **0.00** USD

Treat yourself to the comfort of Marriott Hotels in your home.

SHOP·MARRIOTT·COM

**Important Information**

**Do Not Reply to this Email**
This email is an auto-generated message. Replies to automated messages are not monitored. If you have any questions please contact the hotel directly at (619) 435-3000.

**Why Have I Received this Email?**
You received this email because you subscribed to eFolio, a feature enabling you to receive an electronic version of your hotel bill by email after every stay. Modify your email preferences >>

**Availability**
Electronic versions of your hotel bill, available by email from our over 2,300 participating properties

*to your airport in NJ*

## US LIMO EXPRESS
## 1-800-714-LIMO
### 732-422-7701
PASSENGER WWW.LIMOEXPRESS.ORG

95467

| | | | | |
|---|---|---|---|---|
| BASIC FARE | | | | |
| PRKNG | | | | |
| TOLLS | | | | |
| WAIT TIME | | | | |
| E/LATE CHARGE | | | | |
| STOPS | | | | |
| VCHER FEE | $ | 3 | 00 | |
| NJ TAX | | | | |
| SUB-TOTAL | | | | |
| TIPS | | | | |
| TOTAL | 160 | 00 | | |

| APPROVAL CODE | | | | |
|---|---|---|---|---|
| DATE | CAR NO. | JOB NO. | DRIVER ID | |
| DISP TIME | ETA | RES TIME | PICKUP TIME | AM PM |
| REMARKS | | | ORIG W.T. | INIT. |

AUTHORIZED SIGNATURE

PICK UP POINT | ZONE-ZIP

FINAL DEST.

| | STOPS | ZONE/ZIP | W.T. | INIT. |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |

COST CODE/DEPT. # | CLIENT MATTER/PH-NUMBER/REF#

| PHONE USAGE | AREA CODE | W.T. | INIT. |
|---|---|---|---|
| | AREA CODE | W.T. | INIT. |

---

Lero's Kitchen + Lounge
1015 Orange Avenue
Coronado, CA 92118
(619) 437-6087
Date:        Nov15'15 11:52AM
Card Type:   AMEX
Acct #:      XXXXXXXXXXX1004
Card Entry:  SWIPED
Trans Type:  PURCHASE
Auth Code:   549305
Check:       3002
Check ID:    109 GUY
Server:      5349 Emily N

Subtotal:            19.44

TIP _____ 4—

TOTAL _____ 23.44

SIGNATURE _____
I AGREE TO PAY THE ABOVE TOTAL
ACCORDING TO MY CARD ISSUER
AGREEMENT!

        MHS  11/15

---

Il Fornaio Cucina Italiana
1333 First Street
Coronado, CA  92118
(619) 437-4911
Date:      Nov15'15 06:02PM
Card Type:  Amex
Acct #:    XXXXXXXXXX1004
Card Entry: SWIPED
Trans Type: PURCHASE
Trans Key: GIG000839989506
Auth Code: 546894
Check:      2223
Check ID:   BAR/4
Server:    916562 DEAN, L

Subtotal:          25.80

Gratuity  4—

Total   29.80
* * * * Guest Copy * * * *

        MHS  11/15

Il Fornaio Cucina Italiana
1333 First Street
Coronado, CA  92118
(619) 437-4911
Date:    Nov19'15 05:25PM
         Card Type: Amex
Acct #:  XXXXXXXXXX1004
         Card Entry: SWIPED
         Trans Type: PURCHASE
Trans Key: GIG0008725678839
         Auth Code: 562295
         Check: 2331
Server:  38911 DIEGO G.

Subtotal:              20.47
         Gratuity _____
         Total _____

* * * * Guest Copy * * * *

---

(858)505-9111
BANGKOK WEST THAI CAFE, #H
9119 CLAREMONT MESA #H
SAN DIEGO, CA 92123

11/17/2015                          13:07:26
MID: XXXXXXXXXXXX2240   TID: XXXXX560

CREDIT CARD

AMEX SALE

Card #          XXXXXXXXXX1004
SEQ #:                        32
Batch #:                      39
INVOICE                       32
Approval Code:            509777
Entry Method:             Swiped
Mode:                     Online

PRE-TIP AMT          $22.57

TIP _____  4-

TOTAL AMOUNT _____ 26.57

I agree to pay above total amount
according to card issuer agreement.
(Merchant agreement if Credit Voucher)

X _____
   JOSEPH P NAUGHTON-TRAVERS

MERCHANT COPY

---

Leroy's Kitchen + Lounge
1015 Orange Avenue
Coronado, CA  92118
(619) 437-6087
Date:        Nov16'15 12:25PM
Card Type:   AMEX
Acct #:      XXXXXXXXXX1004
Card Entry:  SWIPED
Trans Type:  PURCHASE
Auth Code:   550701
Check:       3052
Check ID:    112
Server:      5396 Shannon

Subtotal:              23.76

TIP _____  5-

TOTAL _____ 28.70

SIGNATURE
I AGREE TO PAY THE ABOVE TOTAL
ACCORDING TO MY CARD ISSUER
AGREEMENT!

# EXHIBIT 12



MENTAL
HEALTH
SYSTEMS
INC.

9465 Farnham Street
San Diego, CA 92123
Tel: (858) 572-2600
Fax: (858) 573-2602

February 10, 2016

Ms. Patty Kay Danon
Director, Agency Contract Support
5469 Kearny Villa Road
2nd Floor, Suite 2300
San Diego, CA 92123

Subject:   Mental Health Systems, Inc.

Dear Ms. Danon:

The information in this letter is provided under the protection of the California and federal Whistleblower Acts.

For the past two years, Mental Health Systems (MHS) has been using funds obtained from state, federal and county cost reimbursement contracts to finance a failed for-profit company called Novata. This has been done to the serious detriment of MHS, its clients, its employees and its vendors.

For the past seven months MHS has withheld payments to vendors, contractors, doctors and staff in order to transfer cash to the for-profit. On any given week MHS has billed our state, federal and county contracts for anywhere between $1M and $4M of cost reimbursable expenses which have not been paid. This is in violation of the requirements of our cost reimbursement contract terms, and has been done with the full knowledge and authority of Kim Bond, President & CEO, and our Board of Directors.

Additionally, over the past few years MHS has billed our cost reimbursement contracts for approximately $1.2M of expenses paid to a consulting firm called Open Minds, a consulting firm that David Conn, our President's husband, sits on the advisory board of. The owner and several staff of Open Minds are personal friends of Kim Bond and David Conn, all of whom are known to vacation together. There has yet to be a single significant documented deliverable provided by Open Minds for the $1.2M they have received. Instead, they seem to be little more than "advisors". During the period of time that MHS has been paying Open Minds, MHS has laid off literally dozens of productive staff due to "lack of funds". It is not known if Ms. Bond or Mr. Conn are receiving kick-backs from Open Minds, but the inappropriateness of this relationship is obvious.

Finally, our Board has approved of David Conn's appointment to a highly compensated position, reporting directly to his wife. There is today no written job description for this position, and little output that anyone on staff can point to. As a result of this inappropriate reporting relationship, Ms. Bond and Mr. Conn are in the very dangerous position of making decisions that improve their pocket books while the clients and staff of MHS suffer.

While some of these acts may not be strictly illegal, all of them do fail to meet the high standards required of a public trust.

Feel free to contact me if you wish to discuss this further.

Sincerely,
**MENTAL HEALTH SYSTEMS, INC.**

Michael L. Hawkey
Chief Financial Officer

# EXHIBIT 13



# County of San Diego

JOHN M. PELLEGRINO
DIRECTOR

**DEPARTMENT OF PURCHASING AND CONTRACTING**
5560 OVERLAND AVENUE, SUITE 270, SAN DIEGO, CALIFORNIA 92123-1204
Phone (858) 505-6367          Fax (858) 715-6452

ALLEN R. HUNSBERGER
ASSISTANT DIRECTOR

April 26, 2016

Kimberly Bond, President and Chief Executive Officer
Mental Health Systems, Inc.
9465 Farnham Street
San Diego, CA 92123

## CURE NOTICE OF NON-CONFORMING CONTRACT REQUIREMENTS

As you are aware, the County of San Diego ("County") received a letter dated February 10, 2016 from a complainant alleging misconduct on the part of Mental Health Systems, Inc. ("MHS"). As a result of that letter, the County initiated, and has completed, a special review of the allegations. A copy of this special review is attached as Appendix A. Additionally, the County's Health and Human Services Agency ("HHSA") recently concluded its regularly scheduled financial review, and a copy of this review is also attached as Appendix B.

Based upon the findings of both the special review and the regularly scheduled review conducted by HHSA's Agency Contract Support, and in accordance with Article 7 ("Suspension, Delay and Termination"), paragraph 7.1 of the County's contracts with MHS, the County is notifying MHS that it is not in compliance with several terms of its contracts. (The current contracts between MHS and the County are listed in Appendix C).

As a result of MHS's failure to comply with terms of the contracts, including generally accepted accounting principles and good business practices (Article 4.1.1); prompt payment to Vendors and Subcontractors (Article 4.2.6); prohibition of against Interlocking Directorate (Article 8.12.4); and the current high indebtedness of MHS, the County is concerned that MHS may be incapable of continuing to successfully perform its obligations under these contracts to the Standard of Performance necessary to perform and complete the work and provide services required by County contracts (Article 1.1).

Therefore, MHS is required to respond to this cure notice at the earliest possible date, but not later than 6 p.m. on May 27, 2016, detailing MHS's plans to immediately implement corrective actions for all matters identified in both reports.

Should MHS have additional information regarding these matters, it should be immediately provided to my attention. Additionally, the County and its funding sources reserve the right to perform additional reviews and may subsequently issue other reports regarding these contracts. Should the County become aware of any new or additional information as a result of other reviews, these reports may be amended as appropriate.

CURE NOTICE OF NON-CONFORMING CONTRACT REQUIREMENTS
April 26, 2016
Page 2


MHS's response should be provided in writing to my attention at the letterhead address.  I may be reached at (858) 505-6562 for questions regarding this letter.


JOHN M. PELLEGRINO, Director
Department of Purchasing and Contracting

Enclosures:
        Appendix - A – Mental Health Systems Special Review Report No. A16-026 dated April 2016
         Appendix - B – HHSA ACS Contractor Review - Mental Health Systems Inc.
                Fiscal Years    2013-2014, 2014-2015 and 2015-2016
        Appendix - C – MHS Contracts as of April 26, 2016

cc:    Ernest H. Wright II, Mental Health Systems, Chair Board of Directors
       Nick Macchione, Director and Deputy Chief Administrative Officer
       Thomas E. Montgomery, County Counsel
       John Cooley, Senior Deputy County Counsel
       Juan R. Perez, Chief of Audits
       Patty Danon, Director, Agency Contract Support

# EXHIBIT 14

APPENDIX A

**Auditor and Controller**

**County of San Diego**

# OFFICE OF AUDITS & ADVISORY SERVICES



## *MENTAL HEALTH SYSTEMS SPECIAL REVIEW*

Chief of Audits: Juan R. Perez
Audit Manager: Laura R. Flores, CIA, CFE, CGAP
Senior Auditor: Tatiana Foster, CPA, CFE

Report No. A16-026

April • 2016

Intentionally Left Blank

## WHY OAAS PROVIDED THE SERVICES

**Objective**

Under the direction and control of the Office of County Counsel (County Counsel), with the assistance from the Health and Human Services Agency Contract Support Unit (ACS) and the Office of Ethics and Compliance (OEC), the Office of Audits & Advisory Services (OAAS) initiated a special review of Mental Health Systems, Inc. (MHS), a County of San Diego (County) contractor. The objective of the special review was to investigate allegations communicated to the County by a complainant. The allegations are as follows:

Ia/Ib.   MHS used funds obtained from State, federal and County cost reimbursement contracts to finance a failed for-profit company called Novata.

II.   MHS's financing of Novata resulted in serious detriment to MHS, its clients, its employees, and its vendors.

IIIa/IIIb.   MHS withheld payments to vendors, contractors, doctors and staff in order to transfer cash to the for-profit.

IV.   MHS billed State, federal, and county contracts for expenses it had not paid.

V.   MHS billed cost reimbursement contracts for consulting services provided by Open Minds.

VI.   There are no significant documented deliverables for services provided by Open Minds.

VII.   Inappropriate relationships exist between Open Minds owner/staff and MHS management.

VIII.   Dr. David Conn, the husband of MHS's President, sits on the advisory board of Open Minds.

IX.   The MHS Board approved Dr. David Conn's appointment to a highly compensated position that reports directly to Kimberly Bond, his wife (MHS's President & CEO).

This special review was conducted in conformance with the Certified Fraud Examiners' Code of Professional Standards prescribed by the Association of Certified Fraud Examiners.

**Background**

MHS is a non-profit agency founded in 1978. Through administration of various programs and primarily pursuant to government contracts, MHS provides mental health services, drug and alcohol rehabilitation services, vocational rehabilitation services, and educational programs to individuals, families, and communities. Table 1 summarizes MHS's current contracts with the County:

**Table 1. Current MHS Contracts for FY 2015-16**

| County Department | Number of Contracts | Annual Authorized Amount | Contracts Terms |
|---|---|---|---|
| Health and Human Services (HHSA) | 27 | $35,733,737 | Jul 1, 2000 - Jun 30, 2021 |
| Probation | 1 | $901,867 | Jul 1, 2014 - Jun 30, 2021 |
| Housing and Community Development (HCD) | 3 | $230,822 | Jul 1, 2011 - Jun 30, 2016 |
| **Total** | **31** | **$36,866,426** | |

MHS submits claim forms to the County to get reimbursed for services provided pursuant to the County contracts. Claim forms include direct and indirect expenditures incurred by MHS. Indirect expenditures are charged to the County by applying MHS's indirect rate to the direct program expenditures. According to MHS's Cost Allocation Plan, the indirect rate charged to the County in FY 2014-15 and FY 2015-16 was 13.5% and 14.5%, respectively.[1] Table 2 outlines direct and indirect expenditures paid by the County to MHS in FY 2014-15 and FY 2015-16.[2]

**Table 2.  Direct and Indirect Expenditures Paid by the County**

| Department | Direct Expenditures | | Indirect Expenditures | |
|---|---|---|---|---|
| | FY 2014-15 | FY 2015-16 to Date | FY 2014-15 | FY 2015-16 to Date |
| HHSA | $32,075,657 | $17,829,907 | $3,538,089 | $2,024,907 |
| Probation | $719,746 | $535,909 | - | - |
| HCD | $251,923 | $241,107 | $9,162 | $9,000 |
| Total | $33,047,326 | $18,606,923 | $3,547,251 | $2,033,907 |

Each County department reviews claims submitted by MHS prior to payment and is responsible for ensuring the contractor is in compliance with contract requirements, services are being delivered at an acceptable level of quality, outcomes and objectives are on-track to be met or have been met, and the contracted program is having the anticipated impact on the target population. This occurs in a variety of ways throughout the contract year including claim (invoice) reviews, site visits, reviews of performance data, quality assurance reviews, in-depth invoice reviews and reviews of contract deliverables.

In 2010, MHS created a for-profit subsidiary, named Behavioral Healthcare Solutions (BHS), to segregate government and nongovernment funding. In October 2013, BHS purchased the Center for Autism Research, Evaluation & Service, a Psychological Corporation (CARES). Shortly after the purchase, the name of BHS was changed to Novata Behavioral Health (Novata). Novata is a wholly-owned, for-profit subsidiary of MHS. MHS and Novata share the same board of directors and management team.

---

[1] The County is charged an indirect rate by MHS based upon its provisional federal rate.  That provisional rate ended on June 30, 2015.  MHS was unable to confirm that it received government approval of the final rate.  As a result, the County is in the process of calculating MHS's proper indirect rate for FY 2013-14 to FY 2014-15.

[2] HHSA payments are as of January 31, 2016. Probation payments are as of February 29, 2016. HCD payments are as of March 31, 2016.

Novata provides treatment and support services for children and families living with autism and other neurodevelopmental disorders.

Based on information provided by MHS, MHS engaged Open Minds, a Pennsylvania based company, in FY 2010-11 to provide consulting services related to market intelligence and management information.

**Methodology**

OAAS performed its investigation using the following methods:

- Interviewed the complainant to obtain an understanding of the allegations.

- Interviewed MHS's key personnel on policies, procedures, and processes to investigate allegations made by the complainant.

- Reviewed MHS's financial statements and supporting schedules.

- Reviewed MHS's proposed federal indirect rate calculation.

- Analyzed the financial condition of MHS and Novata.

- Confirmed with a random sample of MHS's vendors and subcontractors their receipt of checks and MHS's payment practices.

- Reviewed MHS's payment history to Open Minds and related contracts.

- Reviewed MHS's HR and payroll documents related to David Conn's position and compensation at MHS.

- Obtained results of the work conducted by ACS.

**Terms Definition**

The terms applied to the investigation results are defined as follows:

***Substantiated***: The allegation is accurate and was validated through the investigation.

***Substantiated − Corrective Action Taken***: The allegation is accurate and was validated through the investigation. Corrective action(s) to address identified issues have been implemented.

***Partially Substantiated***: Some elements of the allegation are accurate. Verification was partial where it was concluded that one or more, but not all of the allegations, were substantiated.

***Unsubstantiated:*** The allegation is false or invalid based on the investigation performed.

***Inconclusive:*** The validity and/or accuracy of the allegation cannot be determined due to lack of supporting documentation or because under

the terms of the contract, the County lacks access rights to the necessary information.

**Summary of Investigation Results**

Within the scope of the special review, OAAS concluded the following:

Table 3. Summary of Results

| Conclusion | Allegations |
|---|---|
| Substantiated | 2 |
| Substantiated - Corrective Action Taken | 1 |
| Partially Substantiated | 4 |
| Unsubstantiated | 1 |
| Inconclusive | 3 |

In addition to the investigation results, OAAS identified several operational issues, identified in this report as "Findings" that should be addressed by MHS.

The investigation results for each allegation are detailed below.

**Complainant's Allegation I:**

**Use of Government Funds to Finance Novata**

> *Allegation*: For the past two years, MHS has been using funds obtained from State, federal and county cost reimbursement contracts to finance a failed for-profit company called Novata.

For purposes of clarity, the investigation results of this allegation were divided into two parts:

**Allegation Ia:** MHS financed a for-profit company called Novata.

**Allegation Ib:** MHS has been using funds obtained from State, federal and county cost reimbursement contracts to finance Novata.

**Substantiated**

OAAS's investigation found that MHS has transferred funds to Novata since FY 2013-14, as summarized in Table 4.

Table 4. MHS Transactions with Novata as of December 31, 2015

| Fiscal Year | MHS Cash Transferred to Novata | Novata's Expenses Paid by MHS | MHS Services Provided to Novata | Payments Received from Novata | Receivable Balance Due from Novata |
|---|---|---|---|---|---|
| FY 2013-14 | $1,710,000 | $894,955 | $736 | - | $2,605,691 |
| FY 2014-15 | $3,464,000 | $287,509 | $971,873 | $1,590,302 | $5,738,770 |
| FY 2015-16 | $250,834 | $225,266 | $229,461 | $784,585 | $5,659,748 |
| **Total** | **$5,424,834** | **$1,407,730** | **$1,202,070** | **$2,374,866** | |

While Novata is not a "failed" for-profit company as alleged, an analysis of Novata's financial statements identified a poor financial condition, as illustrated in Table 5.

**Table 5. Novata's Financial Position as of December 31, 2015**

| Description | Balance |
|---|---|
| **Current Assets** | |
| Cash | $387,038 |
| Accounts Receivable, net of allowance | $2,268,930 |
| Other Current Assets | $48,028 |
| **Total Current Assets** | **$2,703,996** |
| | |
| **Non-Current Assets** | |
| Fixed Assets, net of depreciation | $141,681 |
| Goodwill, net of impairment | $1,970,015 |
| Deferred Tax | $1,728,334 |
| Other Non-Current Assets | $39,085 |
| **Total Non-Current Assets** | **$3,879,115** |
| | |
| **Total Assets** | **$6,583,111** |
| | |
| **Total Current Liabilities** | **$1,617,445** |
| **Total Long-Term Liabilities[3]** | **$8,128,883** |
| **Stockholder's Equity** | **($3,163,216)** |

OAAS noted that transferred funds were recorded as account receivables on MHS's financial statements and as liabilities on Novata's financial statements.

In order to secure a loan to acquire CARES, MHS entered into a Support and Guaranty Agreement with a bank, which required MHS to deposit funds into Novata's accounts when Novata is not in compliance with its Debt Service Coverage Ratio and loan obligations.

According to MHS's management, transferred funds were used to cover Novata's payroll obligations and program expenses. Some funds were used for a technology upgrade and start-up costs related to the purchase of CARES. In addition, MHS paid certain expenses on behalf of Novata.

On October 17, 2011, MHS established an agreement with BHS (now named Novata) whereby MHS provides accounting, administrative and management services to Novata. MHS charges Novata a monthly fee of 10% of Novata's revenue for the services provided. (See Finding IV).

> *Impact to the County:* Funds transferred to Novata have impacted MHS's ability to pay its financial obligations which increases the risk that MHS's vendors and subcontractors may not be paid in accordance with County contract terms. This can also impact services provided to the County. Further, Novata's poor financial condition increases the risk that its obligations will not be repaid, thereby its financial condition can potentially worsen.

## Ib. Inconclusive

OAAS was not able to determine which specific funding sources were used to finance Novata's operations, because transfers from MHS to

---

[3] Total long-term liabilities include $5,659,748 owed to MHS.

Novata were processed from MHS's cash account which commingles funds from different sources.  MHS's accounting procedures do not allow for tracing of the cash transferred to Novata back to the original funding source.

OAAS analyzed MHS's revenue for FY 2014-15, as summarized in Table 6, and noted that the majority of MHS's revenue is obtained from government sources.

**Table 6. MHS  Revenue FY 2014-15**

| Revenue Source | Direct Revenue | Pass-Through Federal Funds | Total Revenue | % |
|---|---|---|---|---|
| Federal Government | $601,662 | - | $601,662 | 1% |
| State Government | $16,080,021 | $706,476 | $16,786,497 | 22% |
| County of San Diego | $35,721,910 | $3,817,447 | $39,539,357[4] | 52% |
| Other Counties | $9,957,397 | $6,346,721 | $16,304,118 | 22% |
| Non-government | $2,244,091 | - | $2,244,091 | 3% |
| **Total** | **$64,605,081** | **$10,870,644** | **$75,475,725** | **100%** |

However, in addition to the revenues identified above, MHS also had an $8 million line of credit that could potentially have been used to finance Novata's operations.

> Impact to the County: Impact cannot be determined as it is unknown whether County funds were used to finance Novata.

**Complainant's Allegation II:**

**Impact of Cash Transfers to Novata**

> *Allegation:* Use of funds to finance Novata has been done to the serious detriment of MHS, its clients, its employees and its vendors.

**Partially Substantiated**

OAAS did not quantify the specific detriment caused to MHS clients or employees; however, OAAS determined that funds transferred to Novata have impacted MHS's ability to pay its financial obligations.

OAAS verified that MHS's cash balance, as of January 31, 2016, is insufficient to cover its current liabilities as outlined in Table 7. However, its overall financial position as of the same date appears adequate if all receivables, including those due from Novata, are collected.[5]

---

[4] Revenue amount recorded by MHS varies from County expenditures presented in Table 2 due to timing differences.

[5] Additional financial information received by OAAS during the report writing process indicates that for the nine months ending March 31, 2016, MHS has incurred a net loss of $3,163,048.

**Table 7. MHS Financial Position as of January 31, 2016**

| Description | Total Balance |
|---|---|
| **Liquid Assets** | |
| Cash | $1,285,571 |
| **Total Liquid Assets** | **$1,285,571** |
| | |
| **Current Assets** | |
| Contracts Receivable, net of allowance | $13,274,621 |
| Other Receivables[6] | $5,680,348 |
| Other Current Assets | $791,114 |
| **Total Current Assets** | **$19,746,083** |
| | |
| **Non Current Assets** | |
| Fixed Assets, net of depreciation | $13,190,398 |
| Other Non Current assets | $881,465 |
| **Total Non Current Assets** | **$14,071,863** |
| | |
| **Current Liabilities** | |
| Accounts Payable | $2,817,410 |
| Accrued Payroll and Related Taxes | $1,288,753 |
| Accrued Employee Benefits | $5,319,405 |
| Other Current Liabilities[7] | $6,203,128 |
| **Total Current Liabilities** | **$15,628,696** |
| | |
| **Total Long-Term Liabilities** | **$8,459,333** |
| **Total Net Assets** | **$11,015,487** |

Additionally, OAAS randomly selected invoices and mailed confirmation letters to 48 vendors and subcontractors to identify MHS's payment practices. We received responses from 31 vendors and subcontractors; 11 confirmed that MHS does not consistently pay in a timely manner (in accordance with their own invoice terms).

Also, based on interviews with MHS management and a review of applicable documents, OAAS confirmed that MHS does not pay all invoices by their due dates. According to the management staff interviewed, invoices with high priority such as rent, utilities, payments to psychiatrists, and certain program expenses are processed on a weekly basis. When asked which gets priority - MHS's vendor invoices or making required cash transfers to Novata - MHS's CEO stated that MHS's vendor invoices are paid first.

However, pursuant to the Support and Guaranty Agreement signed with the bank, MHS is legally required to provide cash when Novata is not in compliance with its Debt Service Coverage Ratio and loan obligations.

> _Impact to the County:_ An insufficient cash balance increases the risk that MHS's vendors and subcontractors will not be paid in accordance with County contract terms which can impact services provided to the County.

---

[6] Other Receivables refers to Novata Receivables.
[7] Other Current Liabilities include MHS's current portion of line of credit, unearned revenue, and other miscellaneous liabilities.

**Complainant's Allegation III:**

**Withholding Payments to Vendors and Subcontractors in Order to Subsidize Novata**

> _Allegation:_  For the past seven months, MHS has withheld payments to vendors, contractors, doctors and staff in order to transfer cash to the for-profit.

For purposes of clarity, the investigation results of this allegation were divided into two parts:

> **Allegation IIIa**: Payments to vendors, contractors, doctors and staff have been withheld.

> **Allegation IIIb:** Withheld payments were used to transfer cash to Novata.

**IIIa. Substantiated – Corrective Action Taken**

Through inquiries made to MHS's management and accounts payable staff, OAAS confirmed that MHS withheld payment checks to vendors and subcontractors. While MHS prepared checks for all invoices received on a weekly basis, not all of the checks were released when written.

OAAS confirmed that in January, 2016, MHS held 165 checks totaling $1,376,568; 160 of these checks were prepared in January, 2016, and 5 checks were prepared in October and December, 2015.  Out of 165 checks held in January, 2016, 152 checks were mailed to vendors and subcontractors either in February or March, 2016, and 13 checks were voided[8] in March, as detailed in Table 8. This practice violates Generally Accepted Accounting Principles because it results in understated liabilities and cash recorded on the books[9].

**Table 8. Held Checks**

| Check Status | Holding Period | Number of Checks | Amount |
|---|---|---|---|
| Mailed | 8-20 days | 5 | $18,895 |
| | 21-30 days | 67 | $408,576 |
| | 31-40 days | 28 | $4,900 |
| | 41-44 days | 52 | $607,348 |
| **Total mailed checks** | | **152** | **$1,039,719** |
| Voided | 36-56 days | 8 | $137,425 |
| | 62-132 days | 5 | $199,424 |
| **Total voided checks** | | **13** | **$336,849** |
| **Total checks** | | **165** | **$1,376,568** |

Based on limited testing, OAAS verified that MHS stopped holding checks in February, 2016.

---

[8] Out of 13 voided checks, 7 checks were reissued in March 2016.

[9] Since checks were not mailed to vendors and subcontractors, the amount of cash in MHS's bank account was not affected.

> *Impact to the County:*  According to specific provisions in County contracts, MHS was required to comply with Generally Accepted Accounting Principles and good business practices. By withholding checks made out to vendors and subcontractors, MHS was violating those contractual provisions.

### IIIb. Inconclusive
While MHS's management acknowledged that checks were withheld due to cash issues, OAAS did not find direct evidence to confirm that payments were withheld because MHS needed the cash to prioritize transfers to Novata specifically.

> *Impact to the County:*  Unable to determine.

**Complainant's Allegation IV:**

### Billing for Reimbursable  Expenses that Have not Been Paid

> *Allegation:* On any given week, MHS has billed State, federal, and county contracts for anywhere between $1M and $4M of cost reimbursable expenses which have not been paid.

### Partially Substantiated
Testing to substantiate this allegation was limited to County funds only. As such, the allegation is partially substantiated.

ACS obtained the A/P Aging Report as of March 11, 2016 and requested MHS to identify accounts payable attributable to County contracts, as summarized in Table 9[10].

**Table 9. A/P Aging Analysis**

| A/P Details | Current | 31-60 Days | 61-90 Days | 91 and Over | Totals |
|---|---|---|---|---|---|
| County - Claimed | $72,324.66 | $162,747.15 | $15,447.39 | $243.39 | $250,762.59 |
| County - Not Claimed | $380.09 | $145,154.70 | $58,595.59 | $0.00 | $204,130.38 |
| **Total County Related A/P** | **$72,705** | **$307,902** | **$74,043** | **$243.39** | **$454,893** |
| Indirect Costs | $107,639.53 | $149,531.64 | $85,945.03 | $70,613.28 | $413,729.48 |
| Non-County | $490,750.26 | $296,294.84 | $12,828.14 | $182,869.17 | $982,742.41 |
| **Totals** | **$671,094.54** | **$753,728.33** | **$172,816.15** | **$253,725.84** | **$1,851,364.86** |
| **% of Total Payables** | **36%** | **41%** | **9%** | **14%** | **100%** |

According to MHS's management, $454,893 of accounts payable are direct expenses attributable to County contracts.   Of that amount, $250,763 has been claimed by MHS to the County while the remaining $204,130 had not yet been claimed.

From the $250,763 of accounts payable already billed to the County, $178,437 are past due over 31 days.  MHS's management stated that

---

[10] Due to the time restraints, the accuracy of information presented in Table 9 was not validated by ACS.

the County may have not yet paid some of the $178,437; however no evidence was provided to support this statement.

> *Impact to the County:*  If it is determined that MHS has not paid its vendors and subcontractors for expenses already reimbursed by the County, it constitutes a violation of the "Prompt Payment for Vendors and Subcontractors" term in the County contracts which requires MHS to pay its vendors no later than 30 days after receipt of payment from the County.

**Complainant's Allegation V:**

### Billing the County for Open Minds Consultants

> *Allegation:* Over the past few years, MHS has billed cost reimbursement contracts for approximately $1.2M of expenses paid to a consulting firm called Open Minds.

**Partially Substantiated**
OAAS found that from FY 2010-11 to FY 2015-16, Open Minds billed MHS $1,418,868 for services provided. Of that amount, $1,213,014 had been paid by MHS to Open Minds and $205,854[11] had not been paid as of February 29, 2016.

For purposes of the $1,213,014 paid to Open Minds, OAAS verified the following:

- $816,022 was recorded as part of the Fixed Assets (Software) - Construction in Progress account (CIP). MHS had not yet billed cost reimbursement contracts for such services as they relate to an asset that was placed in service in FY 2015-16[12].

- $396,392 was recorded as part of MHS's indirect cost and billed to cost reimbursement contracts, including the County, through indirect rate charges.

- $600 was recorded as part of the accounts receivable due from Novata and had not been billed to cost reimbursement contracts.

> *Impact to the County:* A portion of the $396,392 payments made to Open Minds had been billed to County contracts. OAAS is unable to determine the exact amount, as payments to Open Minds were billed indirectly.

---

[11] Unpaid invoices are for services provided from July, 2015 to November, 2015.

[12] Payments recorded as part of the CIP account are allocated to the direct or indirect cost when the asset related to CIP is placed in service. Such allocation is done through depreciation of the asset over its useful life.

**Complainant's Allegation VI:**

### Lack of Documented Deliverables Provided by Open Minds

> *Allegation:* There has yet to be a single significant documented deliverable provided by Open Minds for the $1.2M they have received.

**Partially Substantiated**

MHS provided OAAS three contracts with Open Minds that document deliverables totaling $145,100.  MHS did not provide contracts or documented scope of work for the remaining services provided totaling $1,273,768 by Open Minds. The three contracts provided were for the following services:

- Consulting on the acquisition of CARES (Novata's subsidiary).

- Services of an interim business development director.

- Technical assistance in electronic medical records software selection.

In addition, MHS provided a letter from Open Minds for ongoing consultation. The letter states that Open Minds would provide work preauthorized by MHS at discounted hourly rates.  However, the total fee charged for these services is not documented in the letter.

According to MHS's management, Open Minds also provided services based on verbal requests from MHS's management without a formal agreement documenting specific deliverables and compensation. Further, MHS's management stated that it is not efficient to have formal contract agreements for every service provided by Open Minds.

Based on a review of the contracts provided by MHS and invoices paid to Open Minds, OAAS selected a sample of deliverables outlined in these documents.   MHS provided a number of documents in support of the services received from Open Minds including memos, meeting agendas, emails, system implementation milestones information, excel templates, etc.  However, without a documented scope of work and defined deliverables, MHS was not always able to demonstrate that it received from Open Minds the services it requested and for which it paid.

> *Impact to the County:*  Absence of formal contracts that outline service deliverables in support of the full amount paid to Open Minds, results in OAAS's inability to determine whether expenditures related to Open Minds should be included in MHS's indirect cost. As such, indirect rate charged to the County could be affected resulting in overstated indirect expenses allocated to the County.

| | |
|---|---|
| **Complainant's Allegation VII:** | **Inappropriate Relationship with Open Minds** |

> *Allegation:* The owner and several staff members of Open Minds are personal friends of Kim Bond and David Conn, all of whom are known to vacation together…
>
> …It is not known if Ms. Bond or Mr. Conn are receiving kick-backs from Open Minds, but the inappropriateness of this relationship is obvious.

**Inconclusive**

OAAS interviewed Ms. Bond to inquire about the allegation. She stated that she has no friends or family at Open Minds. She also indicated that she did not vacation with Open Minds staff.

Pursuant to audit provisions in County contracts, County auditors' access is limited to contractor records only. Since the allegation cannot be verified by reviewing MHS records, OAAS was unable to make a determination of its validity.

> Impact to the County:  Unable to determine.

| | |
|---|---|
| **Complainant's Allegation VIII:** | **Dr. Conn's Role with Open Minds** |

> *Allegation:* David Conn, the husband of MHS's President, sits on the advisory board of Open Minds.

**Substantiated**

OAAS's research verified that Dr. Conn is an Advisory Board Member with Open Minds. Further, Ms. Bond confirmed the accuracy of this statement and added that Dr. Conn's position on the Advisory Board is not compensated.

OAAS's review of MHS's Conflict of Interest Disclosure Forms found that Dr. Conn's position with Open Minds was not disclosed to MHS's management. While MHS's Conflict of Interest Policy requires its employees to disclose a financial or employment relationship with a competitor, vendor, or customer/client of MHS, the policy does not require the employees to disclose volunteer positions. According to best business practices, and to provide full transparency, employees should disclose all relationships with competitors, vendors, and customers/clients.

> *Impact to the County:*  According to County contracts with MHS, MHS shall comply with good business practices. Failure to require all employees to properly disclose all relationships with competitors, vendors, or customer/clients increases the risk that the company will not identify and address conflicts of interest.

**Complainant's**
**Allegation IX:**

### Dr. Conn's Appointment

> *Allegation:* The MHS Board of Directors has approved David Conn's appointment to a highly compensated position, reporting directly to his wife. There is no written job description for this position, and little output that anyone on staff can point to.

**Unsubstantiated**

OAAS confirmed that on November 1, 2015, Dr. Conn was appointed to the Senior Vice President of Business Development & Government Relations position as a result of a restructuring within MHS. According to MHS's management, the Board of Directors' approval is not needed for the appointment. However, it was noted that the appointment was discussed during a MHS Management Team meeting held on October 19, 2015. Mr. Conn did not receive an increase in compensation as a result of his new position.

Dr. Conn's last salary increase occurred on July 1, 2010; his salary was increased from $109,116 to $120,000. The Board of Directors last reviewed and approved Dr. Conn's compensation on October 17, 2011.

Based on OAAS's review of documents provided, Dr. Conn does not report directly to his wife, Kimberly Bond. Specifically, OAAS verified the following:

- From November 1, 2015 to December 1, 2015, David Conn reported to Novata's Chief Operating Officer.

- From December 1, 2015 to February 10, 2016, he reported to MHS's Chief Financial Officer.[13]

- Beginning February 11, 2016, he reports to MHS's Chief Medical Officer.

OAAS reviewed the job description for David Conn's current position and found that it outlines his essential duties and responsibilities at MHS.   Based on the documents reviewed, it appears that MHS complied with its internal company policy regarding employment of relatives and chain of command reporting.

> *Impact to the County:* No impact to the County.

**Finding I:**

As a result of the investigative work conducted by OAAS, the following findings were identified:

### Relationship Between MHS and Novata

OAAS identified the following issues that evidenced a lack of  an arm's length relationship between MHS and Novata:

---

[13] According to the complainant, the reporting relationship between Dr. Conn and the Chief Financial Officer was administrative only.

- MHS entered into a Support and Guaranty Agreement that required MHS to transfer funds to Novata without interest accrual.

- MHS does not have written agreements for the funds transferred to Novata. According to MHS management, there is an expectation that the transfers to Novata will be recovered and are recognized in MHS records as receivables.

Further, OAAS found that MHS lacks adequate internal controls to demonstrate that transfers to Novata are properly reviewed and approved.
Transactions between non-profit MHS and for-profit Novata not undertaken at an arm's length basis could jeopardize MHS's tax exempt status.

> _Impact to the County:_ Absence of a formal agreement documenting loans made by MHS to Novata could it make difficult for MHS to recover loan funds from Novata. An inability for MHS to collect loan proceeds could worsen MHS's financial condition and increases the risk that MHS's vendors and subcontractors would not be paid in accordance with County contract terms.

**Finding II:**      **Transactions with Interested Persons**
The IRS requires tax exempt organizations to report business transactions with a family member of a current or former officer, director, trustee, or key employee.

According to IRS Form 990, Instructions for Schedule L, an organization must report business transactions with an interested person if compensation payments during the tax year by the organization to a family member of a current or former officer, director, trustee, or key employee of the organization exceeded $10,000. "Interested person" is defined as a family member of a current or former officer, director, trustee, or key employee.

Kimberly Bond is a current MHS officer. MHS's compensation to her husband, Dr. Conn, is not reported on Schedule L, Part IV. As a result, MHS may not be in compliance with IRS regulations.

> _Impact to the County:_  According to MHS's contract with the County, MHS is required to comply with all applicable federal, State, County, and local laws, rules, and regulations, current and hereinafter enacted. By not reporting business transactions with interested persons, MHS may be out of compliance with provisions of County contracts.

**Finding III:**      **Interlocking Directorates**
ACS reviewed a sample of direct expenditures claimed by MHS during FY 2014-15 and 2015-16. ACS identified two direct expenditures of $80 that were questionable. Based on supporting documentation, ACS determined that these expenditures were direct expenditures related to

information technology services provided by Novata. The first expense of $80 was an allocation of a $6,400 invoice. The second expense of $80 was an allocation of a different $2,640 invoice.

MHS failed to notify the County of the use of its for-profit subsidiary, Novata, as a provider of information technology services.

> *Impact to the County:* According to Board of Supervisors Policy A-79 - Interlocking Directorates - the County will not enter into service-type contracts with non-profit corporations who intend to subcontract with related for-profit subcontractors unless specifically authorized by the Board of Supervisors.
>
> MHS's failure to disclose to the County the use of a for-profit corporation appears to be a technical violation of Board Policy A-79. The financial impact is immaterial.

**Finding IV:**     **Management Fees Charged to Novata**
Indirect costs incurred by MHS include compensation of MHS staff that provides management, administrative and accounting services to Novata. According to MHS management, in order to offset costs of services provided to Novata, MHS's indirect costs are reduced by the management fees charged to Novata.

MHS did not provide the methodology used to determine the 10% management fee charged by MHS to Novata. As a result, OAAS was not able to validate whether the 10% management fee is an adequate offset from indirect costs.

As required by its contracts with the County, MHS must make available to County, State or federal officials for examination all records relating to the contracts at any time during normal business hours and as often as the County may deem necessary.

Further, OAAS reviewed the calculation for MHS's 15.2% proposed federal indirect rate for FY 2015-16 and noted that the management fees charged to Novata were not deducted from MHS's indirect costs.[14] OAAS recalculated the federal indirect rate by subtracting Novata's management fees from MHS's indirect costs and found the proposed federal indirect rate to be 14.6% which is still slightly higher than the rate charged to the County.

> *Impact to the County:* Indirect rate charged to the County may be affected resulting in overstated indirect expenses allocated to the County.

---

[14] The proposed Federal indirect rate calculation is used to support indirect rate charged to the County. The indirect rate charged to the County is lower than the proposed Federal indirect rate.

Office of Audits & Advisory Services

| Compliance | Reliability | Effectiveness | Accountability | Transparency | Efficiency |

VALUE

# EXHIBIT 15

# Charity accused of improper billing

By **Jeff McDonald**

MARCH 3, 2016, 5:40 PM

San Diego County is investigating a whistleblower complaint against a social services provider that has dozens of government contracts and is accused of billing taxpayers millions of dollars for "reimbursement" of expenses that had not been incurred.

Mental Health Systems has 34 contracts with San Diego County, providing shelter, rehabilitation, employment and other services for women, children, veterans and others.

The nonprofit's chief financial officer, Michael Hawkey, was placed on leave after raising questions about the group's practices.

"On any given week, MHS has billed our state, federal and county contracts for anywhere between $1M and $4M of cost-reimbursable expenses which have not been paid," Hawkey wrote in his complaint to the county. "This is in violation of the requirements of our cost reimbursement contract terms."

Hawkey spent more than 15 years with the nonprofit group, managing state and federal contracts as well as those with the counties of San Diego, San Bernardino, Fresno, Santa Barbara, Kern and Riverside.

The group's CEO, Kimberly Bond, declined to be interviewed about the allegations but responded to questions through a public-relations professional. She said the claims cannot be substantiated.

"MHS is willing and able to challenge each allegation; this internal scrutiny includes years of audited financial records," the statement said. "We have long been an organization of open transparency in our business operations and relationships."



**Document**

**Whistle-blower complaint against nonprofit group**

Download .PDF

## What do you think? Join the discussion on Facebook

In addition to the probe in San Diego County, Santa Barbara County opened a review of its Mental Health Systems contract last month because of issues with the charity's Center for Change substance abuse treatment center reportedly having trouble paying the rent in Santa Maria.

The San Diego Union-Tribune obtained records for the nonprofit group showing use of an accounting practice called "held checks," in which a check is issued but not mailed until funds are available later.

"The cash availability for December 2015 reflects $1,952,880.53 in held checks," one internal financial snapshot stated. The same report noted that Mental Health Systems had almost nothing left on an $8 million credit line the group had taken out.



Kim Bond, CEO, Mental Health Systems [Union-Tribune file] — *Jeff McDonald*

Bond said the "held check" practice is not unusual. She maintained that the nonprofit did not seek reimbursement from San Diego County for services it had not yet paid for.

"I think we have answered the questions on our tough cash-flow challenges and made no secret of the steps we have taken to address this temporary situation," she said in a statement. "Hold lists are employed by many businesses in similar situations."

In his complaint, Hawkey questioned why the charity paid $1.2 million to Pennsylvania marketing and management consultancy Open Minds, whose advisory board includes Bond's husband, also a Mental Health Systems executive. Those payments, reimbursed with government funds, came as the nonprofit laid off dozens of employees for lack of funding, he claimed in his complaint.

"There has yet to be a single significant documented deliverable provided by Open Minds for the $1.2 million they have received," Hawkey said in his complaint.

Open Minds, of Gettysburg, did not answer questions about its work for Mental Health Systems.

"We have no comment on this matter at this time," Executive Vice President Sarah Threnhauser wrote in an email. "Thank you."

Bond said Open Minds continues to provide market intelligence, strategic planning and tech solutions. She said her husband's position with the Pennsylvania consultancy was voluntary and unpaid.

Hawkey's Feb. 10 complaint letter was sent to Patty Kay Danon, director of a county division that oversees public contracts.

County spokesman Michael Workman declined to discuss specifics of the complaint, but confirmed the county is investigating the organization. He said the county takes allegations of fraud or misconduct very seriously.

According to Hawkey's complaint, Mental Health Systems has been using government reimbursements to cover losses at Novata Behavioral Health, a for-profit subsidiary, which bought the Center for Autism Research, Evaluation and Service, or CARES, in January 2014.

Now called Novata CARES, the company provides counseling, treatment and other support services to families affected by autism. It markets training, evaluation and consulting services to counties and school districts.

The idea initially was that profits from the autism company would benefit the Mental Health Systems charity mission, but Hawkey alleges the nonprofit has had to prop up its private subsidiary.

Internal company documents reviewed by the Union-Tribune track funds "borrowed" using cash transfers from Mental Health Services to Novata. The cumulative balance at the start of 2015 was $2.6 million, and the amount borrowed grew to $4.4 million by the end of the year, the records indicate.

It's not clear what effect the transfers are having on services because the private subsidiary doesn't have the transparency requirements of a nonprofit.

Hawkey said he warned Bond repeatedly that the acquisition was jeopardizing the nonprofit's bottom line.

"Our cash situation has been apparent for over a year, and Kim has received my regular warnings about this," he wrote in a Feb. 10 letter to the charity's governing board. "This is my attempt to protect what is left of MHS by giving you information you may not have."

In her statement, Bond said Mental Health Systems management team does not receive any compensation from Novata CARES. She said the nonprofit does receive management fees from the subsidiary to pay for time executives spend performing work on its behalf.

"MHS is the only shareholder of Novata," Bond wrote. "It was created with the intent that any profit generated by Novata would be paid to MHS as a way of sustaining the nonprofit and diversifying funding."

Laura Deitrick, director of the Institute for Nonprofit Education and Research at the University of San Diego, said it is becoming more common for charities to form or acquire a for-profit subsidiary to support their core mission.

"Best practices suggest that the nonprofit take great care to ensure that the two entities be as distinct as possible," she said. "While I cannot speak to MHS directly, I can say that when faced with a program, asset or subsidiary that is losing money, the board of directors is ultimately responsible for making the appropriate plans to remedy financial problems."

## Previous deficiencies

Mental Health Systems was established by two social workers with a single county contract in 1978.

Since then, the nonprofit has grown in both size and scope. By 2011, Mental Health Systems had revenue of $91.5 million a year — most of it from state and local government contracts to provide services to those in need.

Ten years ago, the Union-Tribune disclosed a series of irregularities and deficiencies in Mental Health Systems programs, including improper billing, hiring employees with criminal records and allowing inmates to lead group therapy sessions.

That year, a number of government agencies asked the charity to repay wrongly billed costs. In March of that year, for instance, state auditors requested the nonprofit return $61,000 in questionable spending on an inmate-therapy program. The charity did so.

**WATCHDOG**

## Investigative tips

Call or text **858-224-BARK**

BLOW THE WHISTLE

The company said at the time, "We believe our programs are of the highest quality and provide invaluable services to the state of California."

Two years ago, a Mental Health Systems employee was accused of falsifying records to generate payments to her friends and family members.

The criminal case, a scheme in which the employee falsified records to generate payments to family and friends, has so far resulted in nine convictions. Three other defendants are wanted on warrants.

Mental Health Systems, which discovered the fraud and reported it to authorities, was ordered to repay $407,000 in invalid billings and disallowed costs. Bond described the case as an isolated incident.

"It was one rogue employee," Bond said.

At the time, the group's contracts with San Diego County totaled about $32 million per year. Now, they have annual contracts worth $37 million, about half the nonprofit's revenue.

The CEO salary has varied in recent years, according to tax records. Bond's pay climbed from $170,000 in 2012 to $376,000 in 2013. It then dipped to $215,000 in 2014 before inching up to $218,000 last year. Bond said the pay cut was voluntary due to "difficult cash flow periods."

## Payments to chairman

Charities are exempt from federal income tax. One trade-off is they must publicly release their annual tax filings. Donors, interest groups and others use the information to see how nonprofits spend their revenue and generally stack up against peers.

Among the things the IRS wants to know in the tax returns is whether officers and directors have any business or personal relationships. Such arrangements are legal but they are supposed to be reported.

Bond is married to Mental Health Systems senior vice president David Conn. On the agency's tax filings, "no" is checked, in response to the question, "Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee?"

The company did not respond to a request to explain the omission.

In his letters to the county and governing board, Hawkey claimed that Conn is rarely in the office, produces little work and is paid $120,000 a year.

"There is today no written job description for this position, and little output that anyone on staff can point to," Hawkey told the county. "Ms. Bond and Mr. Conn are in the very dangerous position of making decisions that improve their pocket books while the clients and staff of MHS suffer."

Conn told the Union-Tribune his work is business development and government relations, and he cited awards he has won in the wellness and mental health fields.

"This is a somewhat unique niche within the organization, and quantifiable achievement wouldn't necessarily be obvious to others working outside this sphere," he said.

Bond said the company has a longstanding practice of allowing employees to work from home on occasion.

Mental Health System has disclosed in tax returns that it paid board Chairman Ernest H. Wright II hundreds of thousands of dollars a year to lease a building he owns in Riverside County.

The charity paid $815,000 in rent between 2012 and 2014 for the 11,000-square-foot complex in Beaumont, which served as the New Hope women's recovery center. No amount was reported on the current tax filing. The building is valued at $1.3 million, according to the Riverside County assessor.

In a statement, Wright said the lease arrangement was signed before he joined the board. After he joined, the directors evaluated the terms and found them fair and reasonable and even below market, he said, with "no other available options in the region."

The lease agreement ended Dec. 31, he said.

"I am proud to have been a part of purchasing and rehabilitating a building that was used as an instrument to change the lives of hundreds of recovering women," Wright said.

The New Hope center in Beaumont closed at the end of last year and its clients were directed to other programs.

Copyright © 2016, The San Diego Union-Tribune

# EXHIBIT 16

# Charity removes CEO, husband, pledges fixes



*Kim Bond, CEO, Mental Health Systems [Union-Tribune file] (Jeff McDonald)*

 By **Jeff McDonald · Contact Reporter**

JUNE 2, 2016, 6:18 PM

**M**ental Health Systems, the charity that billed San Diego County for expenses it had not incurred, will do "everything possible" to shore up operations and keep tens of millions of dollars in contracts with San Diego County, the organization has told public officials.

For starters, the nonprofit removed longtime CEO Kimberly Bond and her husband, senior vice president David Conn, from their positions last month, the group told officials. An attorney told U-T Watchdog on Thursday that the two are on leave.

The board plans to amend its federal tax filings, which did not disclose the two executives' relationship as required.

The charity said it has stopped requesting reimbursements for bills it has not paid. It also plans to sell or close its for-profit subsidiary and end its relationship with a Pennsylvania consultancy that billed the nonprofit more than $1 million without documenting specific services.

"Mental Health Systems' board of directors is committed to doing everything possible to continue its relationship with the County of San Diego," the charity told county officials. "MHS provides invaluable services to individuals and the San Diego community and wants to continue to do so."

The charity's statement was among several dozen pages of correspondence and other documents released late Wednesday under the California Public Records Act. Some of the correspondence from the charity was undated, and some of it was unsigned.

County spokesman Michael Workman did not immediately respond to questions about how the county might answer the spate of new documentation. He has previously said the county is making contingency plans in case Mental Health Systems is terminated.

Problems with Mental Health Systems came to light in March, when the Watchdog reported on a whistle-blower complaint by former CFO Michael Hawkey. The group has contracts at the federal, state and county level to provide social services such as counseling and treatment for teens, the homeless, veterans and others.

The county launched an audit and gave the nonprofit group until May 27 to respond to its findings.

The charity this week referred questions surrounding the county audit to its lawyer, Frank Polek, who issued a statement Thursday saying his clients have cooperated diligently.

"MHS is pleased with the progress of the investigation and believes that the county is satisfied as well," Polek wrote. "MHS will continue to provide high-quality behavioral health services to those in need."

According to Polek's statement, Bond and Conn were "suspended." That verb differs from the charity's response to the county, which used the words "removed from their positions."

Polek said the executives were placed on administrative leave and he could not elaborate.

Charity officials said they never used county funds to support a for-profit subsidiary, Novata CARES, as alleged by Hawkey. Instead, the nonprofit borrowed money from its line of credit to keep the business afloat.

The internal review showed Mental Health System is due extra money, the charity said.

"MHS did not overcharge the county and in fact undercharged the county and is owed money for fiscal years 2013/2014 and 2014/2015," an unsigned May 27 letter to the county states.

The group did not place a dollar amount on the undercharge.

Mental Health Systems is one of San Diego County's largest contractors, collecting about $35 million this year. The contracts with San Diego County represent almost half of the charitable organization's annual revenue, most of which comes from other counties and government agencies.

Officials in Santa Barbara County and at the U.S. Housing and Urban Development Department have opened separate investigations of the San Diego charity.

In late April, San Diego County issued preliminary findings from auditors showing that Mental Health Systems had wrongly billed the agency and voided at least 13 checks after billing the county for them. The county requested the immediate reimbursement of almost $200,000.

Officials also demanded the charity justify more than $2 million in other payments and take other corrective actions.

Auditors also turned over their findings to the District Attorney's Office and to the FBI. Neither law enforcement agency would say whether the matter is being investigated.

In his initial complaint, the CFO said Mental Health Systems wrongly paid the Pennsylvania consulting firm Open Minds more than $1.2 million without receiving any service in return. Conn, the husband of Mental Health's CEO, serves on a board for the consultancy.

In its response to county auditors, Mental Health Systems said it could not say what happened to the money paid to Open Minds, or what it was specifically spent on.

"It appears that the Open Minds expenditures were not supported by adequate documentation or contracts," charity officials wrote. "MHS may have had contracts and deliverables at some point, but with the management team turnover, MHS has had difficulty locating the support."

Mental Health Systems also told county officials it has made numerous other changes.

Specifically, the board is divesting Novata CARES, the autism-services company Mental Health Systems borrowed $4 million to buy in 2013.

"MHS is in discussions with third parties to transfer ownership," the charity wrote. "Should MHS not find a suitable acquiring entity, the company is prepared to cease operations for Novata and focus exclusively on MHS core programs."

The nonprofit said it put three of its properties up for sale to help improve cash flow. It also created the position of a corporate compliance officer who will report directly to the board and set up a whistleblower hotline for employees or vendors to report any new problems.

Mental Health Systems also said it had adopted stricter internal controls and limited expense-account spending by the chief executive to $500 without board approval.

"The resolutions stated above are one component of addressing MHS' cash flow issues," the charity wrote. "In addition, the company will be instituting a comprehensive plan to ensure that all MHS program-related costs are the first priority in terms of payment."

Wendy Broughton, the former Mental Health Systems chief operating officer, has taken over day-to-day management duties as interim CEO while a search for a permanent chief executive is under way.

jeff.mcdonald@sduniontribune.com

Copyright © 2016, The San Diego Union-Tribune

# EXHIBIT 17

# County extends charity's contract

 By **Jeff McDonald · Contact Reporter**

JUNE 10, 2016, 7:00 AM

**S**an Diego County social services officials have extended their contracts with Mental Health Systems, saying the charity responded properly to an audit that examined allegations raised by a whistle-blowing former chief financial officer.

The county announcement followed the charity's formal response to the audit issued in April, when officials asked Mental Health Systems to explain why it sought and received county reimbursement for at least 13 checks that the charity voided and employed other questionable billing practices.

Charity officials "have addressed all allegations and concerns identified in the county review and audit," county spokesman Michael Workman said in a statement. "Additionally, MHS has implemented appropriate corrective and remedial actions to all issues cited."

Among other things, Mental Health Systems said it removed its chief executive officer and her husband — another charity executive — and severed ties with a Pennsylvania consulting group that received $1.2 million without providing any specific work product.

The charity also denied using county funds to keep its for-profit subsidiary afloat and said it had stopped "holding" checks — waiting weeks or months to send checks to vendors, until after the county reimbursed the payments.

Under its government contracts, Mental Health Systems is supposed to pay its bills first and seek repayment later. The charity delayed paying its bills due to persistent cash-flow problems.

Workman said the county will be paying extra attention to the charity in the future.

"The county has initiated monthly status reviews with the MHS board and executive leadership to assess their continued progress in correcting all identified concerns in a timely and complete manner," the statement said.

Meanwhile, the whistle-blower — former CFO Michael Hawkey — sent a letter to the county earlier this week disputing much of what the charity said in its response to the county. For instance, he reiterated that the charity was used to keep afloat Novata CARES, the for-profit subsidiary.

"I was routinely asked by (former CEO) Kim Bond and Wendy Broughton, currently acting CEO, to release Novata contractor checks ahead of any MHS vendor checks," Hawkey wrote, referring to the charity's for-profit subsidiary.

He also said the independent panel set up by Mental Health Systems to investigate his February whistleblower complaint never contacted him for an interview.

"I was asked to meet with several attorneys in the employ of MHS, which I did," Hawkey wrote. "I spent several hours responding to their inquiries about the pending San Diego County audit, but I was not asked about my allegations."

Mental Health Systems holds government contracts to deliver counseling, treatment and other services to needy families and individuals.

The San Diego charity does business across California, but with 34 contracts worth more than $37 million, San Diego County is its largest contractor. Fifteen of the county contracts were set to expire as soon as the end of this month.

Charity officials referred questions to attorney Frank Polek, who issued a statement saying the company has worked diligently with San Diego County to ensure that it is in compliance with all of its contracts and Hawkey's allegations are untrue.

"MHS strongly disagrees with the recent insinuations by Michael Hawkey," the statement said. "Mr. Hawkey was the chief financial officer of MHS during the relevant time period audited by the county. Oddly, the company's former CFO now complains about alleged financial improprieties."

Polek said his clients were preparing to terminate Hawkey before the former CFO sent letters to the county and to the charity's governing board outlining what he called financial improprieties by the organization.

"He has now threatened to sue, hampering the company's ability to respond fully to his allegations in the press," the statement said. "He was questioned for several hours about his allegations, his involvement in the matters about which he now complains, and other issues. He was subsequently terminated."

One key reform Mental Health Systems adopted was to "remove" Bond and her husband from the organization leadership, the charity told the county. When pressed for an explanation last month, Polek said they were on leave and declined to say whether they were still drawing paychecks.

The charity failed to disclose on its federal tax filings that Bond and Conn were married, auditors found. The nonprofit pledged to amend its tax forms.

The charity has had similar issues in the past.

The Union-Tribune reported in 2006 that the nonprofit falsified records, hired employees with criminal records and submitted improper billings, among other violations.

That year, a number of government agencies asked the charity to repay wrongly billed costs. In March of that year, for instance, state auditors requested the nonprofit return $61,000 in questionable spending on an inmate-therapy program. The charity did so.

Copyright © 2016, The San Diego Union-Tribune

# EXHIBIT 18

### *OPEN MINDS* Advisory Board Agreement
August 1, 2014

AGREEMENT made as of this 1st day of August, 2014 between Behavioral Health Industry News, Inc. d/b/a *OPEN MINDS* (hereinafter referred to as the **"Company"**) and David Conn (hereinafter referred to as the **"Consultant"**).

WHEREAS, the Company has determined that it is to the advantage and interest of the Company to avail itself of the Consultant's services in connection with the services of the Company; and

WHEREAS, the Consultant desires to provide services to the Company for its client organizations;

NOW THEREFORE, in consideration of the promises and the mutual covenants herein set forth, the parties do hereby covenant and agree as follows:

1. <u>Definitions</u>.  As used in this Agreement, the following terms shall have the following meanings:

A) <u>Proprietary Information</u> means any trade or business secrets of Company, and any scientific, technical or business materials that are treated by Company as confidential or proprietary, including, but not limited to information to which Consultant has access.  This includes Company's present or planned business that has not previously been released to the public, which could include the names and addresses of Company's clients or prospective clients and methods of doing business.  This also includes business information with which Company has entrusted Consultant such as: sales processes and procedures; costs; Company's general procedures and operations; sales or marketing strategies and techniques; form and content of proposals, reports and analyses; names of personnel; internal reporting methods; and any information about or belonging to clients, potential clients, or others.

B) <u>Intellectual Property</u> means any writing, drawing, logo, computer program, manual, trade name, trademark, service mark or other material belonging to the Company in its own right or as a licensee, registered, or otherwise protected or protectible under state, federal or foreign patent, trademark, copyright, or similar laws.

2. <u>Company Duties</u>.  The Company will provide marketing and management of the research, consultation, and education services provided by Consultant for Company clients.  Company will diligently and conscientiously devote time and attention and best efforts to promote Consultant's professional services.  This agreement supersedes any previous and existing agreements between Company and Consultant.

3. <u>Consultant Duties</u>.  The Consultant will provide business management, technical assistance, education and training, research and writing, and other services to Company clients in the health care and social service fields, as mutually agreed by Consultant and Company.  However, Consultant retains the right to refuse any work assignment offered by Company.

A) <u>Independent Contractor</u>.  Consultant at all times will be an independent contractor providing services pursuant to this Agreement.  Consultant will not represent to third parties that Consultant is an agent empowered to negotiate financial arrangements on behalf of *OPEN MINDS*.  Consultant will pay in a timely manner all income taxes, FICA taxes, and other taxes relating to payments made by *OPEN MINDS* pursuant to this Agreement.

B)   **Office Expenses.**  It is understood that Consultant will work out of his place of business.  However, under no circumstances does the Consultant's office constitute an office or place of business for Company.  Consultant's office must be equipped with a laptop computer capable of producing documents compatible with Microsoft Office 2007 or newer, a reliable Internet connection, a laser-quality computer printer, a dedicated voice telephone line with answering capability, and the ability for 24-hour facsimile and/or scan to email transmission.  All office expenses will be borne by Consultant.

C)   **Travel Expenses.**  Company shall pay for all preauthorized business-related travel expenses of Consultant, including travel to management meetings of Company.  Air travel arrangements shall be made through Company travel agent and will be prepaid by Company.  For all other preauthorized travel expenses, Consultant will pay for expenses and submit expense accounts for reimbursement under standard corporate policies, within 60 (sixty) days of approval of the original expense report.  All business expenses shall be preauthorized in writing by Company.

D)   **Former Activities.**  Consultant represents and warrants that its engagement by *OPEN MINDS* will not conflict with and will not be constrained by any prior employment or consulting agreement or relationship.  Consultant represents and warrants that it does not possess confidential information arising out of prior employment or engagement as a consultant which, in Consultant's best judgement, would be inappropriately utilized in connection with Consultant's engagement by Company.  If Consultant should find that confidential information belonging to any former employer or other party might be usable in connection with Company business, Consultant will not intentionally disclose to Company or use on behalf of Company any such confidential information; but during Consultant's engagement by Company, Consultant will use in the performance of its obligations all information which is generally known and used by persons with training and experience comparable to Consultant's own and all information which is common knowledge in the industry or otherwise legally in the public domain.

E)   **Access To Books, Documents, And Records.**  Consultant agrees with Company that until the expiration of two (2) years after the termination of this Agreement, Consultant will make available to Company, and its duly authorized representatives, all books, documents, and records necessary to certify the nature, cost, and extent of services provided to ensure compliance with all duties and responsibilities assumed by Consultant.  Mutually, for a period of two (2) years after the termination of this Agreement, Company will make available to Consultant, and its duly authorized representatives, all books, documents, and records necessary to certify the nature, cost, and extent of services provided to ensure compliance with the duties and responsibilities of Company.  All costs associated with the review of the books, documents, and records will be borne by the party requesting such access and review.

4.   **Term and Termination.**

A)   **Term Of Agreement.**  The term of this Agreement shall begin on August 1, 2014 and shall end on July 31, 2015 if either party provides 60 (sixty) days prior written notice to terminate.  If such notice is not provided, this Agreement shall be renewed indefinitely until either party provides 60-day prior written notice of intent terminate the Agreement.  Should Consultant seek and obtain other full-time employment during the term of this Agreement, the Agreement may be terminated with 60-day notice.

Upon any termination of this Agreement, neither Consultant nor Company shall have any further obligations under this Agreement except for: (1) the confidentiality and non-solicitation obligations set forth in Section 7 of this Agreement; (2) Consultant's obligation to return all of Company's property, including, without limitation, any Proprietary Information or Intellectual Property or any proprietary or confidential information of third parties obtained by Consultant from Company or any third party, which obligations are continuing in nature and shall survive the termination of this Agreement; and (3) Company's obligation to pay Consultant for services performed prior to the date of termination.

B)   <u>Termination by Company With Cause</u>.  Company shall be entitled to terminate this Agreement at any time without advance notice for cause.  For purpose of this Section 4(B), "cause" shall mean: (i) the Consultant is barred from practicing his profession in the United States of America; (ii) the Consultant breaches any material provisions of this Agreement; or (iii) the Consultant is guilty of any material misrepresentation, dishonesty or theft.

C)   <u>Termination by Consultant With Cause</u>. Consultant shall be entitled to terminate this Agreement at any time without advance notice for cause.  For purpose of this Section 4(C), "cause" shall mean: (i) the Company discontinues operations; (ii) the Company breaches any material provisions of this Agreement; or (iii) the Company is guilty of any material misrepresentation, dishonesty, or theft.

D)   <u>Termination Without Cause</u>. Company and the Consultant shall be entitled to terminate this agreement at any time without cause with 60-day notice after July 31, 2015.

5.   <u>Compensation</u>.  For all services rendered by the Consultant pursuant to this Agreement, the Company shall pay to the Consultant the compensation set forth as follows:

A)   <u>Compensation</u>.  Consultant shall work with Company and be compensated as a Senior Associate.  Consultant will be paid $133 per billable consultation hour for billing under the standard hourly rate schedule; $100 per billable consultation hour for billing under the discounted hourly rate schedule; $1,000 per six-hour training day; or one-third (33-1/3%) of the fixed fee/billing fee paid by Company client for Consultant's services.

Billable consultation hours are defined as that time billed to Company's client accounts at standard rates that are within the projected number of budgeted hours for a project.  Specifically, those consultation service hours not considered billable hours for the purposes of compensation include any administrative tasks and any service hours provided for clients and/or client projects not specifically assigned by Company to Consultant.  The Consultant's compensation will be estimated and paid on a monthly basis, on the 15th day of the following month, and reconciled on a quarterly basis.

B)   <u>Commission On New Sales</u>. Consultant shall also be paid a commission on sales of new consultation projects to client organizations. To be considered a "new consultation project", the project must be one that no *OPEN MINDS* team member is currently in the process of development.  For each prospective new consultation project, Consultant role may be:

- Referral/relationship development – identify new project, provide input on scope, review project proposal and agreement with client, secure client approval of agreement (2% commission on fees as paid)

- Referral/relationship development and proposal preparation – identify new project, create workplan and pricing model

for project, write scope of work and understanding sections of proposal; review final proposal, review project proposal

and agreement with client, secure client approval of agreement (10% commission on fees as paid)

Commissions on new consultation project revenue are paid on the actual amount of consultation fees, which excludes project-related expenses.  To be eligible for these commission payments, Consultant must elect which role he/she will fulfill – referral/relationship development or referral/relationship development and proposal preparation – and must register the potential client project with *OPEN MINDS'* President and/or Chief Executive Officer.  Such registration and designation is at the discretion of Company, but will not be unreasonably withheld.  In addition, for payment of commissions, all proposals and contracts to new client organizations must be signed by *OPEN MINDS* Chief Executive Officer in order to be binding.  These business development activities for the purposes of building new client revenue are considered administrative activities and are not considered "billable hours" for the purposes of compensation outlined in Section 5(A) above.  Commission payments by Company to Consultant are no longer due in the event of termination of this agreement by Consultant or termination by Company for cause as outlined in Section 4(B) and 4(C).  This commission on new sales is reconciled on a calendar quarterly basis, with payments made within 90 days of the close of the calendar quarter.

C)     Royalties on publications.  For any original writings that Consultant develops and *OPEN MINDS* sells on its web site, Consultant will receive 30% of net revenues for such publications.

6.      Billing and Fees. All billings for the services of the Consultant will be done by the Company and all fees and compensation received by the Consultant from the Company's clients as the result of his rendering of services shall be collected by, paid to, and belong to the Company.

7.      Consultant Acknowledgments.

A)     Consultant recognizes and acknowledges that: (1) in the course of Consultant's agreement with Company, it is or may be necessary for Consultant to use or have access to information relating to Company's present or planned business which has not previously been released to the public and which could include in whole or in part, but which is not limited to, the Proprietary Information and Intellectual Property; (2) the use, misappropriation, or disclosure of the Proprietary Information and the Intellectual Property would constitute a breach of trust and cause irreparable injury to Company; and (3) it is essential to the protection of Company's goodwill and to the maintenance of Company's competitive position that the Proprietary Information and Intellectual Property be kept secret and that Consultant not disclose the Proprietary Information and Intellectual Property to others or use the same to Consultant's own advantage or the advantage of others.

B)     Consultant acknowledges that his duties as a Consultant will require him to act in a capacity as one of Company's client-contact personnel as directed by Company and as such he will become familiar with the individuals and accounts from which Company derives its business.  Consultant understands that in such capacity it is an important part of his responsibility to develop goodwill between Company, and its referring sources, customers, and accounts.

C)   Consultant further recognizes and understands that his duties as Consultant may include the preparation of materials, including written or graphic materials, and any such materials written by the Consultant shall be done as "work made for hire" as defined and used in the Copyright Act of 1976, 17 USC §1 et seq.  In the event of publication of such materials, Consultant understands that since the work is "work made for hire," Company will solely retain and own all rights in said materials, including rights of copyright.

D)   Consultant represents that his experience and capabilities are such that the provisions of Section 8 below of this Agreement will not prevent Consultant from earning a livelihood, and also acknowledges that it would cause Company serious and irreparable injury and cost if Consultant were to breach the obligations contained in Section 8.  Consultant further acknowledges that the obligations which he has undertaken in Section 8 shall survive the termination of engagement by Company.

8.   <u>Confidentiality and Non-solicitation:</u>

A)   Consultant agrees at all times, both during and after Consultant's engagement by Company, to maintain in strict confidence Company's Proprietary Information and Intellectual Property.  Consultant understands that by agreeing to maintain the Proprietary Information and Intellectual Property in strict confidence, he is agreeing not to disclose the Proprietary Information and Intellectual Property to any third party (except when specifically and duly authorized to do so for the purposes of furthering the business of Company), and to refrain from utilizing, directly or indirectly, the Proprietary Information and Intellectual Property for any purpose other than for duly authorized business of Company.  Consultant agrees that immediately upon termination of this Agreement without request, to promptly return to Company any and all documentary, machine-readable or other elements or evidence of the Proprietary Information and Intellectual Property and any copies thereof that may be in Consultant's possession.

B)   Consultant agrees that for a period of twenty-four (24) months following the termination of this Agreement, Consultant shall not solicit directly or indirectly any account, client, or customer with whom Company has conducted any business during the period of Consultant's engagement by Company.  As used herein, "to solicit directly or indirectly" means to provide, offer to provide, or communicate with in any way to induce any interest in using for the account of Consultant or another, as owner, principal, stockholder, director, employee, officer, consultant, agent, independent contractor, partner, joint-venturer, or in any other manner, that offers comparable services to Company.

C)   Consultant agrees that for a period of twenty-four (24) months following each of the termination of this Agreement, he will not solicit or seek to persuade any employee, consultant, or independent contractor of Company to discontinue his engagement or relationship with Company, or to become employed or engaged in any business directly or indirectly competitive with Company's business.

D)   Consultant's obligations under this Section 8 of this Agreement shall not be affected by the manner of severance of Consultant's engagement with Company, including termination upon Company's initiative.  Within 30 (thirty) days of the termination of this Agreement for any cause, Company will provide Consultant with a list of organizations, employees, consultants, and independent contractors that are the subject of the non-solicitation clauses in Sections 8(B) and 8(C) above, and such list will be binding on Company.

9.   Remedies. Any breach of this Agreement by either party may subject the breaching party to liability for all damages actually suffered by the non-breaching party, and normally compensable under the law, including but not limited to, actual and consequential damages which were reasonably foreseeable by the breaching party, avoidable damages, and the payment of all costs and expenses incurred by the prevailing party, including attorney's fees, in the enforcing of the provisions thereof.  The existence of any claims or cause of action by Consultant against Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of the covenants of the Agreement.  In the event that Company alleges that the breach of contract by Consultant is in reference to the non-competition and non-solicitation clauses in Sections 8(C) or 8(D), the following steps shall be used for remedy:

A)   Company shall give notice to Consultant detailing the alleged breach of contract.

B)   Consultant shall have 60 (sixty) days from receipt of said notice to propose a remedy to the breach or to deny the breach.

10.   Contractual Obligations.  The Consultant agrees that he will not, unless authorized to do so in writing by the Company, make, draw, accept or endorse any contract, lease, promissory note, or other instrument requiring services of the Company, the payment of money by the Company, nor pledge the credit of the Company.

11.   Notice:  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given to a party hereto if hand-delivered, or if mailed, postage prepaid, by certified mail, return receipt requested, to such person at the following address, or to such other address as such party shall designate by notice as provided herein:

> Company-     At the address as provided below its signature hereon.
>
> Consultant-   At the address as provided below his signature hereon.

12.   Severance.  It is the intention of the parties that the provisions of Section 8 hereof shall be enforceable to the fullest extent permissible under applicable law, but that the unenforceability of any provision or provisions thereof shall not render unenforceable, or impair, the remaining provisions.

13.   Governing Law.  This Agreement shall be governed in all respects, including without limitation, validity, interpretation, effect, performance and enforcement, by the laws of the Commonwealth of Pennsylvania (without application of any principles of conflicts or choice of law that may otherwise be applicable).  Any action arising out of or relating to any of the provisions of this Agreement may, at the election of Company, be brought and prosecuted in the courts of the Commonwealth of Pennsylvania, or through the use of an Independent Arbitrator that follows the American Arbitration Association rules and procedures, and in the event of such election the parties hereto consent to the jurisdiction and venue of said courts or arbitrator.

14.   Modification.  This instrument constitutes the entire Agreement between the parties, and may be changed only by an agreement in writing signed by the parties.

15.   Assignment.  The rights and obligations of the Company under this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company. This Agreement, being for the personal services of the Consultant, shall not be assignable or subject to anticipation by him.

16.   <u>No Conflicting Agreements</u>.  The parties agree that this Agreement supersedes all previous agreements between them relating to Consultant's engagement by Company. Consultant warrants and represents that his execution and performance of this Agreement does not and will not violate, conflict with, or constitute a default under any contract, commitment, agreement, understanding, arrangement, restriction, or any adjudication or finding of any kind by any court or agency to which Consultant may be a party or by which Consultant may be bound.

17.   <u>Headings</u>.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provisions hereof.

18.   <u>Gender & Number</u>.  All nouns, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, and plural as the context may require.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

**Company:**
Behavioral Health Industry, News, Inc.
d/b/a *OPEN MINDS*
163 York Street, Gettysburg, Pennsylvania 17325

By: _____

**Consultant:**
David Conn

By: _____

Address: _____

_____

Q:\OMFILES\CONSULT\CONSULTING PRACTICE - ADMINISTRATION\EMPLOYEE & ADDENDA\1\PENDING\CONN, DAVID\CONN\DAVID_OM\ADVISORYBOARDAGREE_AU01-2014_070814 434PME_CMK.DOC

Page 7/ David Conn/August 1, 2014/Printed On: July 11, 2014

# EXHIBIT 19



**DLA Piper** LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Pamela Naughton
pamela.naughton@dlapiper.com
**T**  619.699.2775
**F**  619.764.6625

July 26, 2016
*Via Personal Service and Email*

Monica E. Oss
Open Minds
163 York Street
Gettysburg, PA 17325-1933
Tel: (717) 334-1329
Fax: (717) 334-0538

**Re:      Mental Health Systems Demand Letter**

Dear Ms. Oss:

Our firm represents Mental Health Systems ("MHS").  On behalf of MHS, we demand Open Minds ("OM"): (1) immediately return $1,067,914.22 to MHS and $54,805 to its subsidiary, Novata, for a total of $1,122,719.22; and (2) credit MHS the remaining amounts billed to it after September 18, 2015, a total of $205,853.61, as you previously agreed to do.

As the County of San Diego found in its audit, the three executed contracts between OM and MHS justify only approximately $145,000 in costs, and yet, OM has billed MHS over $1.4 million. *See* Appendix A to County of San Diego Auditor and Controller Report attached as Exhibit 1.  As discussed below, our review of OM's invoices and records demonstrate egregious billing by OM for unsubstantiated services and expenses.  We are also aware that Ms. Kim Bond's husband, Mr. David Conn, had an undisclosed contract with OM entitling him to monetary compensation from OM which raises substantial conflict of interest issues.  Moreover, we believe that MHS has sustained substantial damages as a result of OM's role in the acquisition of Center for Autism Research, Evaluation & Service ("CARES").

We herein demand that OM immediately repay MHS $1,122,719.22 and credit it $205,853.61, within ten days of receipt of this letter or we will be forced to take further action.  We also ask that OM produce the records identified below within ten days of receipt of this letter.

**<u>OM's Billings Vastly Exceed Terms of the Contracts</u>**

In spite of our repeated requests for records from OM, we have identified only three executed contracts for OM's services.  They are: (1) December 7, 2010 contract to provide technical assistance in electronic records software and implementation for $51,500, (2) June 22, 2012 contract (addressed to David Conn) to provide research and consultative services concerning an acquisition for $36,000, and (3) March 1, 2013 contract (also addressed to David Conn) to provide MHS with an interim business development director (Steve Ramsland) for the period of March 1, 2013 through June 28, 2013 for $57,600.  These contracts total only $145,100 and yet, amazingly, OM has billed MHS over $1.4 million.

The first December 2010 contract retained OM to assist MHS in researching and selecting an electronic records software provider.  The contract outlined a five step process, e.g., defining the specifications needed, preparing an RFP for software vendors, assisting with the vendor selection,



Monica E. Oss
July 26, 2016
Page Two

assisting with the vendor contracting, and implementation.  The contract stated that "all assistance with implementation will be provided at Open Minds discounted hourly rates under a separate contract."  We are not aware of any other contract with OM that provides for this implementation service.  The work product produced by OM indicates that it did assist MHS in identifying a vendor, Netsmart, who, as it turns out, had a financial relationship with OM.  Netsmart and MHS executed an agreement sometime **in September 2011**.  The work specified by the 2010 contract was completed by this time.

And yet, as the County audit indicates, over $816,000 was billed by OM through 2016 for alleged "software implementation," which continued well after MHS was using the Netsmart software.  It defies reason that OM would continue to bill MHS for software implementation service (at an average rate of $40,000 a month) years after a software vendor was retained specifically to assist MHS with the electronic health care records transition.  Even if OM was legitimately assisting MHS with the implementation, after the provider had been retained, it is inconceivable that this process still has not been completed nearly five years later and that the alleged costs are so astronomical.

It should be noted that while OM produced records reflecting its work identifying a software vendor and negotiating the agreement with Netsmart through the fall of September 2011, it produced very little work product substantiating the alleged "implementation" services it billed for in the following years at outrageous rates.  OM produced no timesheets, logs, itemized invoices, or other verifications of the services allegedly performed.

The second contract in June 2012 was for assistance in identifying for acquisition a for-profit company, specializing in autism services.  This work ultimately resulted in the disastrous acquisition of CARES and its merger into Novata.  As discussed below, we believe that MHS has sustained substantial damages as a result of this transaction, which OM orchestrated and championed.  Regardless, the contract specifies that OM was retained to assist MHS with identifying, approaching, and evaluating possible targets for acquisition for a total of $36,000, to be paid over a four month period.  Yet OM's billing vastly exceeded this amount: OM billed MHS approximately $158,284.08 in 2012 and approximately $436,630.12 in 2013.  These amounts are staggering given that only 5 companies were apparently evaluated and that CARES was, very early on in approximately January 2013, identified as the likely target.

The third March 2013 contract concerns MHS's retention of one of OM's senior associates – Steven Ramsland – to serve as an interim business development director for Novata, which MHS was operating as a for-profit entity prior to the CARES acquisition.  Notably, Mr. Ramsland reported directly to Ms. Bond's husband, Mr. Conn, who apparently was a lead proponent of CARES/Novata.  This contract, like the others, was for a limited period of time and amount, i.e. $14,400 per month to be paid over a four month period, for a total of approximately $57,600.  This amount is far less than what was actually billed by OM in 2013.  Documents and correspondence indicate that OM approached and convinced MHS to retain Mr. Ramsland.



Monica E. Oss
July 26, 2016
Page Three

All work identified in the three executed contracts was completed, **by the latest**, in November 2013 when MHS acquired CARES and spun out the operative Novata.  Yet, OM went on to bill MHS **$292,782.06** in 2014, **$335,004.29** in 2015 and **$85,675.33** in 2016!  OM produced only five documents reflecting its work product in 2014 and, in fact, **did not produce any documents** reflecting work performed between August 2014 and January 2015.  It defies reason as to how such little work product substantiates the astronomical amounts billed.

It should also be noted that the metadata of several OM documents you produced as "evidence" of work product indicates that they were either "created" or "modified" long after the work was allegedly done and just days before they were produced to MHS in May 2016.  To ensure that these documents were not in fact created or tampered with prior to their production, MHS requests that OM immediately reproduce these same documents directly from their servers with the metadata preserved.

The amounts OM billed in 2015 and 2016 were ascribed to work done in response to MHS's financial crisis caused by the acquisition of CARES/Novata.  While documents and correspondence indicate that OM was acutely aware of MHS's financial difficulties and the problems with Novata, and sought to find a potential buyer for the very company it convinced MHS to acquire, OM continued to bill MHS approximately $40,000 a month, knowing full well that MHS could not afford it.

Indeed, in an email dated September 17, 2015, Ms. Bond informed you that MHS needed "to halt all work with Open Minds until our cash flow gets better."  In response, on September 18, 2015 at 7:17:40 AM CDT you wrote in an email: "[w]e are willing to continue with the breakeven plan and work on the CARES sales – with no fee – through the end of the year."  Yet, in spite of this representation, and similar representations made by Ms. Bond to MHS personnel and County officials that the work OM performed during fall 2015 through 2016 would be credited, OM continued to charge MHS between $27,000 and $50,000 a month.  We understand that it is now OM's position that this amount of $205,853.61 is due. We strongly disagree and refuse to pay another dime to your company.

**<u>Fraudulent Expenses and Billings</u>**

While OM has yet to produce any of its billing entries, the invoices and expenses it **has** produced are replete with examples of overbilling and excessive charges.  It appears most of the time billed by OM was done by Senior Associate Joe Naughton Travers ("Mr. Travers"), who regularly billed twelve hours, and sometimes even eighteen hours, a day to MHS with very little explanation of the work he supposedly performed.

Moreover, it appears that nearly every month, Mr. Travers would travel to San Diego, occasionally on first class plane tickets, stay at the Coronado Island Marriott Resort and Spa (a luxury hotel nowhere near MHS's offices), at rates between $300-$500 a night for a week at a time, including weekends, rent limos or charge car rentals and valet parking (on average, $400 a visit), and expense multiple meals a day at high end restaurants, all on MHS's dime, even though his actual work for MHS



Monica E. Oss
July 26, 2016
Page Four

only covered a 2-3 day time period.  Indeed, between 2014 and 2016, Mr. Travers expensed from $2,327.04 to $6,851.93 a month to MHS.  **His expenses alone** from just January 1, 2014 through January 31, 2016 exceed $105,000.

For example, in January 2014, Mr. Travers billed $3,940.62 in travel to visit MHS.  He flew out to San Diego on Sunday, January 12 and returned on Saturday, January 18, 2014.  He billed MHS for six nights lodging at a rate of over $300 a night and for meals for six days, approximating $100 a day.  He also charged for internet on the plane, limo service ($160), car rental ($400), and valet parking ($25 a day).  Although Mr. Travers arrived on January 12 and charged MHS for his hotel expenses from this day forward and for approximately $130 in meal expenses on January 13, he did not actually work at MHS on January 13.  He thereafter billed MHS twelve hours a day each day from January 14-17, although the billing entries reflect little more than "on site visits."

Similarly, from Monday, April 20  through the following Tuesday, April 28, 2015, Mr. Travers charged MHS approximately $4,861.80 in expenses, which included $911.18 in airfare and eight nights lodging at the Coronado Island Marriot Resort at a rate of $397.24 a night.  Mr. Travers billed MHS for approximately eight hours on April 20 for "project review and site visit prep" but then on April 21, 22, and 23, billed only between one and a half and two hours a day for "assorted acquisition emails and responses."  Meanwhile, he charged MHS $400 a night for his luxury hotel room and from $50-$100 a day in meals.  Certainly Mr. Travers' presence was not required in San Diego to send a few emails.

Moreover, on April 24, Mr. Travers billed MHS for twelve hours of work for "**Site day work**: Acquisition project- responses, review, and initial compilation, PFM updates."  Yet, on this same day, he was having a $54 lunch – on MHS – in **Coronado** at Il Fornaio Cucina Italiana at approximately 12:49 p.m.!  It is incredulous that Mr. Travers was truly working a twelve hour day on site at MHS in Claremont Mesa when he was having a leisurely lunch in Coronado during the middle of the day.

Again, on Friday, November 14, 2015, Joe Naughton Travers billed MHS $1,171.28 for first class airfare from New Jersey to San Diego.  Evidently, the airfare was supposed to be shared with another client who cancelled.  Mr. Travers was not due to be at MHS until Tuesday, November 16, but, after the other client cancelled, he flew out to San Diego on Friday, stayed the weekend, and charged the entire airfare to MHS.  His hotel that week was $443.43 a night and he expensed a total of six nights, including the weekend, to MHS.  Mr. Travers billed MHS eight hours on Friday, November 14 for "prep time" as well as a $64 dinner.  Mr. Travers did not do any work for MHS on Monday but then billed MHS twelve hours a day on Tuesday (11/17), Wednesday (11/18) and Thursday (11/19) for "preparation, meeting and follow up."  These vague time entries do not even indicate that Mr. Travers was at the MHS site these days, nor do they identify whom he met with or the work he performed.  His dinner expense of $25, again at Il Fornaio Cucina Italiana in Coronado on Thursday, November 19 at 5:25 p.m., indicates that he was not on site and also not likely working a twelve hour day.  Mr. Travers also expensed approximately $336 for limo service this week, bringing his total expenses to approximately $4,820.93 for this trip.



Monica E. Oss
July 26, 2016
Page Five

Notably, this trip occurred **after** you were clearly aware of MHS's dire financial condition and represented that OM would work for free.  It is truly outrageous that Mr. Travers and OM would continue to engage in such lavish conduct at the expense of a troubled nonprofit entity.

## David Conn Was a Paid Consultant of OM

Contrary to repeated representations by Ms. Bond and Mr. Conn that Mr. Conn only had an unpaid position on OM's advisory board, we discovered an undisclosed contract between Mr. Conn and OM which in fact provides for monetary compensation.  Mr. Conn's agreement with OM expressly provides that he is to be compensated as a "Senior Associate" (notably the **same title as Mr. Travers** and Mr. Ramsland) and to be paid:

> $133 per billable consultation hour for billing under the standard hourly rate schedule; $100 per billable consultation hour for billing under the discounted hourly rate schedule; $1000 per six-hour training day; or one-third (33 1/3%) of the fixed fee/ billing fee paid by Company client for Consultant's service.

See Open Minds Advisory Board Agreement, August 1, 2014 between Behavioral Health Industry News, Inc. d/b/a Open Minds and David Conn, Section 5A.

Furthermore, the Agreement also provides that Mr. Conn is also eligible to receive commission payments (2% or 10%) for securing new consultation projects for clients like MHS.  Section 5(b) of the Agreement provides:

> Commission On New Sales:  Consultant shall also be paid a commission on sales of new consultation projects to client organizations.  To be considered a "new consultation project," the project must be one that no *Open Minds* team member is currently in the process of development.  For each prospective new consultation project, Consultant role may be:
>
> - Referral/ relationship development – identify new project, provide input on scope, review project proposal and agreement with client, secure client approval of agreement (2% commission on fees as paid)
>
> - Referral/ relationship development and proposal preparation – identify new project, create work plan and pricing model for project, write scope of work and understanding sections of proposal; review final proposal, review project proposal and agreement with client, secure client approval of agreement (10% commission on fees as paid).



Monica E. Oss
July 26, 2016
Page Six

Mr. Conn is also entitled to 30% of net revenues of any publications he develops and OM sells on its website.  See Agreement Section 7C (Royalties on Publications).

At this point, it is unclear to us whether Mr. Conn received any payment from OM.  If he in fact received a commission payment from OM for the work OM performed for MHS, this would likely amount to an illegal kickback.  We hereby demand that OM produce within ten days any and all documents reflecting money or any other thing of value given to Mr. Conn or Ms. Bond by OM, Behavioral Health Industry News, any affiliated or related entity, Mr.Travers, or you.

Regardless of whether Mr. Conn actually received any monetary payment from OM, the fact he could have under the terms of his consultant agreement, creates an obvious conflict of interest that should have been disclosed and Ms. Bond's and Mr. Conn's relationship with OM fully evaluated, particularly in light of OM's exorbitant and unjustified billings.

This scheme of potential kickbacks and fraudulent documents seems to be a pattern and practice.  We are aware that you were indicted in perhaps the largest criminal healthcare fraud scheme during the 1990s.  *See USA v. Commito, Mattison, Monica E. Oss*, 88-CR-00597-MHP-3 (N.D. Cal. filed September 20, 1998); *USA v. Committo, Mattison, Monica E. Oss*, CR-88-434A (N.D. Ga. filed September 21, 1998).  Certainly knowledge of your criminal past, Mr. Conn's financial relationship with OM, and the unexplained and excessive OM billings, make for a powerful case of fraud.

**Damages Resulting From CARES Acquisition**

Lastly, whether it was Mr. Conn's or Ms. Bond's idea, or whether it was a seed planted by OM, it is clear from the documents produced that OM was intimately involved in the scheme to create a for-profit component of MHS's business and pushed the acquisition of CARES early on.  The records and correspondence also indicate that OM advised MHS on the due diligence, which was woefully inadequate, and was aware that the valuation of the company had to come at a certain price for the deal to happen, even though the company was grossly overvalued.  Moreover, OM was also aware, at least in part, of CARES's litigation exposure prior to the acquisition.  Novata was ultimately sued in a massive class action lawsuit it inherited from CARES and MHS was forced to pay hundreds of thousands of dollars in settlement.  Nearly all of MHS's recent financial difficulties, which have placed its contracts with San Diego County in jeopardy, can be attributed to the disastrous CARES/Novata transaction, which OM arranged.  These transactions deserve increased scrutiny and will no doubt add to MHS's claim for damages.

**Requests for Documents**

As discussed above, our client is truly disgusted by the excessive and unjustified billings by OM and the inherent conflicts of interest between OM and MHS's former executive officers Ms. Bond and Mr. Conn and demands that OM immediately repay MHS $1,122,719.22 and credit it $205,853.61, within



Monica E. Oss
July 26, 2016
Page Seven

ten days of receipt of this letter.  Please note that this letter places you on notice of a dispute and you are required to take proper measures to preserve any and all relevant paper and electronic records.

Furthermore, we ask OM to produce, within ten days of this letter, the following:

- Reproduce all work product documents with metadata preserved;

- All billing entries by OM personnel on any MHS matter;

- Any and all agreements with Mr. David Conn, Ms. Kim Bond, or any other MHS employee;

- All records and documents reflecting payment or gifts of any sort to Mr. David Conn and/or Ms. Kim Bond by OM, Behavioral Health News, any affiliated or related entity, Mr. Travers, or you; and

- All written and electronic communications with Mr. David Conn and Ms. Kim Bond, whether sent and/or received over the MHS server or a personal email account.

Very truly yours,

**DLA Piper LLP (US)**

Pamela J. Naughton
Partner

WEST\270159607.2

# EXHIBIT A



*Auditor and Controller*

*County of San Diego*

# OFFICE OF AUDITS & ADVISORY SERVICES

## MENTAL HEALTH SYSTEMS SPECIAL REVIEW

Chief of Audits: Juan R. Perez
Audit Manager: Laura R. Flores, CIA, CFE, CGAP
Senior Auditor: Tatiana Foster, CPA, CFE

Report No. A16-026

April • 2016

Intentionally Left Blank

## WHY OAAS PROVIDED THE SERVICES

**Objective**

Under the direction and control of the Office of County Counsel (County Counsel), with the assistance from the Health and Human Services Agency Contract Support Unit (ACS) and the Office of Ethics and Compliance (OEC), the Office of Audits & Advisory Services (OAAS) initiated a special review of Mental Health Systems, Inc. (MHS), a County of San Diego (County) contractor. The objective of the special review was to investigate allegations communicated to the County by a complainant.  The allegations are as follows:

Ia/Ib.      MHS used funds obtained from State, federal and County cost reimbursement contracts to finance a failed for-profit company called Novata.

II.          MHS's financing of Novata resulted in serious detriment to MHS, its clients, its employees, and its vendors.

IIIa/IIIb.  MHS withheld payments to vendors, contractors, doctors and staff in order to transfer cash to the for-profit.

IV.         MHS billed State, federal, and county contracts for expenses it had not paid.

V.          MHS billed cost reimbursement contracts for consulting services provided by Open Minds.

VI.         There are no significant documented deliverables for services provided by Open Minds.

VII.        Inappropriate relationships exist between Open Minds owner/staff and MHS management.

VIII.       Dr. David Conn, the husband of MHS's President, sits on the advisory board of Open Minds.

IX.         The MHS Board approved Dr. David Conn's appointment to a highly compensated position that reports directly to Kimberly Bond, his wife (MHS's President & CEO).

This special review was conducted in conformance with the Certified Fraud Examiners' Code of Professional Standards prescribed by the Association of Certified Fraud Examiners.

**Background**

MHS is a non-profit agency founded in 1978. Through administration of various programs and primarily pursuant to government contracts, MHS provides mental health services, drug and alcohol rehabilitation services, vocational rehabilitation services, and educational programs to individuals, families, and communities. Table 1 summarizes MHS's current contracts with the County:

**Table 1. Current MHS Contracts for FY 2015-16**

| County Department | Number of Contracts | Annual Authorized Amount | Contracts Terms |
|---|---|---|---|
| Health and Human Services (HHSA) | 27 | $35,733,737 | Jul 1, 2000 - Jun 30, 2021 |
| Probation | 1 | $901,867 | Jul 1, 2014 - Jun 30, 2021 |
| Housing and Community Development (HCD) | 3 | $230,822 | Jul 1, 2011 - Jun 30, 2016 |
| **Total** | **31** | **$36,866,426** | |

MHS submits claim forms to the County to get reimbursed for services provided pursuant to the County contracts. Claim forms include direct and indirect expenditures incurred by MHS. Indirect expenditures are charged to the County by applying MHS's indirect rate to the direct program expenditures. According to MHS's Cost Allocation Plan, the indirect rate charged to the County in FY 2014-15 and FY 2015-16 was 13.5% and 14.5%, respectively.[1] Table 2 outlines direct and indirect expenditures paid by the County to MHS in FY 2014-15 and FY 2015-16.[2]

**Table 2.  Direct and Indirect Expenditures Paid by the County**

| Department | Direct Expenditures | | Indirect Expenditures | |
|---|---|---|---|---|
| | FY 2014-15 | FY 2015-16 to Date | FY 2014-15 | FY 2015-16 to Date |
| HHSA | $32,075,657 | $17,829,907 | $3,538,089 | $2,024,907 |
| Probation | $719,746 | $535,909 | - | - |
| HCD | $251,923 | $241,107 | $9,162 | $9,000 |
| Total | $33,047,326 | $18,606,923 | $3,547,251 | $2,033,907 |

Each County department reviews claims submitted by MHS prior to payment and is responsible for ensuring the contractor is in compliance with contract requirements, services are being delivered at an acceptable level of quality, outcomes and objectives are on-track to be met or have been met, and the contracted program is having the anticipated impact on the target population. This occurs in a variety of ways throughout the contract year including claim (invoice) reviews, site visits, reviews of performance data, quality assurance reviews, in-depth invoice reviews and reviews of contract deliverables.

In 2010, MHS created a for-profit subsidiary, named Behavioral Healthcare Solutions (BHS), to segregate government and nongovernment funding. In October 2013, BHS purchased the Center for Autism Research, Evaluation & Service, a Psychological Corporation (CARES). Shortly after the purchase, the name of BHS was changed to Novata Behavioral Health (Novata). Novata is a wholly-owned, for-profit subsidiary of MHS. MHS and Novata share the same board of directors and management team.

---

[1] The County is charged an indirect rate by MHS based upon its provisional federal rate.  That provisional rate ended on June 30, 2015.  MHS was unable to confirm that it received government approval of the final rate.  As a result, the County is in the process of calculating MHS's proper indirect rate for FY 2013-14 to FY 2014-15.

[2] HHSA payments are as of January 31, 2016. Probation payments are as of February 29, 2016. HCD payments are as of March 31, 2016.

Novata provides treatment and support services for children and families living with autism and other neurodevelopmental disorders.

Based on information provided by MHS, MHS engaged Open Minds, a Pennsylvania based company, in FY 2010-11 to provide consulting services related to market intelligence and management information.

**Methodology**    OAAS performed its investigation using the following methods:

- Interviewed the complainant to obtain an understanding of the allegations.

- Interviewed MHS's key personnel on policies, procedures, and processes to investigate allegations made by the complainant.

- Reviewed MHS's financial statements and supporting schedules.

- Reviewed MHS's proposed federal indirect rate calculation.

- Analyzed the financial condition of MHS and Novata.

- Confirmed with a random sample of MHS's vendors and subcontractors their receipt of checks and MHS's payment practices.

- Reviewed MHS's payment history to Open Minds and related contracts.

- Reviewed MHS's HR and payroll documents related to David Conn's position and compensation at MHS.

- Obtained results of the work conducted by ACS.

**Terms Definition**    The terms applied to the investigation results are defined as follows:

***Substantiated***: The allegation is accurate and was validated through the investigation.

***Substantiated − Corrective Action Taken***: The allegation is accurate and was validated through the investigation. Corrective action(s) to address identified issues have been implemented.

***Partially Substantiated***: Some elements of the allegation are accurate. Verification was partial where it was concluded that one or more, but not all of the allegations, were substantiated.

***Unsubstantiated:*** The allegation is false or invalid based on the investigation performed.

***Inconclusive:*** The validity and/or accuracy of the allegation cannot be determined due to lack of supporting documentation or because under

the terms of the contract, the County lacks access rights to the necessary information.

**Summary of Investigation Results**

Within the scope of the special review, OAAS concluded the following:

Table 3. Summary of Results

| Conclusion | Allegations |
|---|---|
| Substantiated | 2 |
| Substantiated - Corrective Action Taken | 1 |
| Partially Substantiated | 4 |
| Unsubstantiated | 1 |
| Inconclusive | 3 |

In addition to the investigation results, OAAS identified several operational issues, identified in this report as "Findings" that should be addressed by MHS.

The investigation results for each allegation are detailed below.

**Complainant's Allegation I:**

**Use of Government Funds to Finance Novata**

> *Allegation*: For the past two years, MHS has been using funds obtained from State, federal and county cost reimbursement contracts to finance a failed for-profit company called Novata.

For purposes of clarity, the investigation results of this allegation were divided into two parts:

**Allegation Ia:** MHS financed a for-profit company called Novata.

**Allegation Ib:** MHS has been using funds obtained from State, federal and county cost reimbursement contracts to finance Novata.

**Substantiated**

OAAS's investigation found that MHS has transferred funds to Novata since FY 2013-14, as summarized in Table 4.

Table 4. MHS Transactions with Novata as of December 31, 2015

| Fiscal Year | MHS Cash Transferred to Novata | Novata's Expenses Paid by MHS | MHS Services Provided to Novata | Payments Received from Novata | Receivable Balance Due from Novata |
|---|---|---|---|---|---|
| FY 2013-14 | $1,710,000 | $894,955 | $736 | - | $2,605,691 |
| FY 2014-15 | $3,464,000 | $287,509 | $971,873 | $1,590,302 | $5,738,770 |
| FY 2015-16 | $250,834 | $225,266 | $229,461 | $784,585 | $5,659,748 |
| **Total** | **$5,424,834** | **$1,407,730** | **$1,202,070** | **$2,374,866** | |

While Novata is not a "failed" for-profit company as alleged, an analysis of Novata's financial statements identified a poor financial condition, as illustrated in Table 5.

**Table 5. Novata's Financial Position as of December 31, 2015**

| Description | Balance |
|---|---|
| **Current Assets** | |
| Cash | $387,038 |
| Accounts Receivable, net of allowance | $2,268,930 |
| Other Current Assets | $48,028 |
| **Total Current Assets** | **$2,703,996** |
| | |
| **Non-Current Assets** | |
| Fixed Assets, net of depreciation | $141,681 |
| Goodwill, net of impairment | $1,970,015 |
| Deferred Tax | $1,728,334 |
| Other Non-Current Assets | $39,085 |
| **Total Non-Current Assets** | **$3,879,115** |
| | |
| **Total Assets** | **$6,583,111** |
| | |
| **Total Current Liabilities** | **$1,617,445** |
| **Total Long-Term Liabilities**[3] | **$8,128,883** |
| **Stockholder's Equity** | **($3,163,216)** |

OAAS noted that transferred funds were recorded as account receivables on MHS's financial statements and as liabilities on Novata's financial statements.

In order to secure a loan to acquire CARES, MHS entered into a Support and Guaranty Agreement with a bank, which required MHS to deposit funds into Novata's accounts when Novata is not in compliance with its Debt Service Coverage Ratio and loan obligations.

According to MHS's management, transferred funds were used to cover Novata's payroll obligations and program expenses. Some funds were used for a technology upgrade and start-up costs related to the purchase of CARES. In addition, MHS paid certain expenses on behalf of Novata.

On October 17, 2011, MHS established an agreement with BHS (now named Novata) whereby MHS provides accounting, administrative and management services to Novata. MHS charges Novata a monthly fee of 10% of Novata's revenue for the services provided. (See Finding IV).

> *Impact to the County:* Funds transferred to Novata have impacted MHS's ability to pay its financial obligations which increases the risk that MHS's vendors and subcontractors may not be paid in accordance with County contract terms. This can also impact services provided to the County. Further, Novata's poor financial condition increases the risk that its obligations will not be repaid, thereby its financial condition can potentially worsen.

### Ib. Inconclusive

OAAS was not able to determine which specific funding sources were used to finance Novata's operations, because transfers from MHS to

---

[3] Total long-term liabilities include $5,659,748 owed to MHS.

Novata were processed from MHS's cash account which commingles funds from different sources.  MHS's accounting procedures do not allow for tracing of the cash transferred to Novata back to the original funding source.

OAAS analyzed MHS's revenue for FY 2014-15, as summarized in Table 6, and noted that the majority of MHS's revenue is obtained from government sources.

**Table 6. MHS  Revenue FY 2014-15**

| Revenue Source | Direct Revenue | Pass-Through Federal Funds | Total Revenue | % |
|---|---|---|---|---|
| Federal Government | $601,662 | - | $601,662 | 1% |
| State Government | $16,080,021 | $706,476 | $16,786,497 | 22% |
| County of San Diego | $35,721,910 | $3,817,447 | $39,539,357[4] | 52% |
| Other Counties | $9,957,397 | $6,346,721 | $16,304,118 | 22% |
| Non-government | $2,244,091 | - | $2,244,091 | 3% |
| **Total** | **$64,605,081** | **$10,870,644** | **$75,475,725** | **100%** |

However, in addition to the revenues identified above, MHS also had an $8 million line of credit that could potentially have been used to finance Novata's operations.

> Impact to the County: Impact cannot be determined as it is unknown whether County funds were used to finance Novata.

**Complainant's Allegation II:**

**Impact of Cash Transfers to Novata**

> _Allegation:_ Use of funds to finance Novata has been done to the serious detriment of MHS, its clients, its employees and its vendors.

**Partially Substantiated**

OAAS did not quantify the specific detriment caused to MHS clients or employees; however, OAAS determined that funds transferred to Novata have impacted MHS's ability to pay its financial obligations.

OAAS verified that MHS's cash balance, as of January 31, 2016, is insufficient to cover its current liabilities as outlined in Table 7. However, its overall financial position as of the same date appears adequate if all receivables, including those due from Novata, are collected.[5]

---

[4]  Revenue amount recorded by MHS varies from County expenditures presented in Table 2 due to timing differences.

[5]  Additional financial information received by OAAS during the report writing process indicates that for the nine months ending March 31, 2016, MHS has incurred a net loss of $3,163,048.

**Table 7. MHS Financial Position as of January 31, 2016**

| Description | Total Balance |
|---|---|
| **Liquid Assets** | |
| Cash | $1,285,571 |
| **Total Liquid Assets** | **$1,285,571** |
| | |
| **Current Assets** | |
| Contracts Receivable, net of allowance | $13,274,621 |
| Other Receivables[6] | $5,680,348 |
| Other Current Assets | $791,114 |
| **Total Current Assets** | **$19,746,083** |
| | |
| **Non Current Assets** | |
| Fixed Assets, net of depreciation | $13,190,398 |
| Other Non Current assets | $881,465 |
| **Total Non Current Assets** | **$14,071,863** |
| | |
| **Current Liabilities** | |
| Accounts Payable | $2,817,410 |
| Accrued Payroll and Related Taxes | $1,288,753 |
| Accrued Employee Benefits | $5,319,405 |
| Other Current Liabilities[7] | $6,203,128 |
| **Total Current Liabilities** | **$15,628,696** |
| | |
| **Total Long-Term Liabilities** | **$8,459,333** |
| **Total Net Assets** | **$11,015,487** |

Additionally, OAAS randomly selected invoices and mailed confirmation letters to 48 vendors and subcontractors to identify MHS's payment practices. We received responses from 31 vendors and subcontractors; 11 confirmed that MHS does not consistently pay in a timely manner (in accordance with their own invoice terms).

Also, based on interviews with MHS management and a review of applicable documents, OAAS confirmed that MHS does not pay all invoices by their due dates. According to the management staff interviewed, invoices with high priority such as rent, utilities, payments to psychiatrists, and certain program expenses are processed on a weekly basis. When asked which gets priority - MHS's vendor invoices or making required cash transfers to Novata - MHS's CEO stated that MHS's vendor invoices are paid first.

However, pursuant to the Support and Guaranty Agreement signed with the bank, MHS is legally required to provide cash when Novata is not in compliance with its Debt Service Coverage Ratio and loan obligations.

> _Impact to the County:_ An insufficient cash balance increases the risk that MHS's vendors and subcontractors will not be paid in accordance with County contract terms which can impact services provided to the County.

---

[6] Other Receivables refers to Novata Receivables.
[7] Other Current Liabilities include MHS's current portion of line of credit, unearned revenue, and other miscellaneous liabilities.

| Complainant's Allegation III: | **Withholding Payments to Vendors and Subcontractors in Order to Subsidize Novata** |

> _Allegation:_  For the past seven months, MHS has withheld payments to vendors, contractors, doctors and staff in order to transfer cash to the for-profit.

For purposes of clarity, the investigation results of this allegation were divided into two parts:

> **Allegation IIIa**: Payments to vendors, contractors, doctors and staff have been withheld.

> **Allegation IIIb:** Withheld payments were used to transfer cash to Novata.

### IIIa. Substantiated – Corrective Action Taken

Through inquiries made to MHS's management and accounts payable staff, OAAS confirmed that MHS withheld payment checks to vendors and subcontractors. While MHS prepared checks for all invoices received on a weekly basis, not all of the checks were released when written.

OAAS confirmed that in January, 2016, MHS held 165 checks totaling $1,376,568; 160 of these checks were prepared in January, 2016, and 5 checks were prepared in October and December, 2015.  Out of 165 checks held in January, 2016, 152 checks were mailed to vendors and subcontractors either in February or March, 2016, and 13 checks were voided[8] in March, as detailed in Table 8. This practice violates Generally Accepted Accounting Principles because it results in understated liabilities and cash recorded on the books[9].

**Table 8. Held Checks**

| Check Status | Holding Period | Number of Checks | Amount |
|---|---|---|---|
| Mailed | 8-20 days | 5 | $18,895 |
| | 21-30 days | 67 | $408,576 |
| | 31-40 days | 28 | $4,900 |
| | 41-44 days | 52 | $607,348 |
| **Total mailed checks** | | **152** | **$1,039,719** |
| Voided | 36-56 days | 8 | $137,425 |
| | 62-132 days | 5 | $199,424 |
| **Total voided checks** | | **13** | **$336,849** |
| **Total checks** | | **165** | **$1,376,568** |

Based on limited testing, OAAS verified that MHS stopped holding checks in February, 2016.

---

[8] Out of 13 voided checks, 7 checks were reissued in March 2016.
[9] Since checks were not mailed to vendors and subcontractors, the amount of cash in MHS's bank account was not affected.

> *Impact to the County:*   According to specific provisions in County contracts, MHS was required to comply with Generally Accepted Accounting Principles and good business practices. By withholding checks made out to vendors and subcontractors, MHS was violating those contractual provisions.

### IIIb. Inconclusive

While MHS's management acknowledged that checks were withheld due to cash issues, OAAS did not find direct evidence to confirm that payments were withheld because MHS needed the cash to prioritize transfers to Novata specifically.

> *Impact to the County:*  Unable to determine.

**Complainant's Allegation IV:**

**Billing for Reimbursable  Expenses that Have not Been Paid**

> *Allegation:* On any given week, MHS has billed State, federal, and county contracts for anywhere between $1M and $4M of cost reimbursable expenses which have not been paid.

### Partially Substantiated

Testing to substantiate this allegation was limited to County funds only. As such, the allegation is partially substantiated.

ACS obtained the A/P Aging Report as of March 11, 2016 and requested MHS to identify accounts payable attributable to County contracts, as summarized in Table 9[10].

**Table 9. A/P Aging Analysis**

| A/P Details | Current | 31-60 Days | 61-90 Days | 91 and Over | Totals |
|---|---|---|---|---|---|
| County - Claimed | $72,324.66 | $162,747.15 | $15,447.39 | $243.39 | $250,762.59 |
| County - Not Claimed | $380.09 | $145,154.70 | $58,595.59 | $0.00 | $204,130.38 |
| **Total County Related A/P** | **$72,705** | **$307,902** | **$74,043** | **$243.39** | **$454,893** |
| Indirect Costs | $107,639.53 | $149,531.64 | $85,945.03 | $70,613.28 | $413,729.48 |
| Non-County | $490,750.26 | $296,294.84 | $12,828.14 | $182,869.17 | $982,742.41 |
| **Totals** | **$671,094.54** | **$753,728.33** | **$172,816.15** | **$253,725.84** | **$1,851,364.86** |
| **% of Total Payables** | **36%** | **41%** | **9%** | **14%** | **100%** |

According to MHS's management, $454,893 of accounts payable are direct expenses attributable to County contracts.   Of that amount, $250,763 has been claimed by MHS to the County while the remaining $204,130 had not yet been claimed.

From the $250,763 of accounts payable already billed to the County, $178,437 are past due over 31 days.  MHS's management stated that

---

[10] Due to the time restraints, the accuracy of information presented in Table 9 was not validated by ACS.

the County may have not yet paid some of the $178,437; however no evidence was provided to support this statement.

> _Impact to the County:_  If it is determined that MHS has not paid its vendors and subcontractors for expenses already reimbursed by the County, it constitutes a violation of the "Prompt Payment for Vendors and Subcontractors" term in the County contracts which requires MHS to pay its vendors no later than 30 days after receipt of payment from the County.

**Complainant's Allegation V:**

### Billing the County for Open Minds Consultants

> _Allegation:_ Over the past few years, MHS has billed cost reimbursement contracts for approximately $1.2M of expenses paid to a consulting firm called Open Minds.

**Partially Substantiated**

OAAS found that from FY 2010-11 to FY 2015-16, Open Minds billed MHS $1,418,868 for services provided. Of that amount, $1,213,014 had been paid by MHS to Open Minds and $205,854[11] had not been paid as of February 29, 2016.

For purposes of the $1,213,014 paid to Open Minds, OAAS verified the following:

- $816,022 was recorded as part of the Fixed Assets (Software) - Construction in Progress account (CIP). MHS had not yet billed cost reimbursement contracts for such services as they relate to an asset that was placed in service in FY 2015-16[12].

- $396,392 was recorded as part of MHS's indirect cost and billed to cost reimbursement contracts, including the County, through indirect rate charges.

- $600 was recorded as part of the accounts receivable due from Novata and had not been billed to cost reimbursement contracts.

> _Impact to the County:_ A portion of the $396,392 payments made to Open Minds had been billed to County contracts. OAAS is unable to determine the exact amount, as payments to Open Minds were billed indirectly.

---

[11] Unpaid invoices are for services provided from July, 2015 to November, 2015.

[12] Payments recorded as part of the CIP account are allocated to the direct or indirect cost when the asset related to CIP is placed in service. Such allocation is done through depreciation of the asset over its useful life.

| | |
|---|---|
| **Complainant's Allegation VI:** | **Lack of Documented Deliverables Provided by Open Minds** |

> *Allegation:* There has yet to be a single significant documented deliverable provided by Open Minds for the $1.2M they have received.

**Partially Substantiated**

MHS provided OAAS three contracts with Open Minds that document deliverables totaling $145,100.   MHS did not provide contracts or documented scope of work for the remaining services provided totaling $1,273,768 by Open Minds. The three contracts provided were for the following services:

- Consulting on the acquisition of CARES (Novata's subsidiary).

- Services of an interim business development director.

- Technical assistance in electronic medical records software selection.

In addition, MHS provided a letter from Open Minds for ongoing consultation. The letter states that Open Minds would provide work preauthorized by MHS at discounted hourly rates.  However, the total fee charged for these services is not documented in the letter.

According to MHS's management, Open Minds also provided services based on verbal requests from MHS's management without a formal agreement documenting specific deliverables and compensation. Further, MHS's management stated that it is not efficient to have formal contract agreements for every service provided by Open Minds.

Based on a review of the contracts provided by MHS and invoices paid to Open Minds, OAAS selected a sample of deliverables outlined in these documents.   MHS provided a number of documents in support of the services received from Open Minds including memos, meeting agendas, emails, system implementation milestones information, excel templates, etc.  However, without a documented scope of work and defined deliverables, MHS was not always able to demonstrate that it received from Open Minds the services it requested and for which it paid.

> *Impact to the County:*   Absence of formal contracts that outline service deliverables in support of the full amount paid to Open Minds, results in OAAS's inability to determine whether expenditures related to Open Minds should be included in MHS's indirect cost. As such, indirect rate charged to the County could be affected resulting in overstated indirect expenses allocated to the County.

| | |
|---|---|
| **Complainant's Allegation VII:** | **Inappropriate Relationship with Open Minds** |

> _Allegation:_ The owner and several staff members of Open Minds are personal friends of Kim Bond and David Conn, all of whom are known to vacation together…
>
> …It is not known if Ms. Bond or Mr. Conn are receiving kick-backs from Open Minds, but the inappropriateness of this relationship is obvious.

**Inconclusive**

OAAS interviewed Ms. Bond to inquire about the allegation. She stated that she has no friends or family at Open Minds.  She also indicated that she did not vacation with Open Minds staff.

Pursuant to audit provisions in County contracts, County auditors' access is limited to contractor records only.  Since the allegation cannot be verified by reviewing MHS records, OAAS was unable to make a determination of its validity.

> Impact to the County:  Unable to determine.

| | |
|---|---|
| **Complainant's Allegation VIII:** | **Dr. Conn's Role with Open Minds** |

> _Allegation:_ David Conn, the husband of MHS's President, sits on the advisory board of Open Minds.

**Substantiated**

OAAS's research verified that Dr. Conn is an Advisory Board Member with Open Minds.  Further, Ms. Bond confirmed the accuracy of this statement and added that Dr. Conn's position on the Advisory Board is not compensated.

OAAS's review of MHS's Conflict of Interest Disclosure Forms found that Dr. Conn's position with Open Minds was not disclosed to MHS's management. While MHS's Conflict of Interest Policy requires its employees to disclose a financial or employment relationship with a competitor, vendor, or customer/client of MHS, the policy does not require the employees to disclose volunteer positions.  According to best business practices, and to provide full transparency, employees should disclose all relationships with competitors, vendors, and customers/clients.

> _Impact to the County:_  According to County contracts with MHS, MHS shall comply with good business practices. Failure to require all employees to properly disclose all relationships with competitors, vendors, or customer/clients increases the risk that the company will not identify and address conflicts of interest.

**Complainant's Allegation IX:**

### Dr. Conn's Appointment

*Allegation:* The MHS Board of Directors has approved David Conn's appointment to a highly compensated position, reporting directly to his wife. There is no written job description for this position, and little output that anyone on staff can point to.

**Unsubstantiated**

OAAS confirmed that on November 1, 2015, Dr. Conn was appointed to the Senior Vice President of Business Development & Government Relations position as a result of a restructuring within MHS. According to MHS's management, the Board of Directors' approval is not needed for the appointment. However, it was noted that the appointment was discussed during a MHS Management Team meeting held on October 19, 2015. Mr. Conn did not receive an increase in compensation as a result of his new position.

Dr. Conn's last salary increase occurred on July 1, 2010; his salary was increased from $109,116 to $120,000. The Board of Directors last reviewed and approved Dr. Conn's compensation on October 17, 2011.

Based on OAAS's review of documents provided, Dr. Conn does not report directly to his wife, Kimberly Bond. Specifically, OAAS verified the following:

- From November 1, 2015 to December 1, 2015, David Conn reported to Novata's Chief Operating Officer.

- From December 1, 2015 to February 10, 2016, he reported to MHS's Chief Financial Officer.[13]

- Beginning February 11, 2016, he reports to MHS's Chief Medical Officer.

OAAS reviewed the job description for David Conn's current position and found that it outlines his essential duties and responsibilities at MHS.  Based on the documents reviewed, it appears that MHS complied with its internal company policy regarding employment of relatives and chain of command reporting.

*Impact to the County:* No impact to the County.

**Finding I:**

As a result of the investigative work conducted by OAAS, the following findings were identified:

### Relationship Between MHS and Novata

OAAS identified the following issues that evidenced a lack of  an arm's length relationship between MHS and Novata:

---

[13] According to the complainant, the reporting relationship between Dr. Conn and the Chief Financial Officer was administrative only.

- MHS entered into a Support and Guaranty Agreement that required MHS to transfer funds to Novata without interest accrual.

- MHS does not have written agreements for the funds transferred to Novata. According to MHS management, there is an expectation that the transfers to Novata will be recovered and are recognized in MHS records as receivables.

Further, OAAS found that MHS lacks adequate internal controls to demonstrate that transfers to Novata are properly reviewed and approved.
Transactions between non-profit MHS and for-profit Novata not undertaken at an arm's length basis could jeopardize MHS's tax exempt status.

> *Impact to the County:* Absence of a formal agreement documenting loans made by MHS to Novata could it make difficult for MHS to recover loan funds from Novata. An inability for MHS to collect loan proceeds could worsen MHS's financial condition and increases the risk that MHS's vendors and subcontractors would not be paid in accordance with County contract terms.

**Finding II:**      **Transactions with Interested Persons**
The IRS requires tax exempt organizations to report business transactions with a family member of a current or former officer, director, trustee, or key employee.

According to IRS Form 990, Instructions for Schedule L, an organization must report business transactions with an interested person if compensation payments during the tax year by the organization to a family member of a current or former officer, director, trustee, or key employee of the organization exceeded $10,000. "Interested person" is defined as a family member of a current or former officer, director, trustee, or key employee.

Kimberly Bond is a current MHS officer. MHS's compensation to her husband, Dr. Conn, is not reported on Schedule L, Part IV. As a result, MHS may not be in compliance with IRS regulations.

> *Impact to the County:*  According to MHS's contract with the County, MHS is required to comply with all applicable federal, State, County, and local laws, rules, and regulations, current and hereinafter enacted. By not reporting business transactions with interested persons, MHS may be out of compliance with provisions of County contracts.

**Finding III:**      **Interlocking Directorates**
ACS reviewed a sample of direct expenditures claimed by MHS during FY 2014-15 and 2015-16. ACS identified two direct expenditures of $80 that were questionable. Based on supporting documentation, ACS determined that these expenditures were direct expenditures related to

information technology services provided by Novata. The first expense of $80 was an allocation of a $6,400 invoice. The second expense of $80 was an allocation of a different $2,640 invoice.

MHS failed to notify the County of the use of its for-profit subsidiary, Novata, as a provider of information technology services.

> *Impact to the County:* According to Board of Supervisors Policy A-79 - Interlocking Directorates - the County will not enter into service-type contracts with non-profit corporations who intend to subcontract with related for-profit subcontractors unless specifically authorized by the Board of Supervisors.
>
> MHS's failure to disclose to the County the use of a for-profit corporation appears to be a technical violation of Board Policy A-79. The financial impact is immaterial.

**Finding IV:**      **Management Fees Charged to Novata**

Indirect costs incurred by MHS include compensation of MHS staff that provides management, administrative and accounting services to Novata. According to MHS management, in order to offset costs of services provided to Novata, MHS's indirect costs are reduced by the management fees charged to Novata.

MHS did not provide the methodology used to determine the 10% management fee charged by MHS to Novata. As a result, OAAS was not able to validate whether the 10% management fee is an adequate offset from indirect costs.

As required by its contracts with the County, MHS must make available to County, State or federal officials for examination all records relating to the contracts at any time during normal business hours and as often as the County may deem necessary.

Further, OAAS reviewed the calculation for MHS's 15.2% proposed federal indirect rate for FY 2015-16 and noted that the management fees charged to Novata were not deducted from MHS's indirect costs.[14] OAAS recalculated the federal indirect rate by subtracting Novata's management fees from MHS's indirect costs and found the proposed federal indirect rate to be 14.6% which is still slightly higher than the rate charged to the County.

> *Impact to the County:* Indirect rate charged to the County may be affected resulting in overstated indirect expenses allocated to the County.

---

[14] The proposed Federal indirect rate calculation is used to support indirect rate charged to the County. The indirect rate charged to the County is lower than the proposed Federal indirect rate.

Office of Audits & Advisory Services

| Compliance | Reliability | Effectiveness | Accountability | Transparency | Efficiency |

V A L U E