# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BEHAVIORAL HEALTH INDUSTRY NEWS, INC. D/B/A OPEN MINDS, INC., | CIVIL ACTION NO. 1:16-CV-1874 |
| Plaintiff, | (Chief Judge Conner) |
| v. | |
| MENTAL HEALTH SYSTEMS, INC., | |
| Defendant | |

## MEMORANDUM

Plaintiff Behavioral Health Industry News, Inc. d/b/a Open Minds, Inc. ("Open Minds") alleges that defendant Mental Health Systems, Inc. ("Mental Health") failed to make payments to Open Minds in accordance with two contracts. (See Doc. 1). Presently before the court is Mental Health's motion (Doc. 5) to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), FED. R. CIV. P. 12(b)(2), or, in the alternative, to transfer this case to the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1404(a). For the reasons that follow, the court will deny the motion.

## I. Factual & Procedural Background

Open Minds is a Pennsylvania corporation with its principal place of business in the Commonwealth. (Doc. 1 at 11 ¶ 1). Open Minds offers consulting and other services in the health and human services field. (Id. at 12 ¶ 8). Mental Health is a California corporation that provides mental health and drug and alcohol rehabilitation services to California residents. (Id. at 11 ¶ 2; Doc. 6 at 3). Mental Health's services are primarily funded by San Diego County, with additional

funding from Riverside, Fresno, Santa Barbara, San Bernardino, and Contra Costa Counties. (Doc. 6 at 3) Mental Health does not provide any services in the Commonwealth of Pennsylvania. (Id.) It also does not receive state funding from the Commonwealth. (Id.)

Open Minds entered into four contracts with Mental Health, only two of which are subjects of the instant case. (Doc. 1 at 12-14 ¶¶ 10, 13 & n.1). The first contract involves Open Minds assisting Mental Health in identifying a software vendor for Mental Health's electronic healthcare records of California patients (the "Services Agreement"). (Id. at 12 ¶ 10). The contract features Open Minds' letterhead and originated in Pennsylvania before being sent to Mental Health in California. (Id. at 19). Mental Health also agreed to reimburse Open Minds "for any additional pre-authorized services billed monthly at . . . discounted hourly rates." (Id. at 13 ¶ 12). Mental Health and Open Minds signed this contract on December 21, 2010, and January 2, 2011, respectively. (Id. at 20). Mental Health paid Open Minds a $51,500 fixed fee under this contract. (Id. at 13 ¶ 15).

Appendix A of the Services Agreement enumerates Open Minds' contractual responsibilities in greater detail. (See id. at 21-22). Open Minds would first "conduct an on-site assessment and review" of Mental Health's "organizational materials" to determine Mental Health's requirements for an electronic healthcare records provider. (Id. at 21). The on-site assessment would be conducted over the course of a one-time, three-day site visit to Mental Health's facilities in California. (Id.) Open Minds also agreed to "assist [Mental Health] leadership with on-site vendor demonstrations," by providing "two one-day on-site visits." (Id. at 22).

Open Minds also entered into a Discounted Hourly Basis Agreement (the "Hourly Agreement") with Mental Health. (Id. at 13 ¶ 13). The Hourly Agreement proffered by Open Minds is a letter sent to Mental Health on August 3, 2011 by Monica Oss, president and founder of Open Minds. (Id. at 24). The letter states that Open Minds would "set up a new project number for ongoing consultation as requested." (Id.) The work contemplated would be billed at "[Open Minds'] discounted hourly rates, as per [the] original agreement." (Id. at 13 ¶ 13).

Mental Health requested and paid for Open Minds' consultation services pursuant to the Services Agreement and Hourly Agreement for four years. (Id. at 14 ¶¶ 16-18). Mental Health ceased making payments after July 1, 2015. (Id. at 14 ¶ 19). In the fall of 2015, Kim Bond ("Bond"), Mental Health's Chief Executive Officer, flew to Pennsylvania to discuss amounts due to Open Minds. (Id. at 14 ¶ 20). Open Minds received no subsequent payments despite Bond's alleged agreement to pay in full any amounts due from 2015 to 2016. (Id. at 14-15 ¶¶ 20-21).

Open Minds commenced this action in the Court of Common Pleas for Adams County on August 5, 2016. (Id. at 2 ¶ 1). Open Minds' complaint contains two counts: breach of contract and, in the alternative, unjust enrichment. (Id. at 15-17 ¶¶ 23-35). Open Minds alleges that Mental Health failed to make payments pursuant to the Services Agreement and the Hourly Agreement, totaling $236,045.08. (Id. at 15-16 ¶¶ 24-29). Mental Health timely removed the action to the Middle District of Pennsylvania on September 12, 2016. (Id. at 1-5). On September 19, 2016, Mental Health filed the instant motion (Doc. 5) to dismiss for lack of personal jurisdiction or, in the alternative, to transfer this case to the United States

3

District Court for the Southern District of California. The motion is fully briefed (Docs. 6, 7, 15) and ripe for disposition.

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may move to dismiss a complaint for lack of personal jurisdiction. FED. R. CIV. P. 12(b)(2). In ruling on a Rule 12(b)(2) motion, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well-pled factual allegations in the plaintiff's favor. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002); Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992). The court's review is not limited to the face of the pleadings, as consideration of affidavits submitted by the parties is both appropriate and required. See Carteret Sav. Bank, 954 F.2d at 146.

Even though the plaintiff bears the ultimate burden of proving personal jurisdiction over a defendant, Mellon Bank (East) PSFS Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992), the plaintiff need not make such a showing at the pleading stage of litigation. Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009). To survive a motion to dismiss, the plaintiff must merely allege sufficient facts to establish a *prima facie* case of jurisdiction over the defendant. Id.; Carteret Sav. Bank, 954 F.2d at 142 n.1.

Motions for dismissal or transfer based on the inconvenience of the forum require an individualized analysis of the facts of each case. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995); Lony v. E.I. Du Pont de Nemours & Co., 935 F.2d 604, 608-15 (3d Cir. 1991). The moving party bears the burden of proving,

by a preponderance of evidence, the facts supporting the inadequacy of the current venue and the benefits of the proposed location. Jumara, 55 F.3d at 879-80; Lony, 935 F.2d at 609. An evidentiary hearing is permissible, and sometimes necessary, but such motions may often be resolved on the basis of the undisputed allegations of the pleadings and affidavits submitted by the parties. See Plum Tree, Inc. v. Stockment, 488 F.2d 754, 756 (3d Cir. 1973); see 15 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE §§ 3828, 3844 (2d ed. 1986).

### III. Discussion

#### A. Personal Jurisdiction

Mental Health contends that it does not have sufficient minimum contacts with Pennsylvania to justify the court's exercise of personal jurisdiction. (Doc. 6 at 14, 16). Mental Health avers that it does not: (1) conduct business in the Commonwealth, (2) run any programs in the Commonwealth, or (3) receive any funding from the Commonwealth. (Id.) Open Minds rejoins that Mental Health purposefully directed its activities at the Commonwealth by requesting services from Open Minds, while knowing said services would be provided from and within the state. (Doc. 7 at 13).

A federal court may assert jurisdiction over a nonresident of the forum state to the extent authorized by the law of the forum. See FED. R. CIV. P. 4(k)(2). The Pennsylvania Long-Arm Statute grants jurisdiction coextensive with that permitted by the Due Process Clause of the Fourteenth Amendment. 42 PA. CONS. STAT. § 5322(b). The court's constitutional inquiry is guided by the "minimum contacts" test established in Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945). Under this test,

5

the plaintiff must show that the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe, 326 U.S. at 316 (internal quotations and citation omitted); see also Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007). The focus of the minimum contacts analysis is "the relationship among the defendant, the forum, and the litigation," Shaffer v. Heitner, 433 U.S. 186, 204 (1977), such that the defendant has fair warning that he may be subject to suit in that forum. Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001); Marten, 499 F.3d at 296. "[T]he mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 298 (1980) (internal citation omitted).

A federal court must possess one of two forms of personal jurisdiction to comport with these principles. See D'Jamoos *ex rel.* Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-15 (1984)). General jurisdiction allows a court to exercise its jurisdiction over any party that possesses "continuous and systematic" contacts with the forum state, regardless of whether the claim arises out of the party's forum-related activities. Helicopteros, 466 U.S. at 415 n.9; Marten, 499 F.3d at 296. Specific jurisdiction, on the other hand, allows the court to hear claims arising out of or relating to the party's contacts with the forum state. Helicopteros, 466 U.S. at 414 n.8; Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006).

6

Open Minds asserts only specific jurisdiction. (Doc. 7 at 13). To establish specific jurisdiction over a party, the court must find that (1) the party purposefully directed its activities at the forum; (2) the causes of action arise out of or relate to at least one of those activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice. See D'Jamoos, 566 F.3d at 102; Marten, 499 F.3d at 296.

   1.   *Minimum Contacts*

The purposeful availment and relatedness inquiries are often described collectively as requiring 'minimum contacts' between the defendant and the relevant forum. *In re* Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 548 (M.D. Pa. 2009) (citing Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 451 (3d Cir. 2003)). A party reaching out and creating continuing relationships and obligations satisfies the minimum contacts test in contractual disputes. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-74 (1985); Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 98-100 (3d Cir. 2004). The existence of a contract between a resident plaintiff and nonresident defendant, without more, is insufficient to establish defendant's minimum contacts with the resident forum. Mellon Bank, 960 F.2d at 1223.

Courts must consider the totality of the circumstances when determining whether minimum contacts exist. Remick v. Manfredy, 238 F.3d 248, 256 (3d Cir. 2001) (citing Mellon Bank, 960 F.2d at 1223); see Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prod. Co., 75 F.3d 147, 152-53 (3d Cir. 1996)). Of significant import are prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing. Remick, 238 F.3d at

7

256.  Additional considerations include where the services under the contract were performed and whether the challenging party should have known the services would be performed there.  See id.  While actual presence during pre-contractual negotiations, performance, and resolution of post-contract difficulties is generally factored into the jurisdictional determination, id. at 255-56, physical presence within the forum state is not required to establish minimum contacts.  O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312 at 317 (3d Cir. 2007) (citing Grand Entm't Grp., Ltd. v. Star Media Sale, Inc., 988 F.2d 476, 482 (3d Cir. 1993)).

The court finds that Mental Health has sufficient minimum contacts with Pennsylvania.  Mental Health actively pursued a business relationship with Open Minds and purposefully directed its business at Pennsylvania.  See D'Jamoos 566 F.3d at 102; Marten 499 F.3d at 296.  This case is not one of a resident claiming a connection to a non-resident through its own unilateral activity: Open Minds did not solicit the business of Mental Health.  See O'Connor, 496 F.3d at 317, 323.  Mental Health reached into the Commonwealth of Pennsylvania and solicited Open Minds' services.  (Doc. 1 at 12 ¶¶ 3-4).

Mental Health was physically present in Pennsylvania.  Bond traveled to the state in the fall of 2015.  (Doc. 1 at 14 ¶ 20; Doc. 7 at 14).  Open Minds alleges that the purpose of this visit was to discuss the "overdue invoices" that are the subject of Open Minds' complaint.  (Doc. 7-1 at 7-8 ¶¶ 26-27).  Taking Open Minds' allegations as true begets finding that Bond was in Pennsylvania to resolve a post-contractual dispute.  See Pinker 292 F.3d at 368.  Mental Health was not only physically present in Pennsylvania, but fully engaged in an on-going business relationship.  See

8

Burger King, 471 U.S. at 478.  The court finds that Bond's presence in Pennsylvania evidences Mental Health's minimum contacts with Pennsylvania.

The terms of the disputed contracts and the parties' course of dealing likewise support a finding of sufficient minimum contacts.  The parties executed the Services Agreement on Open Minds' letterhead, which prominently displays Open Minds' Commonwealth address.  (Doc. 1 at 19).  Despite Open Minds' two visits in California, Mental Health clearly understood that certain work was contemplated in the Commonwealth of Pennsylvania, see Remick, 238 F.3d at 256, and that the contract subjected it to the benefit of Pennsylvania law.  See Marten, 499 F.3d at 296.  Open Minds produced all of the deliverables pursuant to the Services Agreement and Hourly Agreement in the Commonwealth.  (Doc. 7-1 at 6 ¶¶ 12, 17, 18).  From approximately January 2011 until the end of June 2015, Mental Health received invoices from and remitted payment to Open Minds' Pennsylvania headquarters without protest.  (Doc. 1 at 14 ¶¶ 16-18; Doc. 7-1 at 7 ¶¶ 21-23).  Four years of solicitation of, and payment for, services from Open Minds in the Commonwealth provides a concrete nexus between Mental Health and the Commonwealth.  Miller Yacht Sales, Inc., 384 F.3d at 98.  This nexus and the terms of the contracts justify jurisdiction over Mental Health in the Commonwealth of Pennsylvania.

In support of its motion, Mental Health relies upon Vetrotex, where a Pennsylvania manufacturer and a California manufacturer engaged in "sporadic contacts" concerning a sales contract and a passive buyer.  Vetrotex, 75 F.3d at 149.  The matter *sub judice* is easily distinguishable.  Vetrotex was not a case where (1)

"the defendant solicited the contract or initiated the business relationship leading up to the contract;" (2) "the defendant sent any payments to the plaintiff in the forum state;" or (3) "the defendant engaged in extensive post-sale contacts with the plaintiff in the forum state." Id. at 152-53. Mental Health initiated contact with Open Minds. (Doc. 1 at 12 ¶ 4). Mental Health sent payments pursuant to the Services Agreement to Open Minds in the Commonwealth. (Id. at 13-14 ¶¶ 11, 15, 18). And Mental Health and Open Minds entered into several subsequent contracts. (Id. at 13-14 ¶¶ 13, 16 & n.1; Doc. 6-2 at 20-23, 25-26, 29-30). The Hourly Agreement in particular contemplates "ongoing consultation as requested." (Doc. 1 at 24). Together the contracts reveal a continuing business relationship spanning more than four years. (See Doc. 1 at 14 ¶¶ 16-18). Mental Health was therefore not a "passive buyer" of Open Minds' services. See Vetrotex, 75 F.3d at 152. Open Minds has met its *prima facie* burden of demonstrating Mental Health's minimum contacts with Pennsylvania.

### 2. *Fair Play and Substantial Justice*

The court must also inquire whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." See Int'l Shoe, 326 U.S. at 316. Jurisdiction is presumptively constitutional upon a finding of minimum contacts, and the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." See Burger King, 471 U.S. at 477. Showing an absence of fairness or lack of substantial justice requires the defendant to overcome a heavy burden. Grand Entm't Grp., 988 F.2d at 483. Determining jurisdictional reasonableness requires balancing the burden on

the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining efficient relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. O'Connor, 496 F.3d at 324 (citing Burger King, 471 U.S. at 477).

The court's exercise of personal jurisdiction in this case comports with fair play and substantial justice. To require Open Minds to litigate in California would impose a burden upon it substantially equivalent to Mental Health's burden in Pennsylvania. See O'Connor, 496 F.3d at 325. One of the parties to the matter *sub judice* will inevitably have to familiarize itself with a new legal system. See id. at 324. Litigating in Pennsylvania will satisfy Open Minds' interest in obtaining convenient and effective relief. See id. at 325. And while California's interest in adjudicating the dispute may be substantial—given that Mental Health is funded by its citizens—the Commonwealth of Pennsylvania has a "'manifest interest in providing effective means of redress' when a foreign corporation reaches into the state and solicits its citizens." Id. (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)). Mental Health has not overcome its heavy burden of showing that the court's exercise of personal jurisdiction fails to comport with traditional notions of fair play and substantial justice.

**B.    Venue**

Mental Health moves to transfer this action to the Southern District of California pursuant to 28 U.S.C. § 1404(a). (Doc. 5 at 1). A district court may transfer a case to any district "where it might have been brought" if transfer is "in

11

the interest of justice." 28 U.S.C. § 1404(a). Mental Health argues that the Southern District of California is an appropriate forum, (Doc. 6 at 17); Open Minds does not address this contention. (Doc. 7 at 18-22). The court finds that California has jurisdiction over Mental Health, given that Mental Health is a resident of California. See CAL. CIV. PROC. CODE § 410.10 (2017); (Doc. 1 at 11 ¶ 2). Venue is proper in the Southern District of California pursuant to 28. U.S.C. § 1391(b)(1), which states that an action may be brought in a judicial district where the defendant resides. See 28 U.S.C. § 1391(b)(1); (Doc. 1 at 11 ¶ 2). The court will weigh private and public interests to determine whether the interests of convenience and justice would be better served by transfer under 28 U.S.C. § 1404(a). Jumara, 55 F.3d at 879 (citation omitted).

    **1.**  ***Private Interest Factors***

The court first considers (1) the plaintiff's choice of forum; (2) the defendant's forum preference; (3) where the claims arose; (4) the convenience of the parties as indicated by their physical and financial condition; (5) the convenience of the witnesses (to the extent of their unavailability for trial in one of the fora); and (6) the location of documents and other evidence. Id. Mental Health advances arguments regarding factors three, five, and six.

At the outset, it is axiomatic that a plaintiff's choice of venue "should not be lightly disturbed." Jumara, 55 F.3d at 879 (citations omitted); Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). The deference accorded a plaintiff's choice of forum is somewhat diminished when the conduct complained of did not occur in

12

plaintiff's selected forum.  Sinclair Cattle Co. v. Ward, 80 F. Supp. 3d 553, 564 (M.D. Pa. 2015) (citing Lomanno v. Black, 285 F. Supp. 2d 637, 644 (E.D. Pa. 2003)).

Mental Health argues that the central events of the case *sub judice* occurred in California, (Doc. 6 at 19), and in the process it mischaracterizes the parties' dispute.  The instant case is not one concerning "excessive billings and possible fraud" rendered upon Mental Health, (id.), but one concerning Mental Health's alleged breach of contract.  (Doc. 1 at 15-17 ¶¶ 23-35).  To determine "where the claims arose" in a breach of contract case, courts look to where the contract was negotiated, executed, performed, and breached.  Bolus v. Morrison Homes, Inc., No. 07-1978, 2008 WL 4452658, at *3 (M.D. Pa. Sept. 30, 2008) (citing Leone v. Cataldo, No. 07-3636, 2008 WL 3495634, at *10 (E.D. Pa. Aug. 11, 2008)).  Venue will ordinarily lie in the district where the contract was to be performed, Waste Mgmt. of Pa., Inc. v. Pollution Control Fin. Auth. of Camden Cty., No. 96-1683, 1997 WL 22575, at *1 (E.D. Pa. Jan. 21, 1997), or where the benefits of the contract were to be received.  Keating v. Whitmore Mfg. Co., 981 F. Supp. 890, 893 (E.D. Pa. 1997) (quoting Bostic v. Ohio River Co. (Ohio Division) Basic Pension Plan, 517 F. Supp. 627, 636 (S.D. W. Va. 1981) (internal citations omitted)).

Open Minds' claims arose in the Commonwealth.  Mental Health solicited Open Minds in the forum state.  (Doc. 1 at 12 ¶ 4).  Open Minds drafted at least one of the disputed contracts in the Commonwealth, (id. at 19), and developed "a substantial amount of the work product" in the Commonwealth.  See Bolus, 2008 WL 4452658, at *3; (Doc. 1 at 12 ¶¶ 5, 7).  Mental Health remitted payments to Open Minds in the forum state, and the breach at issue occurred when Mental Health

13

allegedly discontinued payment. (Doc. 1 at 13-15 ¶¶ 11, 15, 18, 19, 21-22). But for the alleged breach, the contract benefits set to accrue to Open Minds in the Commonwealth would have come to fruition. See Keating, 981 F. Supp. at 893. Open Minds' claims therefore arose in the Commonwealth.

Mental Health also asserts that the location of key witnesses supports transfer to California. The court finds this argument unconvincing for two reasons. First, Mental Health does not adequately specify its "key" witnesses, as is its responsibility. See Sinclair, 80 F. Supp. 3d at 565 (citations omitted). Bond, David Conn, and Michael Hawkey, current and former employees of Mental Health, are the only witnesses clearly identified. (Doc. 6 at 19-20). A conclusory claim that "witnesses would be forced to travel from California to Pennsylvania and would therefore be required to incur undue hardships such as loss of work" is too vague and too tenuous to satisfy Mental Health's burden. See Sinclair, 80 F. Supp. 3d at 565. Second, assuming *arguendo* that Mental Health's identified witnesses are essential, Mental Health has not demonstrated that these witnesses would be unavailable for trial. Jumara, 55 F.3d at 879; (Doc. 15 at 10-11). Defendant's arguments concerning location and availability of witnesses do not weigh heavily in favor of transfer.

Mental Health further submits that key documents concerning Open Mind's work and fraud are located in California. (Doc. 6 at 20). *Per contra*, evidence regarding Open Minds' breach of contract and unjust enrichment claims—including, *inter alia*, the contracts themselves, invoices, and receipts—are all located in the Commonwealth. (Doc. 7 at 21). Any relevant documents or evidence

located in California could easily be "photographically reproduced" here in the Commonwealth. See Wise v. Williams, No. 10-CV-02094, 2011 WL 2446303, at *12 (M.D. Pa. May 18, 2011), report and recommendation adopted, No. 10-CV-2094, 2011 WL 2436524 (M.D. Pa. June 15, 2011) (citing Kovatch Corp. v. Rockwood Sys. Corp., 666 F.Supp. 707, 709 (M.D. Pa. 1986)). The location of documents and other evidence therefore does not support transfer.

### 2. *Public Interest Factors*

Having determined that Mental Health has failed to satisfy its burden of proof in the private factors arena, the court shifts its attention to the public interest factors. Those factors include: (1) the enforceability of the judgment; (2) practical considerations regarding trial; (3) relative administrative difficulty in the two fora due to court congestion; (4) the interest in deciding local controversies; (5) the public policies of the two fora; and (6) the court's familiarity with the applicable state law in diversity cases. Jumara, 55 F.3d at 879-80. Some of these public interest factors may "play no role" in the § 1404(a) balancing analysis. Lomanno, 285 F. Supp. 2d at 647.

Mental Health argues that California, and San Diego in particular, has a strong interest in seeing this case adjudicated in the Southern District of California. (Doc. 6 at 20-21). This interest stems from the state of California's role in providing funds to Mental Health, and Mental Health providing services to California residents. (Id.) California's strong interest in this matter weighs in favor of transfer. See Ritz-Craft Corp. of Pa., Inc. v. The Price Home Grp., LLC, No. 15-CV-

15

02405, 2016 WL 3742875, at *3 (M.D. Pa. July 13, 2016). But Mental Health's burden is not met by the strength of this factor alone.

Mental Health's only other argument is that California law likely applies. Pennsylvania choice of law rules state that "in cases involving contract disputes, the state having the most interest in the controversy and which is most intimately concerned with the outcome is the forum whose law should be applied." Shannon v. Keystone Info. Sys., Inc., 827 F. Supp. 341, 343 (E.D. Pa. 1993). In determining which forum has the most significant contact, the court must consider: (1) the place of negotiation, contracting, and performance of the contract; (2) the location of the subject matter of the contract; and (3) the parties' citizenship. Id. As discussed *supra*, the contracts originated from Open Minds in Pennsylvania, Open Minds performed contractual obligations in Pennsylvania, and post-contractual negotiations occurred in Pennsylvania. (Doc. 1 at 12, 14 ¶¶ 4, 5, 7, 20). Despite California's interest in the well-being of a party that it funds, it is by no means certain that California law would apply. The Commonwealth's interest in deciding a controversy stemming from Pennsylvania contacts supports retaining the action in this forum. See Sinclair, 80 F. Supp. 3d at 566. These considerations weigh against transfer.

After balancing the relevant private and public interest factors and considering the arguments posited by the parties, the court concludes that transfer to the Southern District of California would promote neither "the convenience of the parties and witnesses" nor "the interests of justice." 18 U.S.C. § 1404(a). Mental Health has failed to meet its burden of demonstrating that the factors favor transfer.

See Jumara, 55 F.3d at 879-80; Lony, 935 F.2d at 609.  The suit will remain in the Middle District of Pennsylvania.

**IV.   CONCLUSION**

For the above stated reasons, the court will deny Mental Health's motion (Doc. 5) to dismiss for lack of personal jurisdiction, or, in the alternative, to transfer the case to the Southern District of California.  An appropriate order shall issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    May 4, 2017